**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------- X

Towaki Komatsu,

                 Plaintiff,

      -vs-

The City of New York, NYPD Detective Raymond Gerola
(shield #: 6577), NYPD Lieutenant Ralph Nieves, NYPD
Detective Nicholas Mason (shield #: 6995), NYPD Officer
Lance (shield #: 245), NYPD Officer Santana (shield #: 7291),
Rachel Atcheson, Pinny Ringel, Harold Miller, Nick Gulotta,
Jessica Ramos, Eric Phillips, Jane Doe3 9/26/17, Dustin
Ridener, John Doe1 Tablet 9/26/17, Bill de Blasio, James
O'Neill, Gale Brewer, NYPD Inspector Howard Redmond,
Marco Carrion, James Clynes, NYPD Officer Keck (shield #:
6313), NYPD Officer Baez (shield #: 5984), NYPD Officer
Jerry Ioveno (shield #: 5560), NYPD Officer Keith Dietrich
(shield #: 5779), NYPD Officer John Doe1 9/26/17, NYPD
Officer John Doe2 9/26/17, NYPD Officer Jane Doe1 9/26/17,
NYPD Officer Jane Doe2 9/26/17, NYPD Officer Jane Doe3
9/26/17, NYPD Officer John Doe1 9/27/17, NYPD Officer
John Doe2 9/27/17, NYPD Officer John Doe4 9/27/17, NYPD
Officer John Doe4 9/27/17, NYPD Officer John Doe1 9/28/17,
NYPD Officer John Doe2 9/28/17, NYPD Officer John Doe3
9/28/17, NYPD Officer Jane Doe1 9/28/17, NYPD Officer Jane
Doe2 9/28/17, NYPD Officer Jane Doe3 9/28/17, NYPD
Officer Jane Doe4 9/28/17


- All of the defendants listed above who are people are being
  sued in their individual and official capacities,

                Defendants.

-------------------------------------------------- X

**COMPLAINT**


**JURY DEMAND**

**TABLE OF CONTENTS**

I.   Preliminary Remarks .................................................................................. 3

II.  Jurisdiction ................................................................................................. 44

III. Parties ......................................................................................................... 44

IV.  Legal Standards and Background Facts ..................................................... 62

V.   Statement of Facts ..................................................................................... 134

     A.  The Mayor's 9/26/17 town hall ........................................................ 134

     B.  The Mayor's 9/27/17 resource fair ................................................... 175

     C.  The Mayor's 9/28/17 town hall ........................................................ 184

VI.  Causes of Action ........................................................................................ 195

VII. Jury Demand ............................................................................................... 207

VIII. Prayer for Relief ........................................................................................ 207

Plaintiff Towaki Komatsu (hereinafter referred to in the first-person as "I", "me", and "my"), proceeding pro se in this action, does hereby state and allege all that follows in this pleading.

## PRELIMINARY REMARKS

1.     The following applies throughout this complaint in the interests of brevity:

   a.  Acronyms and aliases in the second column of the following table will be used throughout this pleading instead of the entries in the third column to which they correspond:

| # | Abbreviation | Corresponds To |
|---|---|---|
| 1 | CCRB | New York City Civilian Complaint Review Board |
| 2 | City Council | New York City Council |
| 3 | Defendant City | Defendant City of New York |
| 4 | DHS | New York City Department of Homeless Services |
| 5 | DOE | New York City Department of Education |
| 6 | DOI | New York City Department of Investigations |
| 7 | DOJ | U.S. Department of Justice |
| 8 | DSS | New York City Department of Social Services |
| 9 | FOIL | Freedom of Information Law |
| 10 | FRCP | Federal Rule of Civil Procedure |
| 11 | HRA | New York City Human Resources Administration |
| 12 | IAB | The NYPD's Internal Affairs Bureau |
| 13 | The Mayor | New York City Mayor Bill de Blasio |
| 14 | Mayor's 4/27/17 town hall | The public town hall meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, New York City Councilman Jimmy Van Bramer, and other government officials as a mostly traditional public forum on 4/27/17 in Long Island City in Queens that was subject to New York State's Open Meetings Law and was used a campaign event to support the Mayor's re-election interests that I was illegally barred from attending while I had active litigation against HRA. |

| 15 | Mayor's 9/8/17 public hearing | The public hearing that the Mayor conducted on 9/8/17 at 2 pm in the Blue Room in City Hall that partly concerned proposed legislation about reforming the NYPD as I was illegally prevented from attending that hearing. That public forum was subject to New York State's Open Meetings Law and I was illegally barred from attending it while I had active litigation against HRA that included claims about being illegally barred from public forums that the Mayor conducted. |
|----|----|----|
| 16 | Mayor's 9/14/17 town hall | The public town hall meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, New York City Councilman Chaim Deutsch, and other government officials as a mostly traditional public forum on 9/14/17 at 2525 Haring Street in Brooklyn. That public forum was subject to New York State's Open Meetings Law and I was illegally barred from attending it from within the room in which it was conducted while I had active litigation against HRA that included claims about being illegally barred from public forums that the Mayor and Mr. Banks conducted. |
| 17 | Mayor's 9/26/17 town hall | The public town hall meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, former New York City Councilman Dan Garodnick, and other government officials as a mostly traditional public forum on 9/26/17 at 245 East 56th Street in Manhattan. That public forum was subject to New York State's Open Meetings Law and I was illegally barred from attending it from within the room in which it was conducted while I had active litigation against HRA that included claims about being illegally barred from public forums that the Mayor and Mr. Banks conducted. |
| 18 | Mayor's 9/27/17 resource fair | The public resource fair meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, and other government officials as a mostly traditional public forum on 9/27/17 at 3940 Broadway in Manhattan. That public forum was subject to New York State's Open Meetings Law and I was illegally barred from attending it while I had active litigation against HRA that included claims about being illegally barred from public forums that the Mayor and Mr. Banks conducted. |

| 19 | Mayor's 9/28/17 town hall | The public town hall meeting that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, former New York City Councilman Melissa Mark-Viverito, and other government officials as a mostly traditional public forum on 9/28/17 at 1833 Lexington Avenue in Manhattan. That public forum was subject to New York State's Open Meetings Law and I was illegally barred from attending it while I had active litigation against HRA that included claims about being illegally barred from public forums that the Mayor and Mr. Banks conducted. |
|----|---------------------------|----------------------------------------------------------------------------------|
| 20 | Mayor's CAU | The Mayor's Community Affairs Unit |
| 21 | Mr. Banks | HRA Commissioner Steven Banks |
| 22 | My HRA lawsuit | The hybrid lawsuit that I commenced against HRA in January of 2017 that corresponds to _Komatsu v. New York City Human Resources Administration_, No. 100054/2017 (Sup. Ct., New York Cty.) and is being appealed. I asserted claims in that case that my claims in this case relate back to and amplify. Prior to 6/8/17, I asserted claims in that case that concerned illegal acts and omissions that were committed against me by defendants in this action that caused me to have been illegally barred from attending both the Mayor's 4/27/17 town hall and the Mayor's 5/23/17 public resource fair meeting. |
| 23 | My X1 lawsuit | The related case that I commenced against the City of New York, Defendant Nieves, and others in April of 2018 that corresponds to the ongoing case of _Komatsu v. City of New York_, No. 18-cv-3698 (LGS)(GWG)(S.D.N.Y.) that my claims in this case relate back to and amplify. The judges in that case refused to grant me sufficient time to file a further amended complaint in that case that would have otherwise enabled me to assert my claims in that case instead of in this case. In fact, Judge Lorna Schofield explicitly directed me to instead commence a new civil action for additional claims that I sought to assert in that case. |
| 24 | My X2 lawsuit | The related case that I commenced against the City of New York, Mr. Banks, and others on 8/14/20 that corresponds to the ongoing case of _Komatsu v. City of New York_, No. 18-cv-6510(LLS)(S.D.N.Y.) that my claims in this case relate back to and amplify. |
| 25 | My X3 lawsuit | The related case that I commenced against the City of New York, Defendant Nieves, and others on 8/29/20 that corresponds to the ongoing case of _Komatsu v. City of New York_, No. 18-cv-7046 (S.D.N.Y.) that my claims in this case relate back to and amplify. |

| 26 | My X4 lawsuit | The related case that I commenced against the City of New York as well as Defendants Gerola, Nieves, and others on 9/13/20 that corresponds to the ongoing case of *Komatsu v. City of New York*, No. 18-cv-7502(S.D.N.Y.) that my claims in this case relate back to and amplify. |
| 27 | NTT Data, Inc. | NTT |
| 28 | NYAG | New York State Attorney General's Office |
| 29 | OCA | New York State Office of Court Administration |
| 30 | OTDA | The New York State Office of Temporary and Disability Assistance |
| 31 | Second Circuit | United States Court of Appeals for the Second Circuit |
| 32 | Urban | Urban Pathways, Inc. It is the slumlord for the building in which I reside. |

2.      Every reference that I make in this pleading that concerns my efforts to have attended the Mayor's **a)** 9/26/17 town hall, **b)** 9/27/17 resource fair, and **c)** 9/28/17 town hall concerns those that I made to have lawfully attended them from within the room in which they were conducted as they were conducted for all 3 of those public forums as well as **b)** shortly before and after they began and ended with respect to the Mayor's 9/26/17 and 9/28/17 town hall.

3.      The Mayor's office and others New York City government officials arranged to have identical public notices issued on the Internet about the Mayor's **a)** 9/26/17 town hall, **b)** 9/27/17 resource fair, and **c)** 9/28/17 town hall that identified when and where they would be conducted, how the public could register in advance to attend them, organizations that sponsored those events, and the members of the City Council who would moderate the Mayor's 9/26/17 and 9/28/17 while the Mayor, them, and other government officials were running for re-election. True copies of those public notices appear within the annexed **Exhibit 1**.

4.      A public notice for the Mayor's 9/26/17 town hall was posted on 9/25/17 at 1:08 pm on the Twitter account that has the username of "@DanGarodnick" that is registered to former City Councilman Dan Garodnick. That Twitter posting is available on the Internet at https://twitter.com/DanGarodnick/status/912363225873895424.

5.      A public notice for the Mayor's 9/27/17 resource fair was posted on 9/20/17 at 8:22 pm

on the Twitter account that has the username of "@nycgov" that is registered to the City of New

York. That Twitter posting is available on the Internet at

https://twitter.com/nycgov/status/910660348092583936.

6.      A public notice for the Mayor's 9/28/17 town hall was posted on 9/26/17 at 10:37 am on

the Twitter account that has the username of "@galeabrewer" that is registered to Manhattan

Borough President Gale Brewer. That Twitter posting is available on the Internet at

https://twitter.com/galeabrewer/status/912687603652202496.

7.      The following shows the e-mail message that I sent on 9/20/17 at 2:37 pm to the e-mail

address that the Mayor's office used to process registrations for the Mayor's 9/26/17 town hall to

register in advance to attend that public forum:

> **From:** Towaki Komatsu <towaki_komatsu@yahoo.com>
> **Subject:** RSVP for 9/26/17 public Town Hall meeting with New York City's Mayor
> **Date:** September 20, 2017 at 2:37:20 PM EDT
> **To:** manhattantownhall@cityhall.nyc.gov
>
> My name is Towaki Komatsu
>
> This e-mail serves as my RSVP for the 9/26/17 public Town Hall meeting New York
> City's Mayor will hold.
>
> Pursuant to New York State's Open Meetings Law, I have a legal right to attend that
> public town hall meeting.
>
> Any attempt to hinder my ability to attend it will constitute a violation of both that law
> and the federal criminal statute that concerns obstruction of justice, specifically 18 U.S.C.
> 1512.
>
> Any such attempt to hinder my ability to attend that public meeting will be severely dealt
> with from a legal standpoint.

8.      The information that I expressed in that e-mail message was in response to the fact that

members of the Mayor's staff and members of the Mayor's NYPD security detail repeatedly

committed illegal acts and omissions with other government personnel that include New York State court officers and other members of the NYPD against me while I was conducting myself in an entirely lawful manner that caused me to be illegally and repeatedly prevented from attending public town hall meetings, public resource fair meetings, and a public hearing from within the rooms in which members of the public conducted them in a collaborative manner with the Mayor and other government officials as they were conducted on 4/27/17, 5/23/17, 6/8/17, 7/12/17, 8/30/17, 9/8/17, 9/14/17. Those illegal acts and omissions against me were again committed against me on 9/26/17, 9/27/17, and 9/28/17 in relation to my efforts to have lawfully attended the Mayor's 9/26/17 town hall, 9/27/17 resource fair, and 9/28/17 town hall from within the rooms in which they were conducted as they were conducted by the same criminals who previously committed them against me at public forums on the dates that I just listed as well as new accomplices that they partnered with. The illegal acts and omissions that were perpetrated against me on 9/26/17, 9/27/17, and 9/28/17 in relation to my efforts to lawfully attend the town hall and resource fair meetings that the Mayor conducted then occurred while I continued to engage in protected activities through **a)** my HRA lawsuit that was ongoing in which I had active claims about having been previously barred fro the Mayor's 4/27/17 town hall and 5/23/17 resource fair and **b)** whistleblowing about matters of both public and private concern against the Mayor's administration, its business partners, the NYPD, and other government personnel.

9.      Those illegal acts and omissions against me were in furtherance of an ongoing campaign of harassment and unequal treatment against me that lacked a rational basis and were committed against me at public forums. That campaign was comprised of patently illegal acts that were unofficial practices, customs, and policies that were devised, executed, condoned, ignored, ratified, illegally covered-up, and coordinated by and among senior policymakers that include the

Mayor and Defendant O'Neill, senior members of the Mayor's staff that include Defendants Ramos, Carrion, Miller, and Ringel; and Defendant Redmond. The following patently illegal acts against me comprised that campaign and were again illegally executed against me on 9/26/17, 9/27/17, and 9/28/17 at the sites of the Mayor's town hall meetings and resource fair meeting that were conducted on those dates in relation to my efforts to have lawfully attended them:

a. Whistleblower retaliation.

b. Voter suppression and voter fraud in violation of the Hatch Act (5 U.S.C. §1502(a)(1)) for the benefit of the Mayor, Mr. Banks, members of the City Council, themselves, and other government personnel while the Mayor, members of the City Council, and other government officials were then running for re-election and using those public forums as campaign events to attract support that includes publicity while illegally marginalizing criticism against the Mayor, his administration, the NYPD, members of the City Council, and other government officials during those public forums partly by illegally denying such critics access to the rooms in which those public forums were conducted as they were conducted.

c. Prior restraints on First Amendment rights.

d. Abuse of process, viewpoint discrimination, standardless discretion, other discrimination that includes illegal segregation.

e. Violations of due process, equal opportunity, and selective-enforcement that corresponds to the class-of-one legal theory and is tied to an illegitimate animus.

f. Failure to intervene on my behalf by members of the NYPD and members of the Mayor's staff to fully comply with and uphold my constitutional rights at the sites of public town hall, public resource fair, and public hearings that the Mayor and other

government officials conducted on the dates when they were conducted as well as a publicity stunt that the Mayor illegally conducted in a subway station near City Hall in violation of the MTA's rules as members of the NYPD, Mayor's staff, and other government officials flagrantly committed illegal acts and omissions against me in their immediate presence as they exhibited a deliberate indifference about that in furtherance of a conspiracy to violate and illegally condone such illegal acts and omissions against me.

g.  Unofficial arrests by a show of authority in violation of the Fourth Amendment of the First Amendment right to lawfully access, assemble, petition for redress, and receive and disseminate information in public forums.

h.  Harassment and reprisals in response to protected activities I engaged in against them and otherwise tried to engage in against them since 4/27/17. On 9/8/17, NYPD Officer Cruz (shield # 751) and someone else I don't know and yet suspect was Defendant Nieves illegally prevented me from attending a public hearing that the Mayor conducted in City Hall at 2 pm in its Blue Room that was partly about proposed legislation for reforming how the NYPD operates. I intended to testify in that hearing against both of them, the Mayor, other members of the Mayor's NYPD security detail, other members of the NYPD, and members of the Mayor's staff.  On 9/8/17, Mr. Cruz was personally involved in having illegally prevented me from walking past him shortly after 1:50 pm to enter City Hall to testify in the public hearing that I just discussed while he was then assigned to the NYPD guardhouse that is located just inside of the entrance to City Hall by Park Row. The NYPD thereafter illegally didn't provide me video recordings from its video security cameras in that

area in response to a timely FOIL demand that I submitted for those public records.
Instead, the NYPD illegally destroyed that evidence. I sought those video recordings
from the NYPD to decisively establish the fact that both Mr. Cruz and I were at that
guardhouse as Mr. Cruz illegally prevented me from lawfully attending that public
hearing. Protected activities that I managed to engage in against the Mayor's NYPD
security detail and other members of the NYPD on and after 4/27/17 were by
reporting entirely valid complaints to the CCRB, DOI, IAB, DOJ, NYAG, City
Council, New York City Public Advocate's office, Mayor, Defendant O'Neill, people
I later learned were whistleblower news censors in journalism, and in my HRA
lawsuit. The following are among the ways that I did so:

    i.   I engaged in protected whistleblowing against Defendant Redmond in remarks
that I made at the elapsed time of 37 seconds in a video recording that I
recorded with my cell phone of the Mayor on 9/26/17 at 12:33 pm in the
presence of whistleblower news censors in journalism as the Mayor stood in
front of a building in which he resided while he was a student of New York
University. . I inadvertently recorded that video upside-down. A properly
rotated version of that video is available on the Internet at
https://drive.google.com/file/d/1hdNYP3AOw4Oi9RPpzItXsvOINQQvm1R8/
view?usp=sharing. That whistleblowing concerned Defendant Redmond's
status as the defendant in _Sherrard v. City of New York_, No. 15-cv-7318 (MB)
(S.D.N.Y. Jun. 13, 2018). Mr. Redmond blatantly and materially lied as he
testified in that case at trial while I attended it and in a deposition that he gave
on 5/19/17. The New York City Law Department provided me a copy of that

deposition and a video recording that jointly confirm that Defendant Redmond

lied during that deposition about why he illegally directed other members of

the NYPD to cause the plaintiff in that case to be stopped as he lawfully rode

a bicycle on Lafayette Street toward Leonard Street in front of the New York

City Family Court on 9/17/12 as Mr. Redmond lied in that deposition by

fraudulently claiming that Mr. Sherrard was then blocking a car that he was

driving. The video recording that the New York City Law Department

provided to me of that incident clearly confirms that Mr. Redmond lied about

that because it shows Mr. Redmond driving in the middle of a street while Mr.

Sherrard was lawfully riding a bicycle along the far-left side of that roadway

at a distance from the front of Mr. Redmond's car that was more than two car

lengths from it as other bicyclists behind Mr. Sherrard whose conduct he

didn't control also separated where he then was from where Mr. Redmond's

car was.

ii.   I similarly engaged in protected whistleblowing against Defendant Redmond

about _Sherrard v. City of New York_ and Michael Gartland's status as a censor

in journalism in remarks that I made at the elapsed times of **a)** 14 seconds and

**b)** 38 seconds in a video recording that I recorded with my cell phone of the

Mayor on 9/26/17 at 1:20 pm in the presence of whistleblower news censors

in journalism as the Mayor stood near the building in which he resided while

he was a student of New York University. A copy of that video is available on

the Internet at

https://drive.google.com/file/d/15h47dqh6hRaLhTnidqFGWqR5EIUspEkI/vie

w?usp=sharing. That video recording confirms that I explicitly asked the Mayor at the elapsed time of 4 seconds if I could attend the public town hall meeting that he would conduct on that date without getting a response from him. Ms. Ramos appears in that video at the elapsed time of 31 seconds.

iii.  I began asserting claims in my HRA lawsuit against Defendant Redmond, Gerola, and other members of the NYPD on 5/19/17 through an order to show cause application that I filed in that case. That occurred before a senior aide to the Mayor named Jaclyn Rothenberg who worked for him in a capacity that was related to a spokeswoman sent an e-mail message on 6/28/17 at 5:18 pm that confirms that she **a)** illegally had access to information about updates in my HRA lawsuit that was then sealed at my request since January of 2017 and **b)** communicated that information to Defendants Redmond, Ramos, Carrion, and Phillips as well as to other senior members of the Mayor's staff that included Emma Wolfe (the Mayor's Chief of Staff), Andrea Hagelgans, Michael Casca, Kayla Arslanian. The following screenshot shows that e-mail message that I received from the Mayor's office with other records on 2/15/19 in response to a FOIL demand that I submitted to it on 7/1/17 to be provided all records that the Mayor's administration had about me.

From: Rothenberg, Jaclyn
Sent: Wednesday, June 28, 2017 17:18
To: Ramos, Jessica
Cc: Phillips, Eric; Redmond, Howard DI.; Hagelgans, Andrea; Casca, Michael; Arslanian, Kayla; Carrion, Marco A.; Wolfe, Emma
Subject: RE: town halls

Confirmed that he appeared at 4WTC on June 6 and served an Order to Show Cause. That OSC and another pending matter were submitted to the court for a decision on June 7. HRA is still waiting for the written decision.

Ms. Ramos thereafter committed defamation against me in an e-mail message that she sent to Erin Durkin on 6/28/17 at 5:42 pm in which she stated the following as he lied about both legal filings that were submitted in my HRA lawsuit and disruptive behavior that I never exhibited in June of 2017 at HRA's offices located at 150 Greenwich Street in Manhattan while lawfully serving legal papers upon HRA in conjunction with my HRA lawsuit.

> "Mr. Komatsu has been served an Order to Show Cause due to his appearance at HRA in June, when he showed disruptive behavior. That OSC and another pending matter were submitted to the court for a decision on June 7. HRA is still waiting for the written decision."

Contrary to Ms. Ramos' lies, I was never served an order to show cause application to which she referred in the following excerpt from that e-mail message an no such order to show cause application was filed in my HRA lawsuit by an attorney for HRA. Instead, it was my order to show cause application that I lawfully served upon HRA and filed in my HRA lawsuit. Prior to lying about me then, Ms. Ramos lied about me earlier as she stated the following remarks in an e-mail message that she sent to Ms. Durkin and Defendant Phillips at 3:27 pm on 6/28/17:

**From:** Ramos, Jessica
**Sent:** Wednesday, June 28, 2017 3:27 PM
**To:** Erin Durkin
**Cc:** Phillips, Eric
**Subject:** RE: town halls

Hi Erin,

Mr. Komatsu has never RSVP'd to a town hall. He is allowed to enter the overflow room.

Contrary to Ms. Ramos' lie in the preceding excerpt from that e-mail message, I RSVP'd in advance for every public town hall and public resource fair meeting that the Mayor conducted that I attempted to attend and Ms. Durkin thereafter sent her an e-mail message in which she tactfully pointed out that she was aware that Ms. Ramos had blatantly lied to her about that. Also, her remark in that e-mail message about me being allowed to "enter the overflow room" for town hall meetings that the Mayor conducted with others is a clear smoking gun that substantiates my claims in this action because it decisively establishes that a premeditated illegal scheme existed among senior members of the Mayor's staff to prospectively subject me to an illegal prior and pre-emptive restraint without any due process on my rights pursuant to the First Amendment, Fifth Amendment, and Fourteenth Amendment to lawfully assemble in the specific rooms in which the Mayor conducted public town hall meetings as they were conducted by illegally preventing me from being in those rooms during those public forums.

iv.  I thereafter filed a new order to show cause application in my HRA lawsuit as recently as 9/18/17 in which I requested to be granted relief that would compel the City of New York to enable me to attend whichever town hall,

resource fair, and public hearings that the Mayor conducted within the rooms in which they were conducted as they were conducted before Defendant Clynes and New York State Supreme Court Judge Alexander Tisch illegally and willfully delayed that application from being promptly and properly reviewed on the merits while Mr. Clynes was trying to be elected as a New York City Civil Court judge and was Judge Tisch's court attorney. He thereafter literally sat in the front row during the Mayor's 9/26/17 town hall after he was recorded on video on 9/26/17 as he walked right by Defendant Gerola and I to enter the school that hosted that town hall.

v.   I engaged in protected whistleblowing against Defendant Gerola and other members of the Mayor's NYPD security detail in discussions that I had with a whistleblower news censor in journalism named Michael Gartland on 5/23/17 inside of the Bronx Supreme Court while that was recorded on video and 7/16/17 after he and other whistleblower news censors in journalism witnessed a conversation that I had with the Mayor in a small park named Clement Clarke Moore Park in the Chelsea District of Manhattan that another whistleblower news censor in journalism named Grace Rauh was also then in.

vi.   I engaged in protected whistleblowing against the Mayor's NYPD security and New York State Court officers who illegally prevented me from attending the Mayor's 4/27/17 town hall and 5/23/17 resource fair on 5/23/17. I did so by promptly telling Jumaane Williams and Brad Lander during a meeting that was conducted in lower Manhattan near 200 West Street that I was illegally prevented from attending the Mayor's 5/23/17 resource fair by members of

the Mayor's NYPD security detail. Back then, Mr. Williams was a member of the City Council. He is now the New York City Public Advocate and I have no reason to believe that he took any appropriate action in response to my complaints against members of the Mayor's NYPD security detail.

vii.   I engaged in protected whistleblowing against the Mayor's NYPD security and New York State Court officers who illegally prevented me from attending the Mayor's 4/27/17 town hall and 5/23/17 resource fair on 5/24/17 during a meeting that Eric Schneiderman conducted with New York State Assemblywoman Liz Krueger that was conducted at the CUNY Graduate Center that is located at the intersection of Fifth Avenue and 34th Street in Manhattan. Mr. Schneiderman was then the New York State Attorney General. I did so then by writing questions about that on a comment card I was given during that meeting that I handed back to see if Mr. Schneiderman would address my questions on that card. While serving as the moderator for that meeting, Ms. Krueger didn't ask him anything about what was written on the comments card that I submitted. Prior to submitting that comments card, I recorded the questions that I wrote on that card in a Microsoft Word file largely because I presciently anticipated that either Mr. Schneiderman would prove to be too spineless to answer my questions during that meeting or Ms. Krueger would be too spineless to ask them during it.

viii.   I reported entirely valid complaints to the DOJ on 6/5/17 against Defendants Redmond, Gerola, Nieves, and other members of the NYPD before I received letter dated 8/28/17 fro Lara Eshkenazi in her capacity as the co-chief of the

DOJ's civil rights unit for the U.S. Attorney's Office for the Southern District of New York in which she lied by claiming that the complaints that I reported to the DOJ didn't appear to implicate a violation of federal civil rights laws over which her office had jurisdiction. Contrary to that lie, her office had jurisdiction over aspects of my complaints that corresponded to violations of 42 USC §242, 42 USC §1985 and 42 USC §1986. This is further confirmed by 34 U.S.C. §12601. Also, the criminal division of the U.S. Attorney's Office for the Southern District of New York had jurisdiction over aspects of my complaints that corresponded to violations of 18 USC §245(b)(5), 18 USC §241, and other applicable laws. I thereafter reported new and entirely valid complaints to the DOJ on 9/1/17 against Defendants Redmond, Nieves, and other members of the NYPD after they illegally caused me to be ejected from the Mayor's 8/30/17 town hall.

ix.  I engaged in protected whistleblowing against Defendant Gerola and members of the Mayor's staff on 6/8/17 as I talked with New York State Assemblyman Andrew Hevesi directly in front of the building that hosted the town hall meeting that the Mayor conducted on that date in Rego Park in Queens before that town hall began and shortly after it ended. A whistleblower news censor in journalism named Jon Cronin witnessed my conversation with Mr. Hevesi after that town hall ended.

x.  I testified against Mr. Gerola and other members of the Mayor's NYPD security detail on 6/14/17 during the public hearing that the City Council's Committee on Public Safety conducted that was recorded on video and

transcribed in writing.

xi.   I engaged in protected whistleblowing against Defendant Redmond and other members of the Mayor's NYPD security detail during conversations that I had with whistleblower news censors in journalism named Marcia Kramer and Juliet Papa on 6/15/17 during a town hall meeting that CBS New York conducted in Corona in Queens that another whistleblower news censor in journalism named Erin Durkin attended while that town hall was recorded on video.

xii.   I reported entirely valid complaints against Defendant Redmond and other members of the Mayor's NYPD security detail to Defendant O'Neill on 6/26/17 during a meeting that the New York City Bar Association conducted and recorded on audio as whistleblower news censors in journalism attended it.

xiii.   I engaged in protected whistleblowing against Defendants Redmond, Gerola, and Nieves in communications that I had with a whistleblower news censor in journalism named Graham Rayman between 6/28/17 and 7/4/17 that were largely by e-mail.

xiv.   I reported complaints against the Mayor's NYPD security detail to the Mayor on 7/16/17 and 7/18/17 as I talked with him directly in front of whistleblower news censors in journalism that include Michael Gartland and Gloria Pazmino during the public resource fair meeting that he conducted with others as Mr. Gerola stood nearby while that was recorded on video on 7/18/17.

xv.   I reported entirely valid complaints to the CCRB against Defendants

Redmond, Gerola, Nieves, and other members of the NYPD on 4/27/17,

6/1/17, 6/9/17, 6/24/17, 9/1/17, 9/13/17, 9/15/17, and 9/27/17

xvi.   I reported entirely valid complaints to DOI and IAB on 5/25/17 against

Defendants Redmond, Gerola, Nieves, and other members of the NYPD.

xvii.   I engaged in protected whistleblowing on 6/6/17 against the Mayor's NYPD

security detail in an e-mail message that I sent to former New York City

Councilwoman Melissa Mark-Viverito who moderated the Mayor's 9/28/17

town hall, Lourdes Rosado while she headed the NYAG's civil rights

division, and the New York City Public Advocate's office.

xviii.   I engaged in protected whistleblowing on 9/1/17 against the Mayor's NYPD

security detail in e-mail messages that I sent to Brooklyn District Attorney

Eric Gonzalez and Jumanne Williams that concerned my having been illegally

ejected from the Mayor's 8/30/17 town hall.

xix.   I engaged in protected whistleblowing on 9/1/17 and 9/9/17 against the

Mayor's NYPD security detail in e-mail messages that I sent to Lourdes

Rosado.

10.   The Mayor' office arranged to have the Mayor's 9/26/17 town hall recorded on video.

That video recording is available on the Internet at

https://www.youtube.com/watch?v=yxwAzQDVLE8.

11.   On 9/27/17, I used the information that appeared in the public notice that was issued for

the Mayor's 9/27/17 resource fair to register on the Internet in advance to attend that public

forum. I then saved a copy of an automated notice that appeared at the end of that registration

process that confirmed that my registration had been accepted and stated the following about my

attendance at that public forum:

"We look forward to seeing you there!"

12.     A true copy of that confirmation that was in response to my registration to attend the

Mayor's 9/27/17 resource fair appears within the annexed **Exhibit B**.

13.     The following screenshot shows responses to questions that I was prompted to complete

in order to register to attend that public forum through its online registration form:



14.     In the screenshot above, the manner in which I saved that registration form after I submitted it caused the information that I entered in the first field to be truncated. However, it is sufficiently clear that I entered information in that field that indicated that it was my intent to attend that public forum partly to discuss discrimination. I was then referring to illegal acts of

discrimination that had previously been committed against me at public forums that the Mayor

and other government officials had been conducting since 4/27/17. The preceding screenshot

also makes clear that I intended to attend the Mayor's 9/27/17 resource fair to address matters

that pertained to the NYPD, HRA, and housing issues. All of those were issues that were then

among my claims in my HRA lawsuit and concerned ongoing fraud and negligence by both

HRA and Urban to my detriment and others who then resided in the building in which I reside on

whose behalf I also sought to attend the Mayor's 9/27/17 resource fair.

15.     The following shows the e-mail message that I sent on 9/24/17 at 9:08 pm to the e-mail

address that the Mayor's office used to process registrations for the Mayor's 9/28/17 town hall to

register in advance to attend that public forum:

> **From:** Towaki Komatsu <towaki_komatsu@yahoo.com>
> **Subject:** RSVP for 9/28/17 public Town Hall meeting with New York City's Mayor
> **Date:** September 24, 2017 at 9:08:30 PM EDT
> **To:** townhallrsvp@cityhall.nyc.gov
>
> My name is Towaki Komatsu
>
> This e-mail serves as my RSVP for the 9/28/17 public Town Hall meeting New York
> City's Mayor will hold.
>
> Pursuant to New York State's Open Meetings Law, I have a legal right to attend that
> public town hall meeting.
>
> Any attempt to hinder my ability to attend it will constitute a violation of both that law
> and the federal criminal statute that concerns obstruction of justice, specifically 18 U.S.C.
> 1512.
>
> Any such attempt to hinder my ability to attend that public meeting will be severely dealt
> with from a legal standpoint.

16.     The Mayor' office arranged to have the Mayor's 9/28/17 town hall recorded on video.

That video recording is available on the Internet at

https://www.youtube.com/watch?v=4s9fYZNLK8o.

17.     The following is a link to a video recording on the Internet that was recorded on 9/26/17 by a video security camera that the DOE controlled and was then installed in close proximity to the entrance to the school that hosted the Mayor's 9/26/17 town hall:

https://drive.google.com/open?id=1Nml0XsbNM57G_mX5-36BqdsPCg7C30zj

18.     That video is hereinafter referred to as "9/26 cam1 video" for identification purposes.

19.     The following screenshot from that video is from the elapsed time of 46 minutes and 50 seconds that corresponds to the time of 6:46:00.319 pm, reflects both the angle at which the video security camera that recorded 9/26 cam1 video was installed on 9/26/17 and its approximate location relative to the entrance to the school that hosted the Mayor's 9/26/17 town hall:



20.     I and Defendants Gerola, Clynes, Ringel, and Miller as well as additional defendants in this action are shown in the preceding screenshot as I was then being illegally prevented from attending the Mayor's 9/26/17 town hall from within the room in which it was conducted. In this complaint, I will include screenshots that were created from a magnified playback of "9/26 cam1 video" to optimally present relevant facts that substantiate my claims.

21.     I received the video that corresponds to "9/26 cam1 video" and additional video recordings from the DOE that were all recorded on 9/26/17 by additional video security cameras that the DOE then controlled and were installed on the exterior of the school that hosted the Mayor's 9/26/17 town hall in response to a FOIL demand that I submitted to the DOE for those video recordings. The video recording for 9/26 cam1 video recorded video that covers the period between 6 pm and 7:30 pm on 9/26/17 as it was angled in the direction of Second Avenue while it was installed along East 56th Street in front of the school that hosted the Mayor's 9/26/17 town hall.

22.     A longer version of the video recording from which 9/26 cam1 video was recording is available on the Internet at https://drive.google.com/open?id=1aw2-dNSN-hbMWrV8wVBU5iqfzd1m0jh0. That version was recorded between 6 pm and 10:40 pm and is hereinafter referred to as "long 9/26 cam1 video".

23.     The following is a link to a video recording on the Internet that was recorded on 9/26/17 by another video security camera that the DOE controlled and was then installed in close proximity to the entrance to the school that hosted the Mayor's 9/26/17 town hall:

https://drive.google.com/open?id=1T4MChdgvdNqy2iVRIUDEVKbc3KoeF4lf

24.     That video is hereinafter referred to as "9/26 cam2 video" for identification purposes.

25.     The video recording for 9/26 cam2 video recorded video that covers the period between 6

pm and 7:30 pm on 9/26/17 as it was angled in the direction of Third Avenue while it was

installed along East 56th Street in front of the school that hosted the Mayor's 9/26/17 town hall.

26.      The following screenshot from that video is from the elapsed time of 21 minutes and 30

seconds that corresponds to the time of 6:21:08.429 pm, shows the video security camera that

recorded 9/26 cam1 video, reflects both the angle at which the video security camera that

recorded 9/26 cam2 video was installed on 9/26/17 and it approximate location relative to the

entrance to the school that hosted the Mayor's 9/26/17 town hall:



27.     A former whistleblower news censor in journalism named Grace Rauh is shown in the preceding screenshot as she and I talked. Back then, she worked for a whistleblower news censorship business named NY1 that is also known as Spectrum News. In this complaint, I will also include screenshots that were created from a magnified playback of "9/26 cam2 video" to optimally present relevant facts that substantiate my claims.

28.     A longer version of the video recording from which 9/26 cam2 video was recording is available on the Internet at

https://drive.google.com/open?id=1T4MChdgvdNqy2iVRIUDEVKbc3KoeF4lf. That version was recorded between 6 pm and 10:40 pm and is hereinafter referred to as "long 9/26 cam2 video".

29.     The following is a link to a video recording on the Internet that was recorded on 9/26/17 by a third video security camera that the DOE controlled and was then installed in close proximity to the entrance to the school that hosted the Mayor's 9/26/17 town hall:

https://drive.google.com/file/d/1eHpTKVw0tbKAi3eh6WxO48i-asDrNPQU/view?usp=sharing

30.     That video is hereinafter referred to as "9/26 cam3 video" for identification purposes.

31.     The video recording for 9/26 cam2 video recorded video that covers the period between 6 pm and 7:30 pm on 9/26/17 as it was angled in the direction of Second Avenue while it was installed along East 56th Street in front of the school that hosted the Mayor's 9/26/17 town hall.

32.     The following screenshot from that video is from the elapsed time of 21 minutes and 30 seconds that corresponds to the time of 6:08:03.139 pm, and reflects both the angle at which the video security camera that recorded 9/26 cam3 video was installed on 9/26/17 and it approximate location relative to the entrance to the school that hosted the Mayor's 9/26/17 town hall:



33.     I'm shown in the preceding screenshot as I then wore a blue dress shirt with long sleeves and had a backpack on while papers were in my left hand as I walked along a sidewalk in the direction of the entrance to the school that hosted the Mayor's 9/26/17 town hall and someone who is shown in that screenshot as well and appears to be Defendant Miller. In this complaint, I may also include screenshots that were created from a magnified playback of "9/26 cam3 video" to optimally present relevant facts that substantiate my claims. What appears in this screenshot is significant because it confirms that I arrived sufficiently early to the site of the Mayor's 9/26/17 town hall on 9/26/17 to wait in line with other members of the public in a lawful manner next to the school that hosted the Mayor's 9/26/17 town hall to be accorded my constitutional right of access pursuant to the First Amendment, Fourth Amendment, Fifth Amendment, and Fourteenth Amendment to the Mayor's 9/26/17 town hall within the room in which it was conducted as it was conducted without encountering any unreasonable interference in that regard that would certainly lack an objectively valid justification.

34.     The table shown next contains brief information about as well as links to copies of video recordings that I recorded with my cell phone between 9/26/17 and 9/28/17 while I lawfully conducted myself as I **a)** stood outside of and in close proximity to the buildings that hosted the Mayor's **a)** 9/26/17 town hall, 9/27/17 resource fair, and **c)** 9/28/17 town hall shortly before they began and as they were conducted while I was being illegally prevented from attending those public forums from within the room in which those town hall and resource fair meetings were conducted in flagrant violation of my constitutional rights and other applicable laws. The second table that follows this one includes a description of what appears in those video recordings.

| # | Creation Date and Time | Filename | Link to video |
|---|---|---|---|
| 1 | 9/26/17 at 6:23 pm | Gerola on 9-26-17 at 6_23 pm preventing you from attending the Mayor's town hall from within the room in which it was conducted_IMG_2178.MOV | https://drive.google.com/file/d/1QW9zmdxDW-yDqo2x9FNeAmy8XL8QNwad/view?usp=sharing |
| 2 | 9/26/17 at 7:21 pm | IMG_2179.mov | https://drive.google.com/file/d/1oZOMnB5-Dla3fS71UnjEYuv7mU6r339P/view?usp=sharing |
| 3 | 9/26/17 at 7:21 pm | IMG_2180.mov | https://drive.google.com/file/d/1To1-pDJ-7UXs2bBb2pf0mPq-JaYWpcZV/view?usp=sharing |
| 4 | 9/26/17 at 7:21 pm | IMG_2182.mov | https://drive.google.com/file/d/1GeYlTX-qzn3cVBr5plD9NcubYN5bomWH/view?usp=sharing |
| 5 | 9/26/17 at 7:21 pm | IMG_2183.mov | https://drive.google.com/file/d/1yHduxyLazjXlJz3t8oBYqlW9qonoiou3/view?usp=sharing |
| 6 | 9/26/17 at 7:21 pm | IMG_2184 (1).MOV | https://drive.google.com/file/d/1AJZZ1s4BznFxmYPTeVcU3pY4q6BWgIwU/view?usp=sharing |
| 7 | 9/26/17 at 7:24 pm | 9-26-17_7_24 pm at Mayor's Town Hall.MOV | https://drive.google.com/open?id=1rZR38woBRgPwSfcVwx0jxT2aaBjaG-bw |

| 8 | 9/26/17 at 8:22 pm | IMG_2191.mov | https://drive.google.com/file/d/1Is1dJ68IFES03-QvdSSN8ipeZilR868r/view?usp=sharing |
|---|---|---|---|
| 9 | 9/26/17 at 9:27 pm | 9-26-17 9_27 pm video of some of the whistleblowing subject matter I intended to engage in at the Mayor's town hall_IMG_2192.MOV | https://drive.google.com/open?id=1wcS99V3Uww4VKVEnFuAaM6FDpus3nCd5 |
| 10 | 9/27/17 at 12:10 pm | 9-27-17 at 12_10 pm with NYPD Keck at Mayor's resource fair.mp4 | https://drive.google.com/open?id=1o9u-shzm6QT16milV5kQIaWrxIrCLGo1 |
| 11 | 9/27/17 at 12:10 pm | IMG_2208.mov | https://drive.google.com/file/d/1dGY57XF5K1MbA034uFj7QbTTqIN7SgQf/view?usp=sharing |
| 12 | 9/27/17 at 12:15 pm | IMG_2210.MOV | https://drive.google.com/file/d/1CmViDeG_bI0McrouSP00snPWUxgp_0gq/view?usp=sharing |
| 13 | 9/27/17 at 12:59 pm | 9-27-17 12_59 video of NYPD School Safety officer at Mayor's public resource fair meeting helping others to attend while not letting me do so in Gerola & Keck's presence_IMG_2211.MOV | https://drive.google.com/open?id=1DXfcRV7p3SdRfgzLHL9_hMfp8qc_Mpjg |
| 14 | 9/28/18 at 5:58 pm | IMG_2236 (1).MOV | https://drive.google.com/file/d/1pTCrvsfAZDhPClFRVrtnieLEXdestLip/view?usp=sharing |
| 15 | 9/28/18 at 7:34 pm | IMG_2237.MOV | https://drive.google.com/file/d/1sJn9E8avdIW0L1EOQ51t4lMwJbn9zLUY/view?usp=sharing |
| 16 | 9/87/18 at 7:37 pm | IMG_2238.MOV | https://drive.google.com/file/d/112J4brOf0gbX0mft-Lsy3wmt-SbbRbI9/view?usp=sharing |

| # | Filename | Description |
|---|----------|-------------|
| 1 | Gerola on 9-26-17 at 6_23 pm preventing you from attending the Mayor's town hall from within the room in which it was conducted_IMG_2178.MOV | Defendant Gerola is shown and heard in this video as he made remarks to me by the entrance to the school that hosted the Mayor's 9/26/17 town hall in which he explicitly stated that he was then "definitely not" letting me attend that town hall from within the room in which it was conducted. He did so as I provided narration for that video as I pointed out that he was then violating New York State's Open Meetings Law by illegally not allowing me to attend that town hall from within the room in which it would be conducted. Mr. Gerola clearly stated in that video that he was restricting my ability to be in the school that hosted the Mayor's 9/26/17 town hall on that date to an overflow room that was used for that town hall. That occurred as members of the public who were directly in front of me and in back of me in line were granted the ability to attend that town hall from within the room in which it was conducted instead in flagrant violation of my Fourteenth Amendment due process and equal protection rights as well as those that prohibited selective-enforcement, abuse of process, discrimination, and illegal unofficial arrests of movement. Mr. Gerola is also heard in that video as he lied about me to members of the public by fraudulently claiming that I was holding them up from being able to enter the school that hosted the Mayor's 9/26/17 town hall instead of acknowledging that he responsible for that delay by illegally not letting me attend that town hall from within the room in which it would be conducted.<br><br>I'm also shown holding a printed copy of the e-mail message that I sent on 9/20/17 at 2:37 pm to the e-mail address of "manhattantownhall@cityhall.nyc.gov" to register in advance with the Mayor's office to attend that town hall from within the room in which it would be conducted.<br><br>Defendants Mason, NYPD Officer Jane Doe1 9/26/17, and Santana appear in that video as they then stood near Mr. Gerola and I in front of the doors to that school. None of them did anything to try to perform their legal duty as law-enforcement personnel to have intervened on my behalf to enforce on my right to attend that town hall from within the room in which it was conducted. They instead clearly exhibited deliberate indifference about the fact that I was being illegally prevented from attending the Mayor's 9/26/17 town hall from within the room in which it was conducted as I was conducting myself in an entirely lawful manner. |

| | IMG_2179.mov | I recorded this video of Defendant Ringel and NYPD Officer Jane Doe1 9/26/17. NYPD Officer Jane Doe1 9/26/17 was then a member of the NYPD who was standing next to a door at the entrance to the school that hosted the Mayor's 9/26/17 town hall as she then stood in close proximity to where Mr. Ringel and I were. NYPD Officer Jane Doe1 9/26/17 appears at the start of that video on the right and behind Defendant Santana. Mr. Ringel is shown covering his face with his right hand as I recorded that video. That video recording was recorded with my cell phone as I stood near the entrance to the school that hosted the Mayor's 9/26/17 town hall as neither of them made any effort to intervene on my behalf to enable to exercise my constitutional right to attend that town hall from within the room in which it was conducted. Mr. Ringel was then a co-conspirator in the illegal scheme with Mr. Gerola and others to cause me to be barred from attending the Mayor's 9/26/17 town hall within the room min which it was conducted by his failure to intervene on my behalf in violation of NYPL §195.00, New York City Charter §1116, and the oath of office he took upon beginning his employment with the City of New York that required him to swear or affirm that he would perform his job with the City of New York in accordance with the U.S. and New York State Constitution. As a co-conspirator with Mr. Gerola, Defendant Mason, and others on 9/26/17 for that purpose, he is jointly liable with them for having violated 18 USC §245(b)(5), 18 USC §241, NYPL §240.20, NYPL §240.26, and New York State's Open Meetings Law, 42 USC §1983, 42 USC §1985, 42 USC §1986, and my rights pursuant to the First Amendment, Fourth Amendment, Fifth Amendment, and Fourteenth Amendment that applied to my efforts to lawfully attend the Mayor's 9/26/17 town hall from within the room in which it was conducted. |
| 2 | IMG_2180.mov | I recorded this video of Defendant Ringel and NYPD Officer Jane Doe2 9/26/17. NYPD Officer Jane Doe2 9/26/17 was then a member of the NYPD who was behind Mr. Ringel, against a metal barricade, and looking in my direction while wearing a black NYPD uniform. Mr. Ringel is shown covering his face with his right hand as I recorded that video. That video recording was recorded with my cell phone as I stood near the entrance to the school that hosted the Mayor's 9/26/17 town hall as neither of them made any effort to intervene on my behalf to enable to exercise my constitutional right to attend that town hall from within the room in which it was conducted. |
| 3 | IMG_2182.mov | Defendants Mason and Gerola appear from left to right in this video that I recorded with my cell phone as I stood in front of the entrance to the school that hosted the Mayor's 9/26/17 town hall as Defendant Mason acted as a co-conspirator with Defendants Gerola, Ringel, and others by illegally not doing anything to try to intervene on my behalf to enable me to exercise my constitutional right to attend the Mayor's 9/26/17 town hall from within the room in which it was conducted. |

| 4 | IMG_2183.mov | Defendant Mason is shown raising his right hand in this video that I recorded with my cell phone as he and I stood in front of the entrance to the school that hosted the Mayor's 9/26/17 town hall. |
|---|---|---|
| 5 | IMG_2184 (1).MOV | Defendants Gerola, Santana, and Ringel appear in this video that I recorded with my cell phone as we stood in front of the entrance to the school that hosted the Mayor's 9/26/17 town hall. Defendants Santana is shown wearing a Black NYPD uniform and eyeglasses and a hat. He was then a co-conspirator with Defendants Gerola, Ringel, Mason, and others by illegally not doing anything to try to intervene on my behalf to enable me to exercise my constitutional right to attend the Mayor's 9/26/17 town hall from within the room in which it was conducted. Mr. Ringel is the person who is shown wearing a Jewish head covering that is known as a yamaka (this may be misspelled) in that video. |
| 6 | 9-26-17_7_24 pm at Mayor's Town Hall.MOV | Defendants Ringel, Gerola, and Mason appear in this video that I recorded with my cell phone as we stood in front of the entrance to the school that hosted the Mayor's 9/26/17 town hall. Although Defendant Mason voiced an objection about the fact that I was using the flash feature on my cell phone to record that video while it was then dark outside as they continued to illegally prevent me from exercising my constitutional right to attend the Mayor's 9/26/17 town hall from within the room in which it was conducted, estoppel barred him, Gerola, and Ringel from objecting to that by virtue of the fact that they were illegally barring me from that public forum from within that particular room as I was then recording that video to lawfully gather evidence of that fact and they were entirely aware of that then. Defendant NYPD Officer Jane Doe1 9/26/17 also appears in that video as she stood by a door at the entrance to that school and continued to illegally not try to intervene on my behalf to enable me to attend the Mayor's 9/26/17 town hall from within the room in which it was conducted. |

| 7 | IMG_2191.mov | Defendants Gerola and Nieves appear in this video that I recorded with my cell phone as they were inside of a hallway that is located just past the entrance to the school that hosted the Mayor's 9/26/17 town hall. Mr. Nieves illegally made no attempt to enable me to the Mayor's 9/26/17 town hall from within the room in which it was conducted. Instead, he was a co-conspirator with Defendants Gerola, Mason, Ringel, and others in illegally barring me from attending the Mayor's 9/26/17 town hall from within the room in which it was conducted. Also, he later lied to me that night as he and I stood on a sidewalk located outside of and in close proximity to that school that was in an area located to the left of that school's entrance that attendance at the Mayor's 9/26/17 town hall had been by invitation only. He also told me then that I would need to have a judge issue an order to have him and others stop violating my constitutional right to attend public forums that included town hall meetings, resource fair meetings, and public hearings that the Mayor was conducting. |
| --- | --- | --- |

| 8 | 9-26-17 9_27 pm video of some of the whistleblowing subject matter I intended to engage in at the Mayor's town hall_IMG_2192.MOV | I recorded this video with my cell phone as I stood just inside of the entrance to the school that hosted the Mayor's 9/26/17 town hall. At that time, it was relatively cold outside and I was lightly dressed. This video recording briefly shows literature that I prepared and intended to lawfully distribute and otherwise make available to those who attended the Mayor's 9/26/17 town hall within the room in which it was conducted as it was conducted shortly before it began, and shortly after it ended as well as in other public areas in that school that I could lawfully access that night and outside of that school while waiting to be granted access to that town hall. I distributed a large number of copies of that literature and others that I brought with me to the site of that town hall as I stood in front of the school that hosted that town hall to try to offset the fact that I was being illegally prevented from attending that town hall from within the room in which it was conducted. Since the defendants in this action and others they worked with previously, repeatedly, and illegally prevented me from attending earlier public town hall meetings, resource fair meetings, and public hearings from within the rooms in which they were conducted by the Mayor and others while I conducted myself in an entirely lawful manner in stark contrast to them, I correctly anticipated that those criminals and others they partnered with would continue to commit illegal acts and omission against me on 9/26/17 to violate my constitutional rights to attend the Mayor's 9/26/17 town hall from within the room in which it was conducted as they did so largely to steal the 2017 New York City government elections for the Mayor, his administration, and their own benefits by engaging in whistleblower retaliation, voter suppression, and voter fraud in violation of the Hatch Act as they sought to ride the coattails of an election win by the Mayor for all of the various benefits (such as job security, and opportunities for career advancement, and reciprocal cover-ups and condoning of their illegal acts by the Mayor and his staff) that such a win would offer them as a windfall. |
|---|---|---|

| 9 | 9-27-17 at 12_10 pm with NYPD Keck at Mayor's resource fair.mp4 | I recorded this video of Defendant Keck as he stood in front of the entrance to the building that hosted the Mayor's 9/27/17 public resource fair meeting and illegally prevented me from lawfully walking past him to enter that building as he illegally subjected me to an abuse of process, illegal prior restraint on my First Amendment right of access to a public forum without any justification, standardless discretion, selective-enforcement, discrimination, and an unofficial arrest of my right to enter that building through a show of authority in violation of my Fourth Amendment rights. He didn't provide me any reason why he was preventing me from attending that public forum that I had registered with the Mayor's office in advance to lawfully attend. By preventing me from attending that public forum, he was a co-conspirator with Defendant Gerola, Baez, and others for that purpose as he then violated his oath as a member of the NYPD, 18 USC §245(b)(5), 18 USC §241, NYPL §240.20, NYPL §240.26, NYPL §240.65, NYPL §175.25, NYPL §195.00, New York City Charter §1116, New York State General Business Law §349, New York State's Faithless Servant Doctrine, New York State's Open Meetings Law, 42 USC §1983, 42 USC §1985, 42 USC §1986, and my rights pursuant to the First Amendment, Fourth Amendment, Fifth Amendment, and Fourteenth Amendment that applied to my efforts to lawfully attend the Mayor 9/27/17 public resource fair. |

| 10 | IMG_2208.mov | I recorded this video of Defendant Baez as he stood in front of the entrance to the building that hosted the Mayor's 9/27/17 public resource fair meeting and illegally prevented me from lawfully walking past him to enter that building as he illegally subjected me to an abuse of process, illegal prior restraint on my First Amendment right of access to a public forum without any justification, standardless discretion, selective-enforcement, discrimination, and an unofficial arrest of my right to enter that building through a show of authority in violation of my Fourth Amendment rights. He didn't provide me any reason why he was preventing me from attending that public forum. By preventing me from attending that public forum, he was a co-conspirator with Defendant Gerola, Keck, and others for that purpose as he then violated his oath as a member of the NYPD, 18 USC §245(b)(5), 18 USC §241, NYPL §240.20, NYPL §240.26, NYPL §240.65, NYPL §175.25, NYPL §195.00, New York City Charter §1116, New York State General Business Law §349, New York State's Faithless Servant Doctrine, New York State's Open Meetings Law, 42 USC §1983, 42 USC §1985, 42 USC §1986, and my rights pursuant to the First Amendment, Fourth Amendment, Fifth Amendment, and Fourteenth Amendment that applied to my efforts to lawfully attend the Mayor 9/27/17 public resource fair.<br><br>I previously recorded him on 7/12/17 as he illegally didn't intervene on my behalf to enable me to attend the public town hall meeting that the Mayor conducted with others then in the Bronx in the room in which it was conducted as it was conducted. That occurred as Defendant Baez was aware that others that included Defendants Gerola and Nieves were illegally preventing me from lawfully doing so. Also, he thereafter was among members of the NYPD that included Defendants Redmond and Nieves who illegally prevented me from attending the public resource fair meeting that the Mayor conducted on 10/25/17 in Brooklyn as I conducted myself in an entirely lawful manner then too and stood on a public sidewalk that is a traditional public forum. |

| 11 | IMG_2210.MOV | I recorded this video with my cell phone that shows Defendants Gerola, Baez, and Keck in it as well as well as an unknown eyewitness of mine as we stood in front of the entrance to the building that hosted the Mayor's 9/27/17 public resource fair meeting as Defendants Gerola, Baez, Keck, and others illegally prevented me from lawfully attending that public forum. Defendant Gerola is shown in this video with his left hand near his ass. Defendant Baez |
|----|--------------|----|
|    |              | As he also illegally prevented me from attending the Mayor's 9/27/17 public resource fair, Defendant Gerola subjected me to an abuse of process, illegal prior restraint on my First Amendment right of access to a public forum without any justification, standardless discretion, selective-enforcement, discrimination, and an unofficial arrest of my right to enter that building through a show of authority in violation of my Fourth Amendment rights. He didn't provide me any reason why he was preventing me from attending that public forum. |
|    |              | By preventing me from attending that public forum, he was a co-conspirator with Defendant Keck, Baez, and others for that purpose as he then violated his oath as a member of the NYPD, 18 USC §245(b)(5), 18 USC §241, NYPL §240.20, NYPL §240.26, NYPL §240.65, NYPL §175.25, NYPL §195.00, New York City Charter §1116, New York State General Business Law §349, New York State's Faithless Servant Doctrine, New York State's Open Meetings Law, 42 USC §1983, 42 USC §1985, 42 USC §1986, and my rights pursuant to the First Amendment, Fourth Amendment, Fifth Amendment, and Fourteenth Amendment that applied to my efforts to lawfully attend the Mayor 9/27/17 public resource fair. |
|    |              | Prior to 9/26/17, Defendants Gerola, Nieves, Mason, and others jointly and illegally prevented me from attending the Mayor's 9/14/17 town hall in Brooklyn within the room in which it was conducted as I was conducting myself in a lawful manner. |
|    |              | The eyewitness of mine who is shown in this video is the Black male who is shown wearing a black shirt as he put something into a white plastic basket with his right hand as he held a container in his left hand. |

| 12 | 9-27-17 12_59 video of NYPD School Safety officer at Mayor's public resource fair meeting helping others to attend while not letting me do so in Gerola & Keck's presence_IMG_2211.MOV | I recorded this video with my cell phone that shows Defendants NYPD Officer John Doe1 9/27/17, Gerola, Keck, Baez (just his left hand, leg, and foot), NYPD Officer John Doe2 9/27/17, and NYPD Officer John Doe3 9/27/17 in it as well as well as Richard Buery, Jr. as he then worked for the Mayor's administration as we stood in front of the entrance to the building that hosted the Mayor's 9/27/17 public resource fair meeting. I recorded that video as Defendants NYPD Officer John Doe1, Gerola, Baez, and Keck were personally involved in illegally preventing me from attending that public resource fair meeting while NYPD Officer John Doe2 9/27/17 and NYPD Officer John Doe3 9/27/17 were nearby and illegally didn't intervene on my behalf to enable me to do so.

While Defendant NYPD Officer John Doe1 9/27/17 illegally prevented me from attending that public resource fair meeting, I happened to meet a journalist then and there named Alexandra Semenova. I struck up a conversation with her as I told her that I was being illegally prevented from attending the Mayor's 9/27/17 resource fair while I was a whistleblower. I asked her then if she could do me a favor by simply asking NYPD Officer John Doe1 for a valid explanation about why he and others were illegally preventing me from attending that public forum. Although she agreed to do so and asked him that question while I stood a few feet away, she then told me that she didn't get a valid explanation from him about that.

As he also illegally prevented me from attending the Mayor's 9/27/17 public resource fair, Defendant NYPD Officer John Doe1 9/27/17 subjected me to an abuse of process, illegal prior restraint on my First Amendment right of access to a public forum without any justification, standardless discretion, selective-enforcement, discrimination, and an unofficial arrest of my right to enter that building through a show of authority in violation of my Fourth Amendment rights. He didn't provide me any reason why he was preventing me from attending that public forum.

By preventing me from attending that public forum, he was a co-conspirator with Defendant Gerola, Keck, Baez, and others for that purpose as he then violated his oath as a member of the NYPD, 18 USC §245(b)(5), 18 USC §241, NYPL §240.20, NYPL §240.26, NYPL §240.65, NYPL §175.25, NYPL §195.00, New York City Charter §1116, New York State General Business Law §349, New York State's Faithless Servant Doctrine, New York State's Open Meetings Law, 42 USC §1983, 42 USC §1985, 42 USC §1986, and my rights pursuant to the First Amendment, Fourth Amendment, Fifth Amendment, and Fourteenth Amendment that applied to my efforts to lawfully attend the Mayor 9/27/17 public resource fair. |

| 13 | IMG_2236 (1).MOV | I recorded this video with my cell phone that shows Defendants NYPD Officer John Doe1 9/28/17, Ringel, Miller, Gulotta, Mason, Gerola, and Ioveno in it as well as well as an unknown eyewitness of mine as they stood in front of the entrance to the building that hosted the Mayor's 9/28/17 town hall, I lawfully waited with other member of the public nearby to be granted access to to that building to attend that town hall from within the room in which it would be conducted, and Defendants NYPD Officer John Doe1 9/28/17, Ringel, Miller, Mason, Gerola, Ioveno, and others acted as co-conspirators as they committed illegal acts and omissions against me that prevented me from lawfully entering that building in flagrant violation of my constitutional rights and other applicable laws. Defendant Redmond also appears in this video.

While illegally prevented me from attending the Mayor's 9/28/17 town hall, Defendants NYPD Officer John Doe1 9/28/17, Ringel, Miller, Gulotta, Mason, Gerola, Ioveno, and others subjected me to an abuse of process, illegal prior restraint on my First Amendment right of access to a public forum without any justification, standardless discretion, selective-enforcement, discrimination, and an unofficial arrest of my right to enter that building through a show of authority in violation of my Fourth Amendment rights. None of them provided me any reason why they were preventing me from attending that public forum.

By preventing me from attending that public forum, the defendants who did so through their acts and omissions were co-conspirators with one another for that purpose as they then violated their oath as members of the NYPD and other employees of the City of New York, 18 USC §245(b)(5), 18 USC §241, NYPL §240.20, NYPL §240.26, NYPL §240.65, NYPL §175.25, NYPL §195.00, New York City Charter §1116, New York State General Business Law §349, New York State's Faithless Servant Doctrine, New York State's Open Meetings Law, 42 USC §1983, 42 USC §1985, 42 USC §1986, and my rights pursuant to the First Amendment, Fourth Amendment, Fifth Amendment, and Fourteenth Amendment that applied to my efforts to lawfully attend the Mayor 9/28/17 public resource fair. |
|----|----|----|

| 14 | IMG_2237.MOV | I recorded this video of Defendant Ringel as I stood in front of the entrance to the building that hosted the Mayor's 9/28/17 town hall while a sign about that public town hall meeting was affixed to a door located directed behind him and he continued to illegally not intervene on my behalf to enable me to attend that public forum in defiance of applicable laws and the oath of office he took upon working for the City of New York that required him to swear or otherwise affirm that he would perform his duties for the City of New York to the best of his abilities and in accordance with the U.S. and New York State Constitution.<br><br>Members of the public who were then lawfully exercising their First Amendment right to protest then and there behind me against the Mayor and his administration are clearly heard in that video recording as they did so in Spanish. They were mainly protesting about the Mayor's housing and rezoning policies. They also were illegally not allowed to enter that building to lawfully attend the Mayor's 9/28/17 town hall. |
| 15 | IMG_2238.MOV | I recorded this video of fantastic members of the public who were lawfully protesting against the Mayor as I stood in front of the entrance to the building that hosted the Mayor's 9/28/17 town hall and all of us were illegally being prevented from entering that building to lawfully attend the Mayor's 9/28/17 town hall through the illegal use of a metal barricade that as set up to stop us from exercising our constitutional right to do so.<br><br>Defendants NYPD Officer John Doe2 9/28/17, NYPD Officer Jane Doe1 9/28/17, Dietrich, Mason, NYPD Officer John Doe3 9/28/17, NYPD Officer Jane Doe2 9/28/17, NYPD Officer Jane Doe3 9/28/17, and NYPD Officer Jane Doe4 9/28/17 also appear in this video as all of them illegally made no attempt to intervene on my behalf to enable me to exercise my constitutional right to attend the Mayor's 9/28/17 town hall. Their failure to intervene for that purpose then establishes that they were co-conspirators with Defendants Mason, Gerola, Ringel, Miller, and others to prevent me from exercising my right to attend that public forum.. |

35.    References to HRA, DHS, and DSS will be used interchangeably in this pleading for simplicity.

36.    The illegal acts and omissions that were committed against me on 9/26/17, 9/27/17, and 9/28/17 at the sites of the Mayor's **a)** 9/26/17 town hall, **b)** 9/27/17 resource fair, and **c)** 9/28/17 town hall were committed in relation to my efforts to have exercised my legal right to have done

the following:

  a. Attended those public forums within the rooms in which they were conducted shortly before they began, as they were conducted, and shortly after they ended.

  b. Exercised the full extent of my rights while attending them partly by engaging in protected whistleblowing about a broad array of matters of public concern and private matters.

37. This is a civil rights action to vindicate my rights in response to illegal acts and omissions that were committed against me on 9/26/17, 9/27/17, and 9/28/17 at the sites of the Mayor's **a)** 9/26/17 town hall, **b)** 9/27/17 resource fair, and **c)** 9/28/17 town hall in relation to my efforts to have lawfully attended those public forums while NYPD Inspector Howard Redmond was **a)** the head of the Mayor's NYPD security detail and **b)** the primary defendant in _Sherrard v. City of New York_, No. 15-cv-7318 (MB) (S.D.N.Y. Jun. 13, 2018). Since 4/27/17, I was aware of his status as the defendant in _Sherrard v. City of New York_ by having conducted research about him then in the wake of illegal acts and omissions that he and others committed against me on 4/27/17 that caused me to be illegally barred from attending the Mayor's 4/27/17 town hall in flagrant violation of my constitutional rights and other applicable laws. Those who committed such illegal acts and omissions against me on 9/26/17, 9/27/17, and 9/28/17 at the sites of the Mayor's **a)** 9/26/17 town hall, **b)** 9/27/17 resource fair, and **c)** 9/28/17 town hall did so as part of a conspiracy in retaliation against me that was mainly for protected whistleblowing and litigation activities that I continued to be engaged in against Mr. Redmond, themselves, other members of the NYPD, members of the Mayor's staff, HRA, HRA's business partners, Mr. Banks, New York State court officers, and others. Such protected whistleblowing and litigation activities that this concerns were largely related to my HRA lawsuit and earlier illegal acts and omissions that

were committed against me by the following people in relation to my efforts that I previously

undertook to lawfully attend earlier public forums that were partly conducted by the Mayor, Mr.

Banks, and others that included public town hall meetings, public resource meetings, and public

hearings, and publicity stunts that the Mayor conducted on 7/25/17 in a public area of a subway

station:

    a.  Those who committed the illegal acts and omissions against me on 9/26/17, 9/27/17,

        and 9/28/17 at the sites of the Mayor's **a)** 9/26/17 town hall, **b)** 9/27/17 resource fair,

        and **c)** 9/28/17 town hall.

    b.  Their colleagues in the NYPD and among the Mayor's staff as well as among New

        York State court officers that they partnered with on 5/23/17 to commit illegal acts

        and omissions against me as I lawfully attempted to attend the Mayor's 5/23/17

        public resource fair meeting that was conducted inside of the Veterans' Memorial

        Hall chamber within the Bronx Supreme Court during the U.S. Navy's annual "Fleet

        Week" event while I continued to be a U.S. Navy veteran.

38.     While committing such illegal acts and omissions against me on 9/26/17, 9/27/17, and

9/28/17 in relation to my efforts to have lawfully attended the Mayor's **a)** 9/26/17 town hall, **b)**

9/27/17 resource fair, and **c)** 9/28/17 town hall, that was done to extend a campaign of

harassment, retaliation, and unequal and discriminatory acts against me at public forums dating

back to 4/27/17 that the Mayor and other government officials conducted with members of the

public in a collaborative manner as the Mayor and such other government officials were running

for re-election and using those public forums to try to improve their re-election prospects partly

by trying to attract publicity.

39.     The illegal acts and omissions that were committed against me on 9/26/17, 9/27/17, and

9/28/17 at the sites of the Mayor's **a)** 9/26/17 town hall, **b)** 9/27/17 resource fair, and **c)** 9/28/17

town hall were voter suppression, voter fraud, whistleblower retaliation, a malicious and naked

abuse of process, illegal selective-enforcement, standardless discretion, viewpoint discrimination

in violation of the Hatch Act, my constitutional rights, federal and New York State criminal

statutes, New York State's Open Meetings Law, and other applicable laws.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C.

§§1331 and 1343. This action is brought pursuant to 42 U.S.C. §§1983, 1985, 1988 and the First,

Fourth, Fifth, and Fourteenth Amendments of the U.S. Constitution.

2.      My claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§2201 and

2202, FRCP Rules 57 and 65, and the general legal and equitable powers of this Court.

3.      Venue is proper pursuant to 28 U.S.C. § 1391(b) because I reside in the Bronx and the

illegal acts and omissions that were committed against me that this complaint concerns occurred

in Manhattan.

4.      An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. §1988.

5.      Consistent with the requirements of New York General Municipal Law § 50-e, I filed a

timely Notice of Claim with the New York City Comptroller within 90 days of the accrual of my

claims under New York law.

6.      My claims have not been adjusted by the New York City Comptroller's Office.

## PARTIES

1.      I am, and was at all times relevant to this action, a resident of Bronx County in the State

of New York. I am also a U.S. Navy veteran, who swore to defend the U.S. Constitution against

all of its enemies indefinitely and without exceptions. I have honored that oath and continue to

do so.

2.      At all times relevant herein Bill de Blasio and Defendant James O'Neill were employees of the City of New York.

3.      At all times relevant herein, Bill de Blasio has been the Mayor of the City of New York and Defendant James O'Neill was the commissioner of the NYPD. As the commissioner of the NYPD, Defendant O'Neill was among others who were responsible for how the NYPD operated, how the NYPD's personnel were trained, how they were supervised, and how they were disciplined. Defendant De Blasio was also partly responsible for how the NYPD operated and was supervised at all times relevant herein partly by having the power to replace Defendant O'Neill as the NYPD's commissioner and set the budget for the NYPD.  In regards to this point, Mr. De Blasio was recorded on video on 11/30/17 during the public town hall meeting that he conducted in Queens as he stated the following:

        "If you have a problem with policing, I am ultimately responsible."

4.      Mr. De Blasio is shown and heard as he made that remark in that video at the elapsed time of 1 hour, 49 minutes, and 19 seconds. That video recording is available on the Internet at https://www.youtube.com/watch?v=CRV0IKbg5tQ.

5.      Defendant City of New York is a municipal corporation duly incorporated and authorized under the laws of the State of New York pursuant to §431 of its Charter. The City of New York is authorized under the laws of the State of New York to maintain a police department, the NYPD, which is supposed to act as its agent in the area of law-enforcement and for which it and the Mayor are ultimately responsible. The City and the Mayor both assume the risks incidental to the maintenance of a police force and the employment of police officers.

6.      Defendants NYPD Detective Raymond Gerola (shield No. 6577), NYPD Lieutenant

Ralph Nieves, NYPD Detective Nicholas Mason (shield No. # 6995), NYPD Officer Lance (shield #: 245), NYPD Officer Santana (shield #: 7291), James O'Neill, NYPD Inspector Howard Redmond, NYPD Officer Keck (shield #: 6313), NYPD Officer Baez (shield #: 5984), NYPD Officer Jerry Ioveno (shield #: 5560), NYPD Officer Keith Dietrich (shield #: 5779), NYPD Officer John Doe1 9/26/17, NYPD Officer John Doe2 9/26/17, NYPD Officer Jane Doe1 9/26/17, NYPD Officer Jane Doe2 9/26/17, NYPD Officer Jane Doe3 9/26/17, NYPD Officer John Doe1 9/27/17, NYPD Officer John Doe2 9/27/17, NYPD Officer John Doe3 9/27/17, NYPD Officer John Doe4 9/27/17, NYPD Officer John Doe1 9/28/17, NYPD Officer John Doe2 9/28/17, NYPD Officer John Doe3 9/28/17, NYPD Officer Jane Doe1 9/28/17, NYPD Officer Jane Doe2 9/28/17, NYPD Officer Jane Doe3 9/28/17, and NYPD Officer Jane Doe4 9/28/17 were at all times relevant herein officers, employees, and agents of the NYPD and the City of New York.

7.     Both Defendants NYPD Lieutenant Ralph Nieves and James O'Neill have retired from the NYPD.

8.     The defendants in this action who I identify with John Doe and Jane Doe in their names were people whose names I don't know were members of the NYPD and Mayor's staff and were recorded in video recordings that I recorded between 9/26/17 and 9/28/17 as they committed illegal acts and omissions against me that concerned by efforts to lawfully attend the Mayor's 9/26/17 town hall, the Mayor's 9/27/17 resource fair, and the Mayor's 9/28/17 town hall. Those defendants appear in the video recordings listed in the following table at the elapsed time shown:

| # | Defendant | Video | Elapsed Time |
|---|-----------|-------|--------------|
| 1 | NYPD Officer John Doe1 9/26/17 | 9/26 cam1 video | 22 minutes and 59 seconds |
| 2 | NYPD Officer Jane Doe1 9/26/17 | Gerola on 9-26-17 at 6_23 pm preventing you from attending the Mayor's town | 20 seconds |

| | | hall from within the room in which it was conducted  IMG_2178.MOV | |
|---|---|---|---|
| 3 | NYPD Officer John Doe2 9/26/17 | a)  IMG_2180.mov<br><br>b)  9/26 cam1 video | a)  3 seconds<br><br>b)  1 hour, 23 minutes, and 36 seconds |
| 4 | NYPD Officer Jane Doe2 9/26/17 | a)  9/26 cam1 video. | 23 minutes and 14 seconds as well as 52 minutes and 10 seconds. |
| 5 | NYPD Officer Jane Doe3 9/26/17 | 9/26 cam1 video. | 1 hour and 53 seconds. |
| 6 | John Doe1 Tablet 9/26/17 | 9/26 cam1 video | 3 seconds |
| 7 | Jane Doe3 9/26/17 | 9/26 cam1 video | 32 minutes and 53 seconds |
| 8 | NYPD Officer John Doe1 9/27/17 | IMG_2211.MOV | 2 seconds |
| 9 | NYPD Officer John Doe2 9/27/17 | IMG_2211.MOV | 6 seconds |
| 10 | NYPD Officer John Doe3 9/27/17 | IMG_2211.MOV | 6 seconds |
| 11 | NYPD Officer John Doe4 9/27/17 | IMG_2210.MOV | Less than 1 second |
| 12 | NYPD Officer John Doe1 9/28/17 | IMG_2236.MOV | 36 seconds |
| 13 | NYPD Officer John Doe2 9/28/17 | IMG_2238.MOV | 25 seconds |
| 14 | NYPD Officer John Doe3 9/28/17 | IMG_2238.MOV | 19 seconds |
| 15 | NYPD Officer Jane Doe1 9/28/17 | IMG_2238.MOV | 16 seconds |
| 16 | NYPD Officer Jane Doe2 9/28/17 | IMG_2238.MOV | 19 seconds |
| 17 | NYPD Officer Jane Doe3 9/28/17 | IMG_2238.MOV | 20 seconds |
| 18 | NYPD Officer Jane Doe4 9/28/17 | IMG_2238.MOV | 21 seconds |

9.     The faces of the defendants in this action who I identify with John Doe and Jane Doe in their names are shown in the following table at the elapsed times in the video recordings to

which I just referred:

| # | Defend-ant | Image | Comments |
|---|---|---|---|
| 1 | NYPD Officer John Doe1 9/26/17 |  | He is the member of the NYPD wearing a hat and holding white objects with his left arm in this screenshot that shows Defendant Gerola and I next to him |
| 2 | NYPD Jane Doe1 9/26/17 |  | |

| 3 | NYPD Officer John Doe2 9/26/17 |  | The first screenshot shown to the left shows him at the elapsed time of 3 seconds in IMG_2180.mov.<br><br>The second screenshot shown to the left shows him at the elapsed time of 1 hour, 23 minutes, and 36 seconds in 9/26 cam1 video as I talked with him. |
| 4 | NYPD Officer Jane Doe2 9/26/17 |  | The first screenshot shown to the left shows her in the top-right corner as she held a metal barricade in 9/26 cam1 video at the elapsed time of 23 minutes and 14 seconds as Defendant Gerola and I are shown on the left as he illegally prevented me from attending the Mayor's 9/26/17 town hall.<br><br>The second screenshot shown to the left shows her in 9/26 cam1 video at the elapsed time of 52 minutes and 10 seconds in the top-right corner as I talked with her. |



| 5 | NYPD Officer Jane Doe3 9/26/17 | | This screenshot shows her in 9/26 cam1 video at the elapsed time of 1 hour and 53 minutes as she and I talked. |
|---|---|---|---|
| 6 | John Doe1 Tablet 9/26/17 | | He appears on the left in front of Defendants Atcheson and Nieves in this screenshot as they stood on a sidewalk in front of the entrance to the school that hosted the Mayor's 9/26/17 town hall. |

| 7 | Jane Doe3 9/26/17 |  | The first screenshot shown to the left shows her in 9/26 cam1 video.<br><br>The second screenshot shown to the left is from a photograph that she appears in with the Mayor that is shown in a New York Times article entitled, "Of 800,000 Poor New Yorkers, Only 30,000 Can Get the New Half-Priced MetroCards" that was published on 1/4/19, was written by David Goodman, adm is available on the Internet at:<br><br>https://www.nytimes.com/2019/01/04/nyregion/fair-fares-metrocard-discount-nyc.html |

| 8 | NYPD Officer John Doe1 9/27/17 |  | |
| 9 | NYPD Officer John Doe2 9/27/17 |  | |

| 10 | NYPD Officer John Doe3 9/27/17 |  | |
| 11 | NYPD Officer John Doe4 9/27/17 |  | NYPD Officer John Doe4 9/27/17 is a Black male who appears to the right of Defendant Gerola in this screenshot as he then wore a hat and blue shirt |

| 12 | NYPD Officer John Doe1 9/28/17 |  | |
|---|---|---|---|
| 13 | NYPD Officer John Doe2 9/28/17 |  | The first screenshot shown to the left shows him on 9/28/17 in IMG_2238.MOV.<br><br>The second screenshot shown to the left is from a video that I recorded on 10/25/17 at 12:48 pm of him and Defendant Baez as they, Defendant Nieves, and Defendant Redmond jointly and illegally prevented me from attending the public resource fair meeting that the Mayor conducted on 10/25/17 in Brooklyn with other government officials while I was conducting myself in an entirely lawful manner. |

| 14 | NYPD Officer John Doe3 9/28/17 |  | He is standing in front of a copy of the public notice that was issued for the Mayor's 9/28/17 town hall. |
|----|----|----|----|
| 15 | NYPD Officer Jane Doe1 9/28/17 |  | |

| 16 | NYPD Officer Jane Doe2 9/28/17 |  | |
| 17 | NYPD Officer Jane Doe3 9/28/17 |  | She is standing in front of a copy of the public notice that was issued for the Mayor's 9/28/17 town hall. |

| 18 | NYPD Officer Jane Doe4 9/28/17 |  | She is standing in front of a copy of the public notice that was issued for the Mayor's 9/28/17 town hall. |
|----|----|----|----|

10.     Upon information and belief, Defendants Redmond, Nieves, Gerola, Mason, Ioveno, and Dietrich were at all times relevant herein members of the NYPD security detail for New York City Mayor Bill de Blasio.

11.     At all times relevant herein, Mr. Redmond helped to direct and supervise how the Mayor's NYPD security detail operated.

12.     On 9/26/17, both Defendant Bill de Blasio and Defendant James O'Neill were responsible for how the NYPD operated. Prior to that date, I had face-to-face conversations with Mr. O'Neill on 6/26/17 and with the Mayor on both 7/16/17 and 7/18/17. My 6/26/17 conversation with Mr. O'Neill was recorded on audio and witnessed by whistleblower news censors in journalism. My 7/16/17 and 7/18/17 conversations with the Mayor also were witnessed by whistleblower news censors in journalism that included Michael Garland and Gloria Pazmino. My 7/18/17 conversation with the Mayor was recorded on video My conversations with Mr. O'Neill and the Mayor on 6/26/17, 7/16/17, and 7/18/17 partly concerned

illegal acts and omissions that Mr. Redmond and other members of the NYPD committed against me since 4/27/17 at public forums that the Mayor and other governed officials conducted. Mr. de Blasio also stood within roughly 20 feet from me as Mr. Redmond was recorded on video on 7/25/17 as he illegally assaulted me in front of many whistleblower news censors in journalism and NYPD Officer Christopher Fowler of the Mayor's NYPD security detail inside of a subway station below Broadway by Murray Street in Manhattan as Mr. Redmond continued to flagrantly violate my constitutional rights at a time and in a location in which the Mayor was illegally conducting a publicity stunt in violation of the MTA's rules that in contrast authorized me to be conducting myself in the manner in which I was then lawfully doing at the time that Mr. Redmond then began flagrantly assaulting me and violating my constitutional rights that was mainly in defense of the Mayor's reputation that I had a First Amendment right to mercilessly and lawfully attack while subjecting him to entirely valid character assassination through criticism while apprising those within earshot about why the Mayor and his administration needed to be fired by the power of their votes as well as those of those they knew as I sought to engage in word-of-mouth advertising about that.

13.     At all times relevant herein, Defendants Rachel Atcheson, Pinny Ringel, Harold Miller, Nick Gulotta, and Marco Carrion were employees of the City of New York who worked for the Mayor's CAU as Mr. Carrion was the commissioner of the Mayor's CAU.

14.     At all times relevant herein, Defendants Jessica Ramos, Eric Phillips, Jane Doe3 9/26/17, Dustin Ridener, and John Doe1 Tablet 9/26/17 were employees of the City of New York who worked for the Mayor's office.

15.     At all times relevant herein, Defendant Gale Brewer was an employee of the City of New York and worked for it as the Manhattan Borough President.

16.     At all times relevant herein, James Clynes was the court attorney for New York State Supreme Court Judge Alexander Tisch.

17.     As I stated earlier, the defendants in this action who are people violated oaths that they were required to take through the illegal acts and omissions that they committed against me on 9/26/17, 9/27/17, and 9/28/17 in relation to my efforts to lawfully attend the Mayor's **a)** 9/26/17 town hall, b) 9/27/17 resource fair, and c) 9/28/17 town hall. The specific oaths that they violated then in regards to me were those that they were required to take upon **a)** joining the NYPD and/or **b)** otherwise working for the City of New York. Those oaths required them to swear or affirm that they would perform their duties as members of the NYPD and/or other personnel of the City of New York in accordance with the U.S. Constitution and New York State Constitution to the best of their abilities. In regards to this point, the Mayor's press office made a transcript available on the Internet of a swearing-in ceremony for new members of the NYPD that the Mayor presided over on 10/8/15. That transcript is available on the Internet at

https://www1.nyc.gov/office-of-the-mayor/news/702-15/transcript-mayor-de-blasio-delivers-remarks-nypd-swearing-in-ceremony.

18.     The next screenshot shows an excerpt from that transcript that reflects how those new members of the NYPD pledged to uphold the U.S. and New York Constitution and to faithfully discharge their duties as members of the NYPD to the best of their abilities after the defendant in this action who are members of the NYPD most likely did the same before they committed illegal acts and omissions against me that this action concerns. Hindsight therefore confirms that they lied in the oaths that they took upon joining the NYPD to become part of a criminal mob as liars and con artists instead of joining the ranks of actual law-enforcement.

**Mayor:** I do hereby pledge – I'm sorry, I should say repeat after me – I do hereby pledge and declare –

**Recruits:** I do hereby pledge and declare –

**Mayor:** – to uphold the Constitution of the United States –

**Recruits:** – to uphold the Constitution of the United States –

**Mayor:** – and the Constitution of the State of New York –

**Recruits:** – and the Constitution of the State of New York –

**Mayor:** – and faithfully discharge my duties –

**Recruits:** – and faithfully discharge my duties –

**Mayor:** – as a New York City Police Officer –

**Recruits:** – as a New York City Police Officer –

**Mayor:** – to the best of my ability –

**Recruits:** – to the best of my ability –

**Mayor:** – so help me God.

**Recruits:** – so help me God.

19.     In a similar vein, other personnel of the City of New York are required upon working for the City of New York by New York State Civil Service Law §62 to take and file an oath or affirmation in which they pledge and declare that they will support the U.S. and New York State Constitution and faithfully discharge the duties of their jobs with the City of New York to the best of their abilities.

20.     On a closely related note, the following shows the terms of New York City Charter Section 435(a) that address the legal duties that all members of the NYPD have and underscores the fact that the defendants in this action who were members of the NYPD between 9/26/17 and 9/28/17 committed illegal acts and omissions against me in relation to my claims in this case by flagrantly violating and disregarding their legal duties as members of the NYPD:

> "**The police department and force shall have the power and it shall be their duty to preserve the public peace, prevent crime, detect and arrest offenders, suppress riots,**

**mobs and insurrections, disperse unlawful or dangerous assemblages and assemblages which obstruct the free passage of public** streets, **sidewalks**, parks and places; **protect the rights of persons** and property, **guard the public health**, **preserve order at** elections and **all public meetings and assemblages**; subject to the provisions of law and the rules and regulations of the commissioner of traffic,* regulate, direct, control and restrict the movement of vehicular and pedestrian traffic for the facilitation of traffic and the convenience of the public as well as the proper protection of human life and health; **remove all nuisances in the public** streets, parks and **places**; arrest all street mendicants and beggars; provide proper police attendance at fires; inspect and observe all places of public amusement, all places of business having excise or other licenses to carry on any business; **enforce and prevent the violation of all laws and ordinances in force in the city**; and for these purposes **to arrest all persons guilty of violating any law or ordinance for the suppression or punishment of crimes or offenses**.

(boldface formatting added for emphasis)

21.     By committing the illegal acts and omissions against me that my claims in this action concern, the defendants who did so and were then personnel of the City of New York violated New York City Charter §1116 that requires them to be promptly fired and prohibited from working for the City of New York again.

22.     The individual defendants are being sued herein in their individual and official capacities.

23.     At all times relevant herein, the individual defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of the NYPD and City of New York. They were acting for and on behalf of the NYPD, Mayor, Mr. Banks, HRA, and one another at all times relevant herein. While doing so, the defendants in this action who are members of the NYPD did so with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

24.     The individual defendants' acts hereafter complained of were carried out intentionally, recklessly, and oppressively with malice and egregious, callous, and wanton disregard of plaintiff's rights.

25.    At all relevant times, the individual defendants were engaged in joint ventures, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

<u>**LEGAL STANDARDS AND BACKGROUND FACTS**</u>

1.    I incorporate by reference the statements that I made in all of the preceding paragraphs as though fully set forth herein.

2.    The following excerpts from <u>*Brown v. Board of Regents of University of Nebraska*, 640 F. Supp. 674 (D. Neb. 1986)</u> and <u>*Nichols v. Hager*, No. 3: 04-CV-0559-LRH-LRL (D. Nev. Aug. 1, 2012)</u> confirm that I had a First Amendment right to have attended the Mayor's 9/26/17 town hall and 9/28/17 town hall from within the rooms in which they were conducted shortly before they began, as they were conducted, and shortly after they ended:

> <u>***Brown v. Board of Regents of University of Nebraska***</u>:
>
> "The First Amendment not only safeguards free speech and press, but public places for purposes of expressive activity. A constitutional right of access to a public forum is guaranteed to all."
>
> <u>***Nichols v. Hager***, **No. 3: 04-CV-0559-LRH-LRL (D. Nev. Aug. 1, 2012)**</u>:
>
> "Nichols has thus shown sufficient evidence that her constitutional right to attend a public meeting was violated."

3.    The U.S. Supreme Court's decision in <u>*Houchins v. KQED, Inc.*, 438 U.S. 1, 98 S. Ct. 2588, 57 L. Ed. 2d 553 (1978)</u> properly stepped back from a fallacy it expressed in <u>*Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 95 S. Ct. 1029, 43 L. Ed. 2d 328 (1975)</u> about the press as it explicitly confirmed in <u>*Houchins v. KQED, Inc.*</u> that "the Constitution provides the press with no greater right of access to information than that possessed by the public at large".

4.    By contrast, the U.S. Supreme Court erred by presumptuously and baselessly claiming that the press is a surrogate of the public in <u>*Cox Broadcasting Corp. v. Cohn*</u> that hindsight

proves is a preposterous contention. The following excerpt from *Cox Broadcasting Corp. v.*

*Cohn* reflects that preposterous claim:

> "In the first place, in a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations. Great responsibility is accordingly placed upon the news media to report fully and accurately the proceedings of government, and official records and documents open to the public are the basic data of governmental operations. Without the information provided by the press most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of government generally. With respect to judicial proceedings in particular, the function of the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice. See *Sheppard* v. *Maxwell,* 384 U. S. 333, 350 (1966)."

5.      The Mayor's 9/26/17 town hall and was conducted in violation of DOE regulations that

are discussed in *Bloomberg v. The New York City Department of Education*, No. 17 Civ. 3136

(PGG) (S.D.N.Y. Sept. 24, 2019). In order for the Mayor and New York City Councilman Dan

Garodnick to have been able to lawfully conduct the Mayor's 9/26/17 town hall within the

school in which it was conducted, invitations would have needed to have been issued to their

political rivals who sought to replace them through the 2017 New York City government

elections. No valid reason exists to believe that prerequisite was met. The following is a relevant

excerpt from that court decision:

> Regulation D-130 (the "Regulation") "governs the use of school buildings by candidates, elected officials, and political organizations and the conduct of school employees and officers with respect to political campaigns and elections." (Regulation D-130 (Abstract) (Dkt. No. 79-3)) The Regulation's introduction provides:
>
> School buildings are not public forums for purposes of community or political expression. The following sets forth the rules which govern: (1) the use of, or access to, Department of Education school buildings by elected officials, candidates for elective office, or organizations working on behalf of such officials or candidates, both during school and non-school hours; (2) use of school facilities, equipment and supplies for political purposes by school employees, personnel, or staff members and officials; and (3) conduct of school employees, personnel, or staff members and officials with respect to political campaigns and elections.

(Id. (Introduction) (footnote omitted)).

Section I.B of the Regulation addresses the use of school facilities, equipment, and supplies, and provides that — generally — these resources "may not be used on behalf of any candidate, candidates, slate of candidates, or political organization/committee." (Id. at § I(B)) In particular,

1. The use of any Department of Education school during school/business hours by any person, group, organization, committee, etc., on behalf of, or for the benefit of any elected official, candidate, candidates, slate of candidates or political organization/committee is prohibited.
2. No rallies, forums, programs, etc., on behalf of, or for the benefit of any elected official, particular candidate, candidates, slate of candidates or political organization/committee may be held in a school building.
3. No material supporting any candidate, candidates, slate of candidates or political organization/committee may be distributed, posted, or displayed in any school building....

6.     On 11/25/14, a news organization named Gothamist published a news article that is entitled, "De Blasio Wrongfully Barred Press From Event At Public School" that was written by Christopher Robbins and is available on the Internet at https://gothamist.com/news/de-blasio-wrongfully-barred-press-from-event-at-public-school. That article reported that members of the Mayor's staff illegally prevented members of the press from attending a meeting that the Mayor conducted in a public school in flagrant violation of the First Amendment. DOI investigated that incident and issued a report on 11/25/14 in which it confirmed that the Mayor's office wrongfully barred members of the press from that meeting. That report by DOI is available on the Internet at https://www1.nyc.gov/assets/doi/reports/pdf/2014/2014-11-25-Pr29cwareport.pdf. Hindsight confirms that the following remarks that were made about that and are attributable to the Mayor and a spokesman for him named Wiley Norvell that are reported in that article were blatant lies as both the Mayor and Mr. Norell fraudulently claimed then that the Mayor's administration wouldn't again illegally prevent people from attending public meetings that the Mayor conducted inside of public buildings in New York City:

a.   Remarks by the Mayor:

"It was a mistake. I think by definition we were in a public building. The media should have been allowed...That was a mistake by my team and a mistake we won't make again."

b.   Remarks by Wiley Norvell:

"We've reviewed the report's findings and will improve our internal procedures to ensure the inadvertent mistake is not repeated."

7.      On 9/8/17, the Mayor's office issued a press release on the Internet that is entitled, "Mayor de Blasio Signs 12 Bills Strengthening Justice and Equity in New York City" and is available on the Internet at https://www1.nyc.gov/office-of-the-mayor/news/581-17/mayor-de-blasio-signs-12-bills-strengthening-justice-equity-new-york-city in relation to the public hearing that the Mayor conducted at 2 pm in the Blue Room in City Hall that NYPD Officer Cruz (shield #: 751) illegally prevented me from attending and testifying in with at least one other person in flagrant violation of my constitutional rights and other applicable laws. The following blatant lies and fraudulent misrepresentations that Mr. Banks expressed about the Mayor's administration's commitment to Fourteenth Amendment equal protection rights appear in that press release:

a.   "Diversity and inclusion are the foundation of our City"

b.   "We applaud this Administration's commitment to these core values and for making a concerted effort to ensure that all New Yorkers, regardless of race, gender, and sexual orientation have equal access to services and resources".

8.      To honor Ruth Bader Ginsburg's legacy in the wake of her having recently passed away, I'll next discuss remarks that she and former fellow U.S. Supreme Court Justice Antonin Scalia made on 4/17/14 about what the First Amendment stands for as both of them were being interviewed by a journalist. Their remarks during that interview are shown and heard in a video recording on C-Span's web site in a report that is entitled, "Justices Scalia and Ginsburg on the First Amendment and Freedom". That report and video recording is available on the Internet at

https://www.c-span.org/video/?318884-1/conversation-justices-scalia-ginsburg-2014. At the

elapsed time of 9 minutes and 57 seconds in that video, Justice Ginsburg made the following

remarks about the First Amendment:

> "This says, "Congress shall make no law abridging the freedom of speech or of the press"
> so it's…it's directed to government and it says, "Government, hands off. These rights
> already exist and you must not touch them.""

9.      The next screenshot is from that video and shows Justice Ginsburg as she made the

preceding remarks:



10.     At the elapsed time of 19 minutes and 6 seconds in that video, Justice Scalia made the

following remarks about the First Amendment:

> "I think if you had to pick…and you probably shouldn't have to….but if you had to pick
> one freedom that was…that is the most essential to the, uh…functioning of a democracy,
> it has to be freedom of speech because democracy means persuading one another and
> uh…and then ultimately voting and the majority…the majority rules. You can't run such
> a system if uh…if if …there is uh…muzzling of uh…one point of view. So, it's a
> fundamental freedom in a democracy…much more necessary in a democracy than in any
> other system of government. I guess you could run an effective monarchy without
> freedom of speech. I don't think you could run an effective democracy without it."

11.     The next screenshot is from that video and shows Justice Scalia as he made the preceding

remarks:



12.     The discussion that follows addresses critically significant remarks that former Second

Circuit Judge Christopher Droney stated on 3/26/19 during the oral arguments hearing that was

conducted in _Knight First Amendment Inst. Columbia v. Trump_, 928 F.3d 226 (2d Cir. 2019) as

he was recorded on video while making them. Although the findings that were expressed in the

written decisions that were issued in _Knight First Amendment Inst. Columbia v. Trump_, 928 F.3d

226 (2d Cir. 2019) and _Knight First Amendment Institute v. Trump_, 302 F. Supp. 3d 541

(S.D.N.Y. 2018) focused on public forums that exist through the use of Twitter, much of what

was discussed during the oral arguments hearings in those cases addressed public forums that are

conducted in the physical world that include town hall meetings that are conducted inside of

schools. In fact, _Knight First Amendment Inst. Columbia v. Trump_, 928 F.3d 226 (2d Cir. 2020)

confirmed that people have and have had a legal right to attend public forums that occur in the

real world apart from Twitter and other social media platforms. The following are a pair of

relevant excerpts from that decision:

    a.  "A simple analogy to physical public fora makes it clear that the distinction between a tweet and its interactive space is appropriate: **at a town hall meeting held by public officials, statements made by the officials are protected government speech. If, however, public comment is allowed at the gathering—as it is on any tweet posted to the Account—the officials may not preclude persons from participating in the debate based on their viewpoints.** Significantly, that discrimination is impermissible even when the public forum is limited and is "of [the State's] own creation." *Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819, 829 (1995); *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) ("The Constitution forbids a state to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place")."

                (boldface formatting added for emphasis)

    b.  "Excluding people from an otherwise public forum such as this by blocking those who express views critical of a public official is, we concluded, unconstitutional viewpoint discrimination."

13.    The Second Circuit's decision in *Knight First Amendment Inst. Columbia v. Trump*, 928

F.3d 226 (2d Cir. 2020) was based upon the earlier decision that it issued in it as well as the

decision that U.S. District Judge Norma Reice Buchwald issued in it at the district court level.

The term "town hall" appears no less than **11 times** in the written transcript that was prepared

from the oral hearing that Judge Buchwald conducted on 3/8/18 in *Knight First Amendment*

*Institute v. Trump*, 302 F. Supp. 3d 541 (S.D.N.Y. 2018) before she issued her 5/23/18 decision

in that case.

14.    The discussion that follows addresses the oral arguments hearing that the Second Circuit

conducted on 3/26/19 in *Knight First Amendment Inst. Columbia v. Trump*, 928 F.3d 226 (2d

Cir. 2019) as C-Span recorded that hearing on video. That video recording has accurate closed-

captioning available for its playback and is available on the Internet at https://www.c-

span.org/video/?459092-1/circuit-hears-oral-argument-presidents-twitter-account-case. The

following remark that former Second Circuit Judge Christopher Droney made about First Amendment rights in public forums that exist in such places as streets, sidewalks, and parks instead of the Internet during that oral arguments hearing was recorded at the elapsed time of 13 minutes and 2 seconds in that video:

> "For the First Amendment, it doesn't really have to be much more burdensome. If it's more burdensome at all, if you have to move down the street, that violates the First Amendment."

15. What follows are 4 screenshots from that video as I played it back with closed-captioning turned on that show Judge Droney as he made the remarks that correspond to the preceding excerpt and is otherwise heard making them as the video camera that recorded that hearing turned away from him as he made those remarks. Those screenshots and Judge Droney's statements during that hearing that apply to them, the First Amendment, public forums, and being coerced to move down the street in regards to efforts that are taken to lawfully attend public forums from within the rooms in which they are conducted as they are conducted confirm that defendants in this action illegally prevented me from attending the Mayor's **a)** 9/26/17 town hall, **b)** 9/27/17 town hall, and **c)** 9/28/17 town hall as they subjected me to illegal segregation and discrimination in violation of my rights pursuant to the First Amendment, Fourth Amendment, Fifth Amendment, Fourteenth Amendment, New York State's Open Meetings Law, and other applicable laws in relation to my efforts to lawfully attend those public forums within the rooms in which they were conducted as they were conducted. One of the ways that they did so was by having illegally coerced me to move away from where I was lawfully waiting in a line with other members of the public on 9/26/17, 9/27/17, and 9/28/17 to be granted access to the buildings that hosted those public forums to attend them from within the rooms in which they were conducted. I recall having arrived to the sites of the Mayor's **a)** 9/26/17 town hall and **b)**

9/28/17 town hall sufficiently early. That fact led me to having been in a position in the line of people that formed outside of and next to the buildings that hosted those public forums that should have otherwise caused me to have been granted access to the rooms in which those public forums were conducted by virtue of the fact that I lawfully waited in line to be granted access to those public forums on a first-come first-serve orderly basis instead of the patently illegal, discriminatory, arbitrary, and **cherry-picking** manner that members of the Mayor's NYPD security detail and Mayor's staff followed that flagrantly violated my First Amendment and Fourteenth Amendment rights as well as other applicable laws.









16.     *Kittay v. Giuliani*, 112 F. Supp. 2d 342 (S.D.N.Y. 2000) explicitly states "that individuals have a right to communicate directly to government officials". Acts and omissions that are committed by government personnel that prevent people from attending public forums by being in the same room as government officials with whom they then seek to exercise their rights pursuant to the First Amendment and Fourteenth Amendment to "communicate directly to government officials" directly violates this finding from *Kittay v. Giuliani* because such illegal prior restraints on First Amendment rights of peaceable assembly, expressive association, speech and other forms of expression, petitioning for redress, and receiving information illegally block direct communication with government officials by those who are barred from such rooms.

17.     *Citizens United v. Schneiderman*, 203 F. Supp. 3d 397 (S.D.N.Y. 2016) addressed illegal prior restraints on First Amendment rights as follows:

> "A prior restraint on speech violates the First Amendment if it places "unbridled discretion in the hands of a government official or agency." *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988)."

18.     The following are a pair of excerpts from *Elrod v Burns,* 427 US 347 (1976) about First Amendment rights that include the right to lawfully assemble in a public forum that include town hall meetings, public resource fair meetings, and public hearings:

a.      "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."

b.      "The timeliness of political speech is particularly important. See _Carroll v. Princess Anne_, 393 U. S. 175, 182 (1968); Wood v. Georgia, 370 U. S. 375, 391-392 (1962)."

19.    The following excerpt from _Hartman v. Moore_, 547 U.S. 250, 126 S. Ct. 1695, 164 L. Ed. 2d 441 (2006) confirms that government personnel are prohibited from subjecting people to reprisals in response to protected conduct:

> "Official reprisal for protected speech "offends the Constitution [because] it threatens to inhibit exercise of the protected right," _Crawford-El v. Britton,_ 523 U. S. 574, 588, n. 10 (1998), and the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out, _id.,_ at 592; see also _Perry_ v. _Sindermann,_ 408 U. S. 593, 597 (1972) (noting that the government may not punish a person or deprive him of a benefit on the basis of his "constitutionally protected speech"). Some official actions adverse to such a speaker might well be unexceptionable if taken on other grounds, but when nonretaliatory grounds are in fact insufficient to provoke the adverse consequences, we have held that retaliation is subject to recovery as the but-for cause of official action offending the Constitution. See _Crawford-El, supra,_ at 593; _Mt. Healthy City Bd. of Ed._ v. _Doyle,_ 429 U. S. 274, 283-284 (1977)"

20.    The excerpt shown next from _Dorsett v. County of Nassau_, 732 F.3d 157 (2d Cir. 2013) makes clear that a violation of a person's right to freedom of expression isn't the only ground upon which someone can establish that his or her First Amendment rights have been violated. It instead confirms that there are other ways that a person's First Amendment right may be violated. Such ways include and aren't limited to subjecting a member of the public who seeks to attend public town hall and public resource fair meetings within the rooms in which they're conducted as they're conducted by members of the public in a collaborative manner with the Mayor and other government officials to patently unequal and illegal discriminatory treatment in violation of the Fourteenth Amendment without any rational basis and legitimate government justification at the entrance to buildings that host such public forums by applying "additional

scrutiny" that oppressively and pre-emptively prevents and otherwise unreasonably impedes and delays the person's First Amendment and Fourteenth Amendment right of access to a public forum.

> "As we have recognized, there is some tension in our First Amendment standing cases. _Gill v. Pidlypchak_, 389 F.3d 379, 381 (2d Cir.2004). We have sometimes given the impression that silencing of the plaintiff's speech is the only injury sufficient to give a First Amendment plaintiff standing. For example, in _Curley v. Village of Suffern_, a case relied upon by the district court, we wrote that "To prevail on this free speech claim, plaintiff must prove... [that] defendants' actions effectively chilled the exercise of his First Amendment right." 268 F.3d at 73; _see also Colombo v. O'Connell_, 310 F.3d 115, 117 (2d Cir.2002); _Spear v. Town of W. Hartford_, 954 F.2d 63, 67 (2d Cir.1992). This was an imprecise statement of law.
>
> **Chilled speech is not the _sine qua non_ of a First Amendment claim. A plaintiff has standing if he can show _either_ that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm. Various non-speech related harms are sufficient to give a plaintiff standing.** _Zherka v. Amicone_, 634 F.3d 642, 646 (2d Cir. 2011) (lost government contract); _Tabbaa v. Chertoff_, 509 F.3d 89, 102 (2d Cir.2007) (**additional scrutiny at border crossing**); _Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals_, 282 F.3d 83, 90 (2d Cir.2002) (revoking a building permit); _Gagliardi v. Vill. of Pawling_, 18 F.3d 188, 195 (2d Cir.1994) (refusal to enforce zoning laws)."

(boldface formatting added for emphasis)

21.     Findings in _Piesco v. City of New York, Dept. of Personnel_, 933 F.2d 1149 (2d Cir. 1991) and _Hampton Bays Connections, Inc. v. Duffy_, 127 F. Supp. 2d 364 (E.D.N.Y. 2001) explicitly confirm that all of the activities listed next are constitutionally protected activities. I was engaged in all of those types of activities on and immediately leading up to 9/26/17, 9/27/17, and 9/28/17 against the Mayor's administration, the Mayor's NYPD security detail, other members of the NYPD, HRA, Mr. Banks, HRA's business partners that included NTT, and Urban, and others that included a judge in my HRA lawsuit and judges that the Mayor appointed. Among the ways that I engaged in such activities were through what was my ongoing HRA lawsuit that was a hybrid proceeding that was comprised of article 78 claims and plenary claims, by distributing

whistleblowing literature about matters of public concern in front of and within the buildings in which the Mayor conducted town hall meetings as they were conducted and shortly before they began, and by trying to testify on 9/8/17 against the NYPD, the Mayor, and others during a public forum that the Mayor conducted in City Hall that I was illegally prevented from attending by a member of the NYPD that I discussed earlier.

**Constitutionally protected activities**:

a.  Commencing Article 78 proceedings and attending public meetings and hearings.

b.  Circulating a petition.

c.  Testifying to a government body while engaging in a free discussion of governmental affairs that was partly about the manner in which government should be operated instead of how it was being operated.

d.  Appealing a decision by a city agency.

e.  Petitioning for government reforms.

f.  Appealing the denial of public assistance benefits.

22.     Prior to, on, and immediately leading up to 9/26/17, I actively participated in all of the preceding types of protected conduct and otherwise tried to do so as I was illegally prevented from doing so on both 8/30/17 and 9/8/17 by members of the NYPD at the Mayor's 8/30/17 town hall and the Mayor's 9/8/17 public hearing. Defendant Nieves and Mr. Redmond were personally involved with other members of the NYPD in having caused me to be illegally ejected from the Mayor's 8/30/17 town hall in retaliation for protected speech I engaged in while talking with other members of the public near me that was largely against Mr. Redmond. That occurred as I lawfully sat in the gym that would shortly thereafter begin hosting that town hall. Mr. Redmond illegally and deliberately initiated physical contact with my body then and there that I

immediately objected to while I ordered him to get away from me and to leave me alone. After

he eventually walked away, Defendant Nieves approached where I continued to lawfully sit and

conduct myself and illegally coerced me to leave that gym by illegally making physical contact

with my body and illegally seizing my backpack. Other members of the NYPD thereafter joined

him in illegally coercing me to leave that gym while also illegally pushing from behind. Findings

in _Wright v. Musanti_, No. 14-cv-8976 (KBF)(S.D.N.Y. Jan. 20, 2017) confirm that the physical

contact that was made with my body by members of the NYPD while I was in that gym on

8/30/17 constituted assault against me because I regarded that contact as offensive.

23.     Prior to trying to attend the Mayor's 9/26/17 town hall, I was actively involved in

litigation activity against the City of New York and the defendants. On 9/5/17, New York State

Supreme Court Judge Alexander Tisch issued an order in my HRA lawsuit in which he flagrantly

violated my First Amendment and Fourteenth Amendment rights to then be able to effectively

petition for redress, have access to the courts, and be accorded proper due process by him in a

manner would be in full accordance with _Goldberg v. Kelly_, 397 U.S. 254, 90 S. Ct. 1011, 25 L.

Ed. 2d 287 (1970) clearly expressed is required of due process. _Goldberg v. Kelly_ requires due

process to be granted at a meaningful time in a meaningful way that is tailored to an individual's

circumstances and capacity to be heard. The order that Judge Tisch issued on 9/5/17 in my HRA

lawsuit was in response to an order to show cause application that I submitted in that case while

New York State Supreme Court Judge Nancy Bannon was on vacation and could not hear that

application then for that reason. He also issued that order while Judge Bannon was then running

for re-election as a judge and after she behaved in the following ways while she was assigned to

my HRA lawsuit:

          a.      She illegally granted an illegal ex-parte adjournment application that an attorney

for HRA named Jeffrey Mosczyc caused to be faxed to her chambers on 4/5/17 in

which he asked her to adjourn the oral arguments hearing that she set on 1/26/17

to be conducted on 4/12/17 in my HRA lawsuit. She illegally granted that in spite

of the fact that I was never given any notice of that application before she illegally

granted it. I certainly had a First Amendment and Fourteenth Amendment right to

have submitted opposition in response to that illegal ex-parte adjournment

application and to have my opposition fully and properly considered by her prior

to her making a decision about Mr. Mosczyc's illegal ex-parte adjournment

application. Instead, Judge Bannon's court clerk left me a voicemail message at

9:56 am on 4/11/17 in which he apprised me of the fact that Judge Bannon

illegally granted Mr. Mosczyc's illegal 4/5/17 ex-parte adjournment application. I

instantly knew that Mr. Mosczyc had engaged in illegal gamesmanship by

submitting his illegal 4/5/17 adjournment application in an ex-parte manner that is

explicitly prohibited by the New York State Court System's regulations, Judge

Bannon's written rules of practice, and my First Amendment and Fourteenth

Amendment rights. I immediately knew all of that largely because my HRA

lawsuit was then parallel litigation with respect to related litigation that I was

engaged in against HRA about identical claims that was assigned to OTDA. On

4/11/17, OTDA conducted a fair hearing between HRA and I by telephone that

both OTDA and I recorded on audio. My audio recording of that hearing was

among the exhibits that I stored on the USB thumb drive that I submitted in my

HRA lawsuit in conjunction with my 5/19/17 order to show cause application.

The sum and substance of what is heard in that audio recording confirms that

Judge Bannon in her 8/10/17 decision by claiming that I hadn't exhausted my administrative remedies for claims that I asserted against HRA as she then referred to OTDA as the New York State administrative appellate forum for claims asserted against HRA. An attorney for HRA named Marin Gerber both lied about material matters during that 4/11/17 OTDA fair hearing and flagrantly violated res judicata for matters that were already decided in my favor against HRA in relation to the fair hearing decision that OTDA issued in my favor against HRA on 9/15/16 that OTDA illegally thereafter refused to fully enforce and HRA refused to fully comply with. Also, the OTDA administrative law judge who presided over my 4/11/17 fair hearing with HRA confirmed that she wouldn't allow that hearing to address additional claims that I asserted against HRA that Jackie Donovan of OTDA's compliance division had added to the agenda for that 4/11/17 fair hearing. I'm referring to additional claims that I apprised OTDA about in a 62-page fax that I faxed to OTDA on 2/9/17 in order for it to perform its legal duty to have fair hearings conducted within 30 days thereafter to address those claims against HRA. OTDA instead illegally never conducted a fair hearing about those additional claims and continued to illegally bar me from its offices located at 14 Boerum Place in Brooklyn where it conducts fair hearings in flagrant violation of my constitutional rights while never granting me any due process to allow me to challenge the lack of validity for that ban and discrimination. OTDA has been illegally barring me from that office ever since an OTDA administrative law judge illegally terminated a fair hearing that I participated in at that office on 7/5/16 while OTDA recorded it on audio. That

audio recording confirms that administrative law judge illegally terminated that fair hearing while I was in the middle of trying to lawfully answer a question that I was asked during it.

b.     She illegally ignored material and admissible evidence that I submitted in that case on 5/19/17 in conjunction with an order to show cause application. That evidence was stored on a USB thumb drive and mostly consisted of relevant audio and video recordings.

c.     She ignored an application that I made in my 5/19/17 order to show cause application to have my HRA lawsuit unsealed, the City of New York ordered to enable me to attend public meetings that the Mayor and Mr. Banks would thereafter continue to conduct, and the City of New York ordered to preserve video recording evidence that was recorded on 4/27/17 at the site of the Mayor's 4/27/17 town hall at which I was illegally prevented from attending the Mayor's 4/27/17 town hall. My HRA lawsuit was sealed in January of 2017 at my request and I sought for it to be unsealed on 5/19/17 largely to be able to be able to better publicize Judge Bannon's misconduct in my HRA lawsuit and the illegal acts and omissions that members of the Mayor's NYPD security detail, other members of the NYPD, and members of the Mayor's staff had been committing against me since the Mayor's 4/27/17 town hall. In short, I sought to lawfully use the sum and substance of my HRA lawsuit as a weapon to engage in large-scale character assassinations to ruin the re-election hopes of the Mayor, Judge Bannon, members of the City Council, and other government officials in 2017 largely by engaging in word-of-mouth advertising about its entirety while attending public forums that

members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, other government officials, and journalists in the rooms in which they were conducted as they were conducted, shortly before they began, and shortly after they ended while they were recorded on video that was broadcast over the Internet.

d.    She lied in the decision that she issued on 8/10/17 in that case. In that decision, she lied partly by suggesting that I had claimed that HRA stole wages of mine in spite of the fact that I never claimed that and I never worked for HRA. She also severed claims that I asserted in that case from her jurisdiction through that decision that caused those matters to be reassigned to Judge Tisch, who then arbitrarily, capriciously, and illegally refused to begin dealing with those severed and transferred claims until after 9/1/18 in flagrant violation of my First Amendment and Fourteenth Amendment rights. Judge Tisch instead illegally referred those transferred back to Judge Bannon through his 9/5/17 order while essentially treating them like the Coronavirus and a hot potato that he wanted to have absolutely nothing to do with.

e.    She **a)** lied in her 1/31/18 decision in my HRA lawsuit by fraudulently claiming that there wasn't anything that she overlooked and misapprehended in issuing her 8/10/17 decision and **b)** illegally disposed of my HRA lawsuit in its entirety in spite of the fact that I continued to have claims that were pending to be addressed in it by virtue of the fact that she previously severed them from her jurisdiction in her 8/10/17 decision. Judge Tisch thereafter illegally waited until 9/17/18 to issue an order that reinstated my HRA lawsuit. He thereafter illegally did nothing to

adjudicate my claims in my HRA lawsuit that Judge Bannon caused to be

assigned to him.

24.     The next screenshot is from the last page of Judge Bannon's 8/10/17 decision in my HRA

lawsuit. The remarks that she expressed in it refer to my having been illegally prevented from

attending the Mayor's 4/27/17 town hall and the Mayor's 5/23/17 resource fair meeting partly by

Defendants Nieves, Gerola, and Atcheson while I was conducting myself lawfully.



25.     The following excerpt from _Reno v. American Civil Liberties Union_, 521 U.S. 844, 117

S. Ct. 2329, 138 L. Ed. 2d 874 (1997) relates to how protected speech of public concern that I

engaged in and sought to continue to engage in against the Mayor, Mr. Banks, HRA, HRA's

business partners that include Urban and NTT, the Mayor's NYPD security detail, other

members of the NYPD, other government personnel, whistleblower news censors in journalism,

OTDA, Judge Bannon and other judges, New York State court officers could be amplified by

having me attend public forums that the Mayor and other government officials conducted on and after 3/15/17 while they were recorded on video that was broadcast over the Internet, attended by members of the public who took photographs and recorded video recordings while doing so and otherwise reported about what was discussed during them, and attended by members of the press who reported about matters that were discussed during them:

> "Through the use of chat rooms, any person with a phone line can become a town crier with a voice that resonates farther than it could from any soapbox. Through the use of Web pages, mail exploders, and newsgroups, the same individual can become a pamphleteer. As the District Court found, "the content on the Internet is as diverse as human thought." 929 F. Supp., at 842 (finding 74). We agree with its conclusion that our cases provide no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium."

26.     If garbage in New York City's fake news industry that included the following people and many more in 2017 had opted to responsibly stop wrongfully subjecting me to whistleblower news censorship as they instead served as dutiful and subservient accomplices of the Mayor's administration and the NYPD to rig the outcomes of the 2017 New York City government elections for the benefit of the Mayor's administration, City Council, other government officials, and NYPD by engaging in behavior that is tantamount to voter suppression, voter fraud, viewpoint discrimination, and whistleblower retaliation, then I wouldn't have needed to try to attend public forums that the Mayor and other government officials conducted in 2017 after 3/15/17 as much to try to overcome and equitably expose their censorship that proximately enabled widespread terrorism by the NYPD across New York City since May of this year:

> Grace Rauh, Gloria Pazmino, Michael Gartland, Graham Rayman, Erin Durkin, Jillian Jorgensen, Errol Louis, Courtney Gross, Mara Gay, David Goodman, Matthew Chayes, Ben Max, Julia Marsh, Madina Toure, Yoav Gonen, Jeff C. Mays, Gwynne Hogan, Jessica Layton

27.     I recall Julia Marsh having told me during a telephone call that she threw away a copy of my 5/19/17 order to show cause application in my HRA lawsuit after I asked her if I could get it

back from her after she informed me that the New York Post wouldn't pursue any reporting

about my HRA lawsuit. That occurred after I was recorded on video on 5/23/17 as I talked with

Mr. Gartland on 5/23/17 face-to-face inside of the Bronx Supreme Court as I was being illegally

prevented from attending the Mayor's 5/23/17 resource fair as I clearly told him then that I was

illegally prevented from attending the Mayor's 4/27/17 town hall as well and that I was a

whistleblower against the Mayor's administration and the NYPD as I also then had an ongoing

lawsuit against HRA. During that meeting, I showed him a copy of my 5/19/17 order to show

cause application that I brought with me to discuss with Mr. Banks, the Mayor, journalists, and

members of the public while attending the Mayor's 5/23/17 resource fair. I also wrote down the

index number of my HRA lawsuit and my contact information on a notepad that he handed to me

as we sat next to one another on a bench in that courthouse on 5/23/17 to enable him to follow-

up with me about my HRA lawsuit. The next 2 screenshots are from a video recording that was

recorded on 5/23/17 by a video security camera that OCA controls that was then installed above

the entrance to Room 105 on the first floor of the Bronx Supreme Court. OCA provided me that

video recording in response to a FOIL demand that I submitted to it. Those screenshots

correspond to parts of that video that were recorded between 9:30 am and 10 am on 5/23/17 as

the Mayor's 5/23/17 resource fair was conducted in the Veterans' Memorial Hall chamber

located in that courthouse during the U.S. Navy's annual "Fleet Week" event in New York City,

and while I continued to be a Navy veteran that the Mayor's administration and NYPD were

stabbing in the back by flagrantly violating my constitutional rights at public forums to steal the

2017 New York City government elections by doing their utmost to illegally silence and prevent

valid criticism against the Mayor's administration, its business partners, and members of the

NYPD at public forums that the Mayor, Mr. Banks, members of the City Council, and other

government officials jointly conducted with the public, journalists, and whistleblower news censors in journalism. These screenshots show me as I **a)** took a notepad from Mr. Gartland for the purpose that I discussed above and **b)** showed him the copy of my 5/19/17 order to show cause application in my HRA lawsuit that was in a large white bag of mine.

 

28.     The following are relevant excerpts from _Piesco v. City of New York, Dept. of Personnel_ that underscore what I have discussed above:

a.      A statement that is made about the competency of a police officer "clearly is a matter of public concern" because "the police officer represents the most basic unit of government, one which arguably most affects the day-to-day lives of the citizenry".

b.      "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of government, _the manner in which government is operated or should be operated_, and all such matters relating to political processes."

c.     "The Supreme Court has recognized that one of the critical purposes of the first amendment is to provide society with a basis to make informed decisions about the government."

d.     The "first amendment guarantees that debate on public issues is "`uninhibited, robust, and wide open'".

e.     Speech "on matters of public concern is that speech which lies `at the heart of the First Amendment's protection'".

f.     "A court is required to accept as true a plaintiff's allegation that retaliatory actions by the City of New York were precipitated by prior testimony he or she gave to a committee."

g.     "Without a searching inquiry into these motives, those intent on punishing the exercise of constitutional rights could easily mask their behavior behind a complex web of post hoc rationalizations."

h.     Summary "judgment is inappropriate when `questions of motive predominate in the inquiry about how big a role' "protected behavior played in" causing an adverse action to occur.

29.    The following excerpt from _McCutcheon v. Federal Election Com'n_, 134 S. Ct. 1434, 572 U.S. 185, 188 L. Ed. 2d 468 (2014) also addresses illegal prior restraints on First Amendment rights:

a.     "The First Amendment "is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, ... in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests." _Cohen v. California,_ 403 U.S. 15, 24, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). As relevant here, the First Amendment safeguards an individual's right to participate in the public debate through political expression and political association. See _Buckley,_ 424 U.S., at 15, 96 S.Ct. 612."

b.     "First Amendment rights are important regardless whether the individual is, on the one hand, a "lone pamphleteer[] or street corner orator[] in the Tom Paine mold," or is, on the other, someone who spends "substantial amounts of money in order to communicate [his] political ideas through sophisticated" means. _National Conservative Political Action Comm.,_ 470 U.S., at 493, 105 S.Ct. 1459. Either way, he is participating in an electoral debate that we have recognized is "integral to the operation of the system of government established by our Constitution." _Buckley, supra,_ at 14, 96 S.Ct. 612."

30.     The following excerpt from *New York Times Co. v. United States*, 403 U.S. 713, 91 S. Ct.

2140, 29 L. Ed. 2d 822 (1971) addresses illegal prior restraints on First Amendment rights:

> "Any system of prior restraints of expression comes to this Court bearing a heavy
> presumption against its constitutional validity." *Bantam Books, Inc.* v. *Sullivan*, 372
> U. S. 58, 70 (1963); see also *Near* v. *Minnesota*, 283 U. S. 697 (1931). The
> Government "thus carries a heavy burden of showing justification for the imposition
> of such a restraint." *Organization for a Better Austin* v. *Keefe*, 402 U. S. 415, 419
> (1971). The District Court for the Southern District of New York in the *New York
> Times* case and the District Court for the District of Columbia and the Court of
> Appeals for the District of Columbia Circuit in the *Washington Post* case held that the
> Government had not met that burden. We agree."

31.     The following is a relevant excerpt from *Doe v. City of New York*, No. 18-cv-670

(ARR)(JO) (E.D.N.Y. Jan. 9, 2020) that confirms that I had a First Amendment right to criticize

all government personnel who were at the sites of the Mayor's **a)** 9/26/17 town hall, **b)** 9/27/17

resource fair, and **c)** 9/28/17 town hall as well as all previous public forums that they conducted

without being retaliated against for doing so:

> ""[t]he right to criticize public officials is at the heart of the First Amendment's right of
> free speech." *Kaluczky v. City of White Plains,* 57 F.3d 202, 210 (2d Cir. 1995) (citing
> *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 282 (1964)). Indeed, the "right to criticize the
> police without reprisal" is "clearly" an "interest protected by the First Amendment,"
> *Kerman v. City of New York,* 261 F.3d 229, 241-42 (2d Cir. 2001), as "[t]he First
> Amendment protects a significant amount of verbal criticism and challenge directed at
> police officers[,]" *id.* at 242 (quoting *City of Houston v. Hill,* 482 U.S. 451, 461 (1987)).
> Thus, on summary judgment, the Second Circuit has held that a plaintiff established a
> First Amendment retaliation claim when he proffered facts showing that police officers
> retaliated against him for making derogatory comments to the officers and for threatening
> to sue them. *Kerman,* 261 F.3d at 241-42.[3]""

32.     The following excerpt from *Puckett v. City of Glen Cove*, 631 F. Supp. 2d 226 (E.D.N.Y.

2009) reinforces the preceding findings from *Doe v. City of New York*:

> "Plaintiff must first allege that she engaged in protected activity to state a First
> Amendment claim of retaliation. The First Amendment protects the right of access to
> the courts, and an individual's right to complain to public officials. *Lewis v. Casey,*
> 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (right of access); *Monsky
> v. Moraghan,* 127 F.3d 243, 246 (2d Cir.1997) (right of access); *Patriots Way, LLC v.*

*Marconi,* 2007 WL 988712 *4 (D.Conn.2007); *see Colondres v. Scoppetta,* 290 F.Supp.2d 376, 381 (E.D.N.Y.2003) (right of access is "bound up" with the First Amendment right to petition the government); *Gagliardi,* 18 F.3d at 194-95 (right to complain to public officials protected by First Amendment). These First Amendment rights include the right to be free from retaliation for their exercise. *Colondres,* 290 F.Supp.2d at 382; *see Patriots Way,* 2007 WL 988712 *6."

33.    *Hershey v. Kansas City Kansas Community College*, No. 2: 16-cv-2251-JTM (D. Kan.

Feb. 17, 2017) includes the following findings about standardless discretion that is used to

violate constitutional rights at public forums and confirms that those who are denied access to a

public forum in violation of their constitutional rights as a result of standardless discretion aren't

required to establish that he or she was discriminated against in that way because of the content

of his or her expression with respect to the First Amendment:

> "Because plaintiff has alleged that access to the public forum is based on "standardless discretion" of College officials, he need not show that he was discriminated against based on the content of his materials. **"A government regulation that allows arbitrary application is `inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view."'** Forsyth Cty., Ga. v. Nationalist Movement, 505 U.S. 123, 130 (1992)"

> (boldface formatting added for emphasis)

34.    *Hopper v. City of Pasco*, 241 F.3d 1067 (9th Cir. 2001) also addresses standardless

discretion as follows:

> "Courts have also been reluctant to accept policies based on subjective or overly general criteria. "`[S]tandards for inclusion and exclusion' in a limited public forum `must be unambiguous and definite' if the `concept of a designated public forum is to retain any vitality whatever.'" *Christ's Bride,* 148 F.3d at 251 (quoting *Gregoire v. Centennial Sch. Distr.,* 907 F.2d 1366, 1375 (3d Cir.1990)). Absent objective standards, government officials may use their discretion to interpret the policy as a pretext for censorship. *See Board of Educ. v. Mergens,* 496 U.S. 226, 244-45, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (generalized definition of permissible content poses risk of arbitrary application); *Putnam Pit, Inc. v. City of Cookeville,* 221 F.3d 834, 845-46 (6th Cir.2000) ("broad discretion [given] to city officials [raises] possibility of discriminatory application of the policy based on viewpoint"); *Cinevision Corp. v. City of Burbank,* 745 F.2d at 560 (9th Cir.1984) (vague standard has "potential for abuse"); *Gregoire,* 907 F.2d at 1374-75 ("virtually unlimited discretion" granted to city officials raises danger of

arbitrary application); *see also City of Lakewood v. Plain Dealer Publ. Co.,* 486 U.S. 750, 758-59, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) (absence of express standards in licensing context raises dual threat of biased administration of policy and self-censorship by licensees). Therefore, "the more subjective the standard used, the more likely that the category will not meet the requirements of the first amendment." *Cinevision,* 745 F.2d at 575; *see also Christ's Bride,* 148 F.3d at 251 (suppression of speech under defective standard requires closer scrutiny)."

35.  Prior to becoming a judge of the Second Circuit, Denny Chin was the U.S. District

Judge who issued the decision in *Million Youth March, Inc. v. Safir*, 63 F. Supp. 2d

381 (S.D.N.Y. 1999) that commenced in response to decisions that were made by the

Community Affairs Unit of the New York City Mayor's Office in relation to

demonstrators who sought to exercise their First Amendment rights in a public forum

in New York City. Judge Chin addressed standard discretion to violate First

Amendment rights and viewpoint discrimination in that decision. The following is a

relevant excerpt from that decision about illegal prior restraints that were imposed on

those demonstrators that led to them being granted an injunction against the NYPD to

allow them to exercise their constitutional rights in a public forum:

> "The right to free speech, however, applies not only to politically correct statements but also to statements that we may disagree with and that, indeed, we may abhor. At least as frightening as the rhetoric of Mr. Muhammad is the possibility of a society where freedom of speech is not respected, and where the right to speak publicly can be denied on the basis of administrative whim, personal dislike, or disapproval of anticipated content."

> MYM's motion for a preliminary injunction is granted to the extent ordered by the Second Circuit last year in *Million Youth March, Inc. v. Safir,* 155 F.3d 124, 126 (2d Cir.1998)."

36.  The following is a relevant excerpt from the related decision that the Second Circuit

issued in *Million Youth March, Inc. v. Safir*, 155 F.3d 124 (2d Cir. 1998) in which it also briefly

addressed standardless discretion to violate First Amendment rights.

In granting the injunction, the District Court properly recognized that "any permit

scheme controlling the time, place, and manner of speech must not be based on the content of the message, must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication." *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 130, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). The District Court found as a fact that the City denied the plaintiff's application in the exercise of authority pursuant either to the so-called "Activity Rules" of the Street Activity Permit Office of the Community Affairs Unit of the Office of the Mayor or a combination of the Activity Rules and the parade permit rules of Section 10-110 of the New York City Administrative Code. The Court also concluded that the Activity Rules accorded administrators unfettered discretion contrary to well established First Amendment limitations. *See Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). Since the City's denial was issued by the Community Affairs Unit, without any reference to Section 10-110, the record plainly supports the finding that the Activity Rules were either the exclusive authority invoked for the denial of the application or at least a substantial part of such authority. At this stage of the litigation, we have no basis to question the Court's conclusion that the standardless nature of the Activity Rules rendered the denial a violation of the First Amendment.

37.     In *Matal v. Tam*, 137 S. Ct. 1744, 582 U.S., 198 L. Ed. 2d 366 (2017), the U.S. Supreme

Court stated the following about viewpoint discrimination:

> "Giving offense is a viewpoint. The "public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Street v. New York,* 394 U.S. 576, 592, 89 S.Ct. 1354, 22 L.Ed.2d 572. Pp. 1761-1764.

38.     On 2/19/20, a leader and trailblazer named David Rem lawfully and awesomely

performed a key civic duty by standing up during the public town hall meeting that the Mayor

conducted in Forest Hills in Queens as he told the Mayor that he was New York City's worst

Mayor ever while that town hall meeting was recorded on video as a result of arrangements that

the Mayor's office made. That video is available on the Internet at

https://www.youtube.com/watch?v=5le6DCaxiG8. Mr. Rem is shown in that video at the elapsed

time of 1 hour, 37 minutes, and 55 seconds as he told the Mayor that he was New York City's

worst Mayor ever. In response to that criticism, Mr. Rem received cheers and applause from

members of that town hall's audience as one of those people rose from his seat to applaud Mr.

Rem and pay proper respect to him for his leadership and outspokenness while taking the gloves

off so to speak at the Mayor's expense in such a refreshing way during that public forum. This proves that the finding in _Cohen v. California_, 403 U.S. 15, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971) that states that "it is nevertheless often true that one man's vulgarity is another's lyric" is true during public forums that the Mayor conducts. This discussion also confirms that I had a First Amendment and Fourteenth Amendment right to beat Mr. Rem to the punch on 9/26/17, 9/27/17, and 9/28/17 by attending the town hall and resource fair meetings that the Mayor conducted on those dates within the room in which they were conducted and similarly criticizing the Mayor, Mr. Banks, members of the Mayor's NYPD security detail, members of the Mayor's staff, and many others while doing so. It's worth pointing out that Mr. Rem was illegally retaliated against in violation of his First Amendment rights on 2/19/20 as the Mayor used a hand signal to illegally direct Mr. Redmond and others to coerce Mr. Rem to abruptly leave that town hall.

39.    The following is a relevant excerpt from _Paterno v. City of New York_, No. 17 Civ. 8278 (LGS) (S.D.N.Y. July 31, 2018) that addresses the legal standard for a "stigma-plus" claim that corresponds to defamation:

> ""To establish a `stigma-plus' claim, a plaintiff must show (1) [stigma —] the utterance of a statement sufficiently derogatory to injure [plaintiff's] reputation, that is capable of being proved false, and that he or she claims is false, and (2) [a plus —] a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights." _Vega v. Lantz_, 596 F.3d 77, 81 (2d Cir. 2010); _accord Dowd v. DeMarco_, No. 17 Civ. 8924, 2018 WL 2926619, at *7 (S.D.N.Y. June 12, 2018). Accordingly, "even where a plaintiff's allegations are sufficient to demonstrate a government-imposed stigma, such defamation is not, absent more, a deprivation of a liberty or property interest protected by due process." _Vega_, 596 F.3d at 81; _accord McNaughton v. de Blasio_, No. 14 Civ. 221, 2015 WL 468890, at *14 (S.D.N.Y. Feb. 4, 2015). "Burdens that can satisfy the `plus' prong under this doctrine include the deprivation of a plaintiff's property, and the termination of a plaintiff's government employment." _Sadallah v. City of Utica_, 383 F.3d 34, 38 (2d Cir. 2004) (internal citations omitted); _accord Filteau v. Prudenti_, 161 F. Supp. 3d 284, 294 (S.D.N.Y. 2016). "However, deleterious effects flowing directly from a sullied reputation, standing alone, do not constitute a `plus' under the `stigma plus' doctrine." _Sadallah_, 383 F.3d at 38; _accord Autotech Collision Inc. v. The Inc. Vill. of Rockville Ctr._, 673 F. App'x 71, 74 (2d Cir.

2016) (summary order)."

40.     On a related note, the following findings that the Second Circuit issued in <u>Ragbir v. Homan</u>, 923 F.3d 53 (2d Cir. 2019) address viewpoint discrimination and acts committed by government personnel against a leading activist named Ravidath Ragbir in retaliation for efforts that he undertook to try to attract news coverage against ICE:

> ""It is a fundamental principle of the First Amendment that the government may not punish or suppress speech based on disapproval of the ideas or perspectives the speech conveys." <u>Matal v. Tam,</u>       U.S.      , 137 S.Ct. 1744, 1765, 198 L.Ed.2d 366 (2017). "Such discriminat[ion] based on viewpoint is an `egregious form of content discrimination,' which is `presumptively unconstitutional.'"[24] <u>Id.</u> at 1766 (quoting <u>Rosenberger v. Rector & Visitors of Univ. of Va.,</u> 515 U.S. 819, 829-30, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995)). The Supreme Court has further described viewpoint discrimination as a "blatant" "violation of the First Amendment." <u>Rosenberger,</u> 515 U.S. at 829, 115 S.Ct. 2510.
>
> Ragbir's plausible allegations and evidence, which we must accept as true at this juncture, support that the Government singled him out for deportation based not only on the viewpoint of his political speech, but on the public attention it received. In a declaration by Micah Bucey, a New York City minister, Bucey asserts that ICE's New York City Field Office Director, Scott Mechkowski, stated that Ragbir and Jean Montrevil were ICE's two most prominent cases in New York City and complained that the activists' protests and comments to the press negatively portrayed ICE to the public and to others in the Government. According to Bucey, Mechkowski stated: "Nobody gets beat up in the news more than we do, every single day. It's all over the place, ... how we're the Nazi squad, we have no compassion." App'x 252. Mechkowski then stated that he had heard Ragbir's New Sanctuary cofounder Montrevil (whom ICE had also just detained) "ma[ke] some very harsh statements. I'm like, `Jean, from me to you... *you don't want to make matters worse by saying things.*" App'x 252 (emphasis added). Mechkowski then turned to Ragbir specifically, stating that it "bother[ed]" him that "there isn't anybody in this entire building that doesn't ... know about Ravi." App'x 253. "Everybody knows this case," Mechkowski stated, "[n]o matter where you go." App'x 253. Ragbir's counsel Alina Das also submitted a declaration stating that she spoke with Mechkowski, who expressed "resentment" about the events of the March 9, 2017 check-in and disapprovingly mentioned that he had heard Ragbir's statements to the press. App'x 55-56, 123.
>
> A plausible, clear inference is drawn that Ragbir's public expression of his criticism, and its prominence, played a significant role in the recent attempts to remove him."

41.     The retaliation that Mr. Ragbir experienced in retaliation for his efforts to receive news

coverage is comparable to illegal acts and omissions that were committed against me on 9/26/17, 9/27/17, and 9/28/17 by the defendants that prevented me from attending the town hall and resource fair meetings that the Mayor conducted on those dates from within the rooms in which they were conducted. I believe that those acts and omissions were partly driven by efforts that I undertook to attract news coverage partly about **a)** my HRA lawsuit and **b)** illegal acts and omissions that members of the Mayor's NYPD security detail, other members of the NYPD, members of the Mayor's staff, the Mayor, Defendant O'Neill had been committing against me since 4/27/17 in relation to my efforts to lawfully attend public forums that members of the public conducted in a collaborative manner with the Mayor, Mr. Banks, other government personnel, whistleblower news censors in journalism, and journalists within the rooms in which they were conducted as they were conducted.

42.      Concerning what I just discussed, I received a 374-page PDF file from the Mayor's office on 2/15/19 in response to a FOIL demand that I submitted to it. That PDF file includes e-mail messages that senior members of the Mayor's staff, Mr. Redmond, and others sent about me in 2017 about illegal acts and omissions that were committed against me by themselves, Mr. Redmond, and others in relation to my efforts to lawfully attend public forums that consisted of public town hall meetings and public resource fair meetings in the rooms in which they were conducted as they were conducted that were conducted on 4/11/17, 4/27/17, 5/23/17, 6/8/17 by members of the public in a collaborative manner with the Mayor, Mr. Banks, members of the City Council, other government officials, whistleblower news censors in journalism, and members of the press. Redactions were applied to the many of the e-mail messages shown in that PDF file before I received it. That PDF file includes e-mail messages that were sent on 6/28/17 and 6/29/17 about me between **a)** Erin Durkin while she then worked for the New York Daily

News and **b)** Defendant Ramos and the Mayor's former mouthpiece, Eric Phillips. As I partly discussed earlier in this complaint, e-mail messages in that PDF file also confirm that Jaclyn Rothenberg, Defendant Ramos, and Raquel Lucas of the Mayor's administration communicated updates on 4/10/17 and 6/28/17 to other members of the Mayor's administration about the status of my HRA lawsuit and related litigation that was assigned to OTDA that I pursued against HRA as Defendant Ramos blatantly lied to Ms. Durkin about that on 6/28/17 at 5:42 pm while she committed defamation against me in the process:

      a.      Raquel Lucas of HRA on 4/10/17 at 5:24 pm. That e-mail message served to help those who received it to engage in damage-control and intense screening against me partly in preparation for my planned attendance on 4/11/17 at the Mayor's public resource fair meeting that he would conduct in Staten Island then. That e-mail message was sent after Jeffrey Mosczyc of HRA submitted an illegal ex-parte adjournment application on 4/5/17 in my HRA lawsuit through which he and Judge Bannon used a fraudulent pretext to flagrantly commit obstruction of justice and witness tampering against me as they criminally stole my First Amendment and Fourteenth Amendment right to testify as originally scheduled in the oral arguments hearing on 4/12/17 in my HRA lawsuit. That damage-control and screening was also about **a)** my fair hearing with OTDA against HRA on 4/11/17 and **b)** whistleblowing that I engaged in as I talked with the Mayor on 3/15/17 during the town hall meeting he conducted and in an e-mail message that I sent to Shauna Stribula of the Mayor's CAU on 3/16/17 at 10:54 pm after I met her during that 3/15/17 town hall that both Mr. Gartland and Mr. Redmond attended as well before Mr. Gartland nor any other whistleblower news censor in

journalism reported anything about what I talked with the Mayor about during
that town hall. That e-mail message from Ms. Lucas on 4/10/17 appears on pages
211 and 212 within that PDF file and has redactions applied to it in numerous
areas. Ms. Lucas then worked as a special assistant for Mr. Banks. The subject
line of that e-mail message is: "Staten Island Resource Fair 4/11 Re: Towaki
Komatsu". The next screenshot from that e-mail message confirms that Ms. Lucas
apprised the recipients of that e-mail message of confidential litigation matters
that were between HRA and I that concerned my 4/11/17 OTDA fair hearing in
violation of applicable privacy laws that include New York State Social Services
Law §136(2) and 18 NYCRR §357:

> In addition to his claims for legal services, he has also made a claim for reimbursement for three
> months in 2016 ▇▇▇▇▇▇▇▇▇▇▇▇▇ His claim is subject to a fair hearing before the state
> tomorrow.

Also, the fact that e-mail message was sent by Ms. Lucas to the following people
naturally raises a question about what were the specific, credible, legitimate, and
justifiable reasons why 6 senior members of the Mayor's administration that
included a Harvard Law School graduate paid such special attention to me **a)** one
day before I would engage in litigation against HRA that was assigned to OTDA,
**b)** 2 days before I was then scheduled to engage in related litigation against HRA
while presenting oral arguments publicly against HRA in my HRA lawsuit while
the scope of my claims in it were far more extensive and damaging to the Mayor's
administration and its business partners, and **c)** one day before I would attend the
Mayor's 4/11/17 public resource fair meeting outside of which Mr. Banks yet
again flat-out lied to my face about my efforts to obtain pro-bono legal

representation or legal assistance from HRA's legal services partners through referrals that I received to them by HRA as he refused to talk with me if I recorded that conversation on video:

    i.    Mr. Banks.

    ii.    Defendant Carrion.

    iii.    Rachel Lauter. According to her career profile on the LinkedIn web site that is available on the Internet at https://www.linkedin.com/in/rachel-lauter/, she then worked for the Mayor's office as a Deputy Chief of Staff and graduated from Harvard Law School.

    iv.    Kayla Arslanian. She was then the Deputy Director of Intergovernmental Affairs within the Mayor's office.

    v.    Jaclyn Rothenberg. She appears to have been a spokeswoman for the Mayor between April of 2017 and May of 2017.

    vi.    Jennifer Yeaw. According to her career profile on the LinkedIn web site that is available on the Internet at https://www.linkedin.com/in/jennifer-yeaw/, she then worked for the New York City Department of Social Services as its Chief of Staff.

b.    Jaclyn Rothenberg on 6/28/17 at 5:18 pm. Ms. Rothenberg's remarks in the e-mail message that she sent at 5:18 pm on 6/28/17 to others in the Mayor's administration and Defendant Redmond about me, my HRA lawsuit, and town hall meetings that the Mayor conducted that I discussed earlier in this complaint refers to the oral arguments hearing that was conducted on 6/7/17 in my HRA lawsuit to make up for the 4/12/17 oral arguments hearing that Judge Bannon and

Mr. Mosczyc's criminally stole from me. Ms. Rothenberg also referred to an order to show cause application that I served upon HRA on 6/6/17 at its office located at 150 Greenwich Street in Manhattan. That address is also known as 4 World Trade and "4WTC".

43.     After sending that e-mail message at 5:18 pm on 6/28/17 about me, Ms. Rothenberg sent another e-mail message on 6/29/17 at 9:43 am that appears on pages 361 and 362 in the 374-page PDF file, is heavily redacted, and was also about me and town halls as confirmed by the subject line in both of those e-mail messages.  That 6/29/17 9:43 am e-mail message was sent to the following people:

> Defendant Ramos, Mr. Carrion, Ricky Da Costa, Andrea Hagelgans, Eric Phillips, Mr. Redmond, Michael Casca, Kayla Arslanian, Emma Wolfe, Jeff Lynch, and Shauna Stribula

44.     I recorded Ms. Stribula on 4/27/17 in the immediate area of where I was near the entrance to the school that hosted the Mayor's 4/27/17 town hall as I was being illegally prevented from entering that school to have to resort to watching how that town hall was conducted on a television screen in an overflow room instead of within the room in which it was conducted after I was issued an admission ticket to access that overflow room by a female member of the Mayor's staff on 4/27/17 at that site. I recorded Ms. Stribula then largely because I observed her behaving in a manner that suggested that she was part of a criminal conspiracy that then existed between Mr. Redmond and Andrew Berkowitz of the Mayor's NYPD security detail as well as Harold Miller and Pinny Ringel of the Mayor's CAU to illegally prevent me from attending that town hall in violation of **a)** 18 U.S.C. §245(b)(5), 18 U.S.C. §241, NYPL §240.20, NYPL §240.26, NYPL §175.25, 5 U.S.C. §1502(a)(1), **b)** my constitutional rights, and **c)** other applicable laws.

45.     On 6/24/17, an eyewitness of mine sent an e-mail message at 4:26 pm to a whistleblower news censor in journalism named Graham Rayman who works for the New York Daily News about what that witness and I experienced on 6/8/17 as we tried to lawfully attend the Mayor's 6/8/17 town hall from within the room in which it was conducted as it was conducted. What follows shows **a)** the header section from that e-mail message without the sender's information and **b)** 2 excerpts from the body of that e-mail message. Since I previously agreed to respect that witness' privacy, I'm not disclosing the identity nor gender of that witness who then worked for the New York State Attorney General's office and I had just met by chance for the first time on 6/8/7. In that e-mail message, "the guard" refers to Defendant Gerola and the "Mayor's staff member" refers to Ms. Stribula.

> **Subject:** Re: Information about police misconduct on 6/8 at Mayor's public town hall meeting in Rego Park
> **Date:** June 24, 2017 at 4:26:20 PM EDT
> **To:** Towaki Komatsu <towaki_komatsu@yahoo.com>
> **Cc:** "Rayman, Graham" <grayman@nydailynews.com>
>
> a.      "I would just like to add that I was allowed to write my question on a card, after which the guard told me they would allow me in to ask the question after they reviewed it and people emptied the room. As the room emptied, they did not let me in saying that the room was full even though we saw empty seats in the TV screens. When I asked a Mayor's staff member why they wouldn't let me in, she explained it was because I was associated with Towaki and he was a "harasser", but did not explain anything else to me."
>
> b.      "I just met him that day. I also think maybe they did not let me in because they did not like my question which was about police accountability, but I'm not sure about that since I know someone else in the room was allowed to ask a question about broken windows policing. Also, please keep my name anonymous. Thanks."

46.     Contrary to a fraudulent remark that Ms. Stribula expressed to that witness that appears I that e-mail message by claiming that I was a "harasser", I was certainly a whistleblower against the Mayor's administration, the NYPD, HRA, Mr. Banks, and HRA's business partners then

after I had been criminally harassed by members of the Mayor's NYPD security detail, other members of the NYPD, members of the Mayor's staff, HRA, and HRA's business partners leading up to that date at public forums and in other ways that enabled me to be viciously assaulted on 7/2/16. T hat 7/2/16 assault involved me having been brutally punched on my head near my left temple more than 15 times by my former roommate (Ronald Sullivan) in the living room of where I reside. That caused me to sustain a concussion that in turn cost me my ability to perform well during a job interview that I had on 8/18/16 for a job that offered to pay $450 daily. That assault was enabled by HRA having criminally and jointly subjected me to a bait-and-switch fraud and forgery with Urban that concerned the binding and fully-enforceable apartment lease agreement that I signed on 2/16/16 in HRA's offices located at 33 Beaver Street in Manhattan with Lisa Lombardi of Urban. I signed that agreement in front of witnesses to be issued sole possession of apartment 4C in the building in which I reside with no roommate and in a fully-furnished condition shortly thereafter

47.     Records that HRA has maintained about me and provided to me confirm that HRA illegally altered that lease agreement within 2 days after I signed it. Urban's personnel thereafter issued me a patently invalid and fraudulent lease on or about 3/7/16 that included a photocopy of the signature page that was from the actual lease that I signed on 2/16/16. While doing so on or about 3/7/16, Urban's personnel issued me shared possession of apartment 4B within the building in which I reside that included a time bomb named Ronald Sullivan as a roommate. HRA's records also confirm that I reported that illegal bait-and-switch fraud and forgery to HRA on 3/16/16 prior to realizing that HRA illegally altered my lease within 2 days after I signed it. I also met with HRA's ombudsman's staff on 3/10/16 in its offices located at 33 Beaver Street during which I reported that illegal bait-and-switch fraud and forgery. However, HRA illegally

failed to remedy that that illegal bait-and-switch fraud and forgery that it criminally perpetrated against me.

48.     Prior to assaulting me on 7/2/16 in the living room of our shared apartment, Mr. Sullivan tried to do precisely that on 5/12/16 in that living room while we were in the immediate presence of one of Urban's personnel named Thomas Fair. However, Mr. Fair physically restrained him as he suddenly rushed toward me to assault me. He tried that right after he had been making verbal threats to do so in Mr. Fair's presence. Although I promptly sent cell phone text messages on 5/12/16 to someone Molly McCracken to have her function as an intermediary between Urban and I to convey my demands to Urban for it to immediately evict Mr. Sullivan because he just proved that he was a clear threat to my safety where I resided, Ms. McCracken informed me that my demands were rejected. Ms. McCracken then worked for an organization named Services for the Services, Inc. ("SUS") that is a business partner of HRA. On 5/19/16, I had telephone conversations with Ms. Lombardi and Ronald Abad of Urban to try to persuade them to immediately evict Mr. Sullivan. They refused. Urban's personnel were required by applicable law to immediately notify both HRA and OTDA in response to Mr. Sullivan's attempted assault against me on 5/12/16 and his actual assault against me on 7/2/16. His 7/2/16 assault against me was both foreseeable and preventable by them and Urban. Also, though 18 NYCRR §491.9(c) prohibited Mr. Sullivan from residing in the building in which I reside without OTDA's approval because of the threat that he posed to my comfort and safety in it, he was able to do so even after he viciously assaulted me on 7/2/16 until I was finally issued an order of protection against him on or about 10/6/6 by the Bronx District Attorney's office. In fact, the NYPD unconscionably released Mr. Sullivan on 7/11/16 after arresting him then for having assaulted me on 7/2/16 where I reside.

49.     To wrap up this discussion of Mr. Sullivan, the Bronx District Attorney's office engaged in prosecutorial misconduct as it prosecuted Mr. Sullivan for assaulting me on 7/2/16. It did so by not presenting any witness other than me in that case in spite of the fact that Mr. Sullivan made incriminating remarks to another tenant on 7/2/16 in the building I which I reside as Mr. Sullivan fled from the building in which I reside. Mr. Sullivan told that witness that he had just assaulted me in our apartment and described how he did so. The Bronx District Attorney's office also engaged in misconduct by not pursuing an appeal as far as it could have of the arbitrary and capricious ruling that Bronx Criminal Court Judge Cori Weston issued in the criminal case against Mr. Sullivan for assaulting me on 7/2/16. That ruling suppressed information from an admissible security log that was maintained by Urban's personnel who worked inside of the building in which I reside. Information in that log included remarks by Urban's personnel on 7/2/16 about the fact that they observed Mr. Sullivan appearing angry as he fled from the building in which he had just assaulted me. The Mayor appointed Cori Weston as a judge. Due to what I just discussed, Mr. Sullivan was fraudulently found not guilty by Judge Weston in February of 2017. *Johnson v. NYC HEALTH & HOSPS*, 246 A.D.2d 88, 676 N.Y.S.2d 38, 676 N.Y.S. 38 (App. Div. 1998) established a precedent that confirmed that security logs are admissible evidence in criminal cases.

50.     What follows shows e-mail messages that I sent to and received from Graham Rayman on 6/28/17 that concerned a news article that he claimed he was working on that would be about my having been illegally prevented from attending public town hall and public resource fair meetings that the Mayor conducted with others since 4/27/17. Nothing was ever reported about that by him nor anyone else who then worked for the New York Daily News in spite of the fact that an eyewitness confirmed to him that it had occurred on 6/8/17 and Jessica Ramos confirmed

to Ms. Durkin on 6/28/17 that it had occurred as she lied to Ms. Durkin about why it occurred.

Mr. Rayman was then working with Ms. Durkin about that possible news article. Also, nothing

was ever reported about that in spite of the fact that a photojournalist for the New York Daily

News named Jefferson Siegel took photographs of me in front of the NYPD's headquarters for

the news article that Mr. Rayman expressed to me that he was working on.

> **From:** "Rayman, Graham" <grayman@nydailynews.com>
> **Subject:** Re: My RSVP for 5/23 Bronx Resource Fair!
> **Date:** June 28, 2017 at 6:16:01 PM EDT
> **To:** Towaki_Komatsu <towaki_komatsu@yahoo.com>
>
> Ok thanks. Will continue working on it tomorrow.
>
> Sent from my iPhone
>
> On Jun 28, 2017, at 6:09 PM, Towaki_Komatsu <towaki_komatsu@yahoo.com> wrote:
> By the way, I've got a video of NYPD Officer Gerola telling me on 4/27 after 10 pm that
> it was the Mayor's staff that was responsible for having kept me out of that event.
> Unfortunately, my phone was pointed at the ground as I accidentally recorded that video.
> Also, I then talked with both Nic Gulotta and Harold Miller of his staff to try to get an
> explanation about why I had been discriminated against by Redmond on 4/27. I met
> Harold Miller on 4/11 in Staten Island's Borough Hall after Mr. Banks lied to me outside
> that building.
>
> On Jun 28, 2017, at 5:41 PM, Rayman, Graham <grayman@nydailynews.com> wrote:
>
> Was it the resource fair you were barred from, or the mayor's Bronx town hall? Those
> were two separate events.

51.     Similarly, what follows shows an e-mail message that I received from Mr. Gartland on

7/16/17 at 3:31 pm as well as an e-mail message that I sent to him on that date at 3:26 pm. Mr.

Gartland clearly expressed to me then that  the New York Post was planning to issue a news

report about my having been illegally barred from public forums since 4/27/17 that the Mayor

and others had been conducting. However, neither he nor anyone else who then worked for the

New York Post ever reported anything about that and wasted my time instead while proving to

be useless.

**From:** Michael Gartland <mgartland@nypost.com>
**Subject:** Re: 4-27-17 audio clip of NYPD Officer Gerola (badge #: 6577) proving Jessica Ramos lied to Jill Jorgensen
**Date:** July 16, 2017 at 3:31:27 PM EDT
**To:** Towaki_Komatsu <towaki_komatsu@yahoo.com>

We're planning a story for tomorrow. Pls keep your cell handy.


On Jul 16, 2017, at 3:26 PM, Towaki_Komatsu <towaki_komatsu@yahoo.com> wrote:

Hi Michael,

As discussed, attached is a video recording I accidentally recorded on 4-27-17 while talking with NYPD Officer Gerola at about 10:20 pm right outside of the school in Long Island City that hosted the Mayor's town hall on that date.


Although Mr. Gerola isn't seen in the video (except for his shoes and leg) because I didn't mean to be recording, he can be heard in it clearly expressing that the Mayor's staff controls who is allowed to attend his town halls. That remark directly contradicts Jessica Ramos' remark in Jill Jorgensen's article I shared with you.

Also, the video clip is part of a longer recording I made shortly after I was shoved 3 times in the chest by NYPD Officer Beato (badge #: 13326) of the 108th Precinct. Prior to shoving me, he illegally ordered me to move from where I legally stood on the sidewalk adjacent to that school in order to ask the Mayor from a sufficient distance away what he was willing to do about the fact that the head of his security detail (Howard Redmond) illegally subjected me to viewpoint discrimination by not letting me attend that town hall.

Since I was standing roughly 45 feet away from where the Mayor later left that building to ask him this question before Mr. Beato shoved me and Mr. Gerola let me stand within roughly 15 feet of him on April 11th in Staten Island, it was entirely clear I had a legal right to remain where I stood on the sidewalk to ask the Mayor my question.

People who witnessed Mr. Beato shoving me were Lieutenant Nieves, a 2nd ordinary NYPD officer, and Mr. Gerola.

Regards,

Towaki

Tel: 201-315-5484

52.    What I have discussed above about whistleblowing and litigation I engaged in were among other things that I intended to engage in protected whistleblowing and political speech and expression about that were of public concern while attending the town hall and resource fair meetings that the Mayor conducted on 9/26/17, 9/27/17, and 9/28/17 within the rooms in which they were conducted as they were conducted partly to try to prevent others from suffering similar hardships largely by trying to have those responsible for them to be immediately fired and criminally prosecuted.

53.    The following is a relevant excerpt from _Walsh v. Enge_, 154 F. Supp. 3d 1113 (D. Or. 2015) that makes it clear that the judge who issued it refused to accept the practice of prospectively barring someone from public forums without due process being accorded:

> "This case requires the Court to decide whether the First Amendment allows a Mayor or his or her designee, acting pursuant to a city ordinance, to exclude a person, potentially indefinitely, from attending future City Council meetings to which the public is otherwise invited to attend and present their opinions simply because the person has been disruptive at previous meetings. The First Amendment protects, among other things, "freedom of speech" and "petitioning for a governmental redress of grievances." U.S. Const. amend. I. The First Amendment is incorporated into the Fourteenth Amendment and thus applies to the states and local governmental bodies. _Gitlow v. New York_, 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138 (1925). No appellate opinion of which this Court is aware has ever held that the First Amendment permits prospective exclusion orders from otherwise public city council meetings. A presiding officer may remove a disruptive individual from any particular meeting, and a sufficiently disruptive person may even be prosecuted for such conduct if public law permits. But no matter how many meetings of a city council a person disrupts, he or she does not forfeit or lose the future ability to exercise constitutional rights and may not be prospectively barred from attending future meetings. Our democratic republic is not so fragile, and our First Amendment is not so weak."

54.    In a similar vein, _Karem v. Trump_, No. 19 Civ. 2514 (D.D.C. Sep. 3, 2019), _Cable News Network, Inc. v. Trump_, No. 18 Civ. 2610 (D.D.C. Nov. 16, 2018), _Nicholas v. Bratton_, No. 15-CV-9592 (JPO) (S.D.N.Y. May 23, 2019) concerned fraudulent pretexts that were employed by the White House and NYPD to violate the First Amendment, Fifth Amendment, and Fourteenth

Amendment rights of journalists named Brian Karem, Jim Acosta, and Jason Nicholas in regards to their ability to use press credentials partly to gain access to meetings conducted by despicable government officials who **a)** disavow civil rights, **b)** benefit from voter fraud and voter suppression and **c)** are devoid of values and integrity. Ultimately, Donald Trump, the White House, and the NYPD lost and otherwise relented in response to those lawsuits by returning press credentials to Mr. Karem, Mr. Acosta, and Mr. Nicholas. Press credentials are functionally equivalent to admission tickets that are issued to members of the public that grant them access to town hall meetings that the Mayor conducts within the rooms in which they're conducted. In particular, findings in <u>Nicholas v. Bratton</u>, No. 15-CV-9592 (JPO) (S.D.N.Y. Feb. 27, 2017) is quite pertinent because it discusses both a fraudulent pretext that the NYPD used against Mr. Nicholas and his contention that that practice amounted to "pre-emptive censorship" against him. Defendant Ramos communicated fraudulent pretexts to Ms. Durkin about why I was illegally barred from public forums that the Mayor conducted with others since 4/27/17. She did so as she pointed out to Ms. Durkin in the e-mail message that she sent to her on 6/28/17 at 3:27 pm that I discussed earlier in this complaint that I would continue to be illegally barred from attending public town hall meetings that the Mayor conducted with others with respect to my ability to attend them from within the rooms in which they would be conducted as they were conducted. That practice indisputably was illegal "pre-emptive censorship" and a prior restraint against my constitutional rights.

55.     The following is a pertinent excerpt from <u>In re Kaiser,</u> 722 F.2d 1574 (2d Cir. 1983) about mendacity that is particularly applicable to my claims in this pleading and lies that Ms. Ramos expressed to Ms. Durkin about me in e-mail messages that appear in the 374-page PDF file:

"the cumulative effect of all the falsehoods together evidences a pattern of reckless and cavalier disregard for the truth serious enough to supply the necessary fraudulent intent required"

56.     The following excerpt from _St. Mary's Honor Center v. Hicks_, 509 U.S. 502, 113 S. Ct.

2742, 125 L. Ed. 2d 407 (1993) further discusses mendacity in the context of discriminatory

intent:

> "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will _permit_ the trier of fact to infer the ultimate fact of intentional discrimination,[4] and the Court of Appeals was correct when it noted that, upon such rejection, "[n]o additional proof of discrimination is _required,_ " 970 F. 2d, at 493 (emphasis added). But the Court of Appeals' holding that rejection of the defendant's proffered reasons _compels_ judgment for the plaintiff disregards the fundamental principle of Rule 301 that a presumption does not shift the burden of proof, and ignores our repeated admonition that the Title VII plaintiff at all times bears the "ultimate burden of persuasion.""

57.     The following is a pertinent excerpt from _Regional Economic Community v. City of_

_Middletown_, 294 F.3d 35 (2d Cir. 2002) that concerns discriminatory intent and how it may be

inferred:

> "Discriminatory intent may be inferred from the totality of the circumstances, including ... the historical background of the decision ...; the specific sequence of events leading up to the challenged decision ...; [and] contemporary statements by members of the decision-making body...." _LeBlanc_, 67 F.3d at 425 (citations and internal quotation marks omitted)."

58.     _Nicholas v. Bratton,_ No. 15-CV-9592 (JPO) (S.D.N.Y. Mar. 26, 2019) includes the

following finding that concerns the right to engage in discovery by obtaining non-redacted

copies of e-mail messages in order to uncover discriminatory intent and fraudulent pretexts:

> "The Court previously ordered that portions of the email chain at Docket Number 188-24, referred to by the Parties as "Exhibit 27," be redacted and filed under seal. (_See_ Dkt. Nos. 189, 192.) "Because of the importance of th[is] sealed material to [the] disposition of this matter, [the Court] order[s] that [this email chain now] be unsealed." _Cox v. Onondaga Cty. Sheriff's Dep't,_ 760 F.3d 139, 150 (2d Cir. 2014).

59.  In _Trump v. Vance_, 591 S. Ct. (U.S. 2020), the U.S. Supreme Court stated the following

about discovery:

> "In our judicial system, "the public has a right to everyman's evidence.""

60.  _Va. Pharmacy Bd. v. Va. Consumer Council_, 425 U.S. 748, 96 S. Ct. 1817, 48 L. Ed. 2d

346 (1976) includes the following relevant findings about the mutual right to communicate and

receive information from speakers that applies to the fact that I was illegally prevented from

attending the town hall and resource fair meetings that the Mayor conducted on 9/26/17, 9/27/17,

and 9/28/17 within the rooms in which they were conducted as they were conducted during

which I would have otherwise lawfully **a)** communicated quietly in a non-disruptive manner with

those who would have been seated near me and been willing to do so with me before that town

hall began, as it was conducted, and shortly after it ended and **b)** exercised my First Amendment

and Fourteenth Amendment right to have talked with government officials in those rooms:

    a.  "we acknowledged that this Court has referred to a First Amendment right to "receive information and ideas," and that freedom of speech " `necessarily protects the right to receive."'

    b.  "Freedom of speech presupposes a willing speaker. But where a speaker exists, as is the case here,[14] the protection afforded is to the communication, to its source and to its recipients both. This is clear from the decided cases."

61.  _Schneider v. State (Town of Irvington)_, 308 U.S. 147, 60 S. Ct. 146, 84 L. Ed. 155 (1939)

confirms that people have a First Amendment to peaceably assemble and distribute literature in a

public forum when and where they choose to do so in the absence of a government restriction

that is objectively valid in stark contrast to a self-serving and fraudulent pretext manufactured by

the NYPD and Mayor's office to prevent and otherwise minimize criticism for the sake of optics.

62. The following is an excerpt from _Karem v. Trump_, No. 19-CV-5255 (D.C. Cir. June 5, 2020)

    that addressed what is required of due process in the context of a denial of access to

government officials through the revocation of a press credential:

> "A fundamental principle in our legal system," the Supreme Court observed in *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012), "is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *Id.* at 253. Such "[e]lementary notions of fairness," the Court explained in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), "dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that [the government] may impose." *Id.* at 574. "This requirement of clarity[,] . . . essential to the protections provided by the Due Process Clause of the Fifth Amendment," *Fox Television*, 567 U.S. at 253, "is implicated" whenever the government imposes "civil penalties," *Gore*, 517 U.S. at 574 n.22 (emphasis omitted). Where such penalties "threaten[] to inhibit the exercise of constitutionally protected rights[,] . . . a more stringent vagueness [and fair-notice] test should apply." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982).
>
> That "essential . . . protection[]" of fair notice applies here. *Fox Television*, 567 U.S. at 253. As we explained in *Sherrill*, "the interest of a bona fide Washington correspondent in obtaining a White House press pass . . . undoubtedly qualifies as [a] liberty [interest] which may not be denied without due process of law under the fifth amendment." 569 F.2d at 130–131. And because "any deprivation" of a protected liberty interest must "be effected pursuant to constitutionally adequate procedures," *Brandon v. District of Columbia Board of Parole*, 823 F.2d 644, 648 (D.C. Cir. 1987), a duly issued hard pass may not be suspended without due process. Accordingly, "[e]lementary notions of fairness" required that Karem "receive fair notice not only of the conduct that [would] subject him to punishment, but also of the . . . magnitude of the sanction that [the White House] might impose." *Gore*, 517 U.S. at 574. Furthermore, because the suspension of a hard pass, like the denial of a hard pass, "implicate[s]" "important first amendment rights," *Sherrill*, 569 F.2d at 130, we evaluate Karem's suspension under a particularly "stringent vagueness [and fair-notice] test," *Village of Hoffman Estates*, 455 U.S. at 498–99.
>
> Applying that test, we think Karem's due process claim is likely to succeed because, on this record, nothing put him on notice of "the magnitude of the sanction"—a month-long loss of his White House access, an eon in today's news business—that the White House "might impose" for his purportedly unprofessional conduct at the non-press-conference event. *Gore*, 517 U.S. at 574.

63.     The following pertinent excerpt from the U.S. Supreme Court's decision in <u>Buckley v. American Constitutional Law Foundation, Inc., 525 U.S. 182, 119 S. Ct. 636, 142 L. Ed. 2d 599 (1999)</u> that concerns whistleblowing, government accountability, and transparency:

> "[a] public armed with information . . . is better able to detect" wrongdoing.

See *id.,* at 67; see also *Grosjean* v. *American Press Co., 297 U. S. 233, 250 (1936)* (observing that an "informed public opinion is the most potent of all restraints upon misgovernment"). "`Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman.' " *Buckley v. Valeo, supra,* at 67, and n. 80 (quoting L. Brandeis, Other People's Money 62 (1933))."

64. The following are relevant excerpts from *Housing Works, Inc. v. Turner*, 00 Civ. 1122 (LAK)(JCF) (S.D.N.Y. Sept. 15, 2004) that address proving retaliation and violations of equal protection:

   a. "A plaintiff's circumstantial evidence of retaliation could include the timing of the defendant's actions, such as when the alleged retaliation closely follows the plaintiff's speech. Morris, 196 F.3d at 110; McCullough v. Wyandanch Union Free School District, 187 F.3d 272, 280 (2d Cir. 1999). The plaintiff can also proffer evidence of unequal treatment, or an ongoing campaign of retaliation. Hampton Bays Connections, Inc. v. Duffy, 127 F. Supp. 2d 364, 374 (E.D.N.Y. 2001); Economic Opportunity Commission of Nassau County, Inc. v. County of Nassau, 106 F. Supp. 2d 433, 437 (E.D.N.Y. 2000) (citing Gagliardi v. Village of Pawling, 18 F.3d 188, 195 (2d Cir. 1994))."

   b. "To prove an Olech-type equal protection claim, the plaintiff must show that there was "no rational basis" for the differential treatment it suffered. Wantanabe, 315 F. Supp. 2d at 396. The Second Circuit has not decided whether an Olech claim also requires a showing a illicit motive or intent on the part of the defendant."

65.   *Housing Works, Inc. v. Turner* was a case that was partly about First Amendment retaliation that senior HRA personnel allegedly committed in response to an Article 78 proceeding that was commenced against HRA and complaints that were reported against HRA. My claims in this action are similarly about First Amendment retaliation that I experienced at the town hall and resource fair meetings that the Mayor conducted on 9/26/17, 9/27/17, and 9/28/17 while I had ongoing litigation against HRA that was a hybrid proceeding that was comprised of article 78 claims and plenary claims.

66.   *Hansen v. Harris*, 619 F.2d 942 (2d Cir. 1980) includes the following relevant findings about estoppel:

"The Government may sometimes be estopped from enforcing its rules, based on the conduct of its agents."

67.     _Barboza v. D'Agata,_ 151 F. Supp. 3d 363 (S.D.N.Y. 2015) includes the following

relevant findings that confirms that people are permitted to use crude and offensive speech in the

context of complaining about government activity:

> "The Court of Appeals found this was in the scope of protected speech because defendant's messages were crude and offensive but made in the context of complaining about government action on a telephone answering machine set up for the purpose, among others, of receiving complaints from the public. Mangano 571. That decision is on all fours with this case. It dealt with offensive language used to express to government employees dissatisfaction with government action"

68.     _Hammock v. Pierce_, No. 15-CV-09052 (NSR) (S.D.N.Y. May 7, 2018) contains the

following findings that addresses proving a retaliatory motive:

> "retaliatory motive may be inferred from a number of circumstantial factors, including, _inter alia, "(i)_ the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter, and (iv) statements by the defendant concerning his motivation." _Burton v. Lynch,_ 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009)"

69.     According to _Jovanovic v. City of New York_, 04 Civ. 8437 (PAC) (S.D.N.Y. Aug. 17,

2006), "malice may be inferred from the lack of probable cause."

70.     The following is a pertinent excerpt from _Frain v. Baron_, 307 F. Supp. 27 (E.D.N.Y.

1969):

> "Fear of disorder, which the City cites to justify its policy, has been ruled out as a ground for limiting peaceful exercise of First Amendment rights. Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963)."

71.     The following is a relevant excerpt from _Capitol Records, Inc. v. Thomas-Rasset_, 692

F.3d 899 (8th Cir. 2012) that concerns having a court issue an order that restrains acts that may

otherwise be lawful due to a propensity and proclivity to commit unlawful conduct:

> "a district court has authority to issue a broad injunction in cases where "a proclivity for

unlawful conduct has been shown." *See McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 192, 69 S.Ct. 497, 93 L.Ed. 599 (1949). The district court is even permitted to "enjoin certain otherwise lawful conduct" where "the defendant's conduct has demonstrated that prohibiting only unlawful conduct would not effectively protect the plaintiff's rights against future encroachment." *Russian Media Grp., LLC v. Cable America, Inc.,* 598 F.3d 302, 307 (7th Cir.2010) (citing authorities). If a party has violated the governing statute, then a court may in appropriate circumstances enjoin conduct that allowed the prohibited actions to occur, even if that conduct "standing alone, would have been unassailable." *EEOC v. Wilson Metal Casket Co.,* 24 F.3d 836, 842 (6th Cir.1994) (internal quotation omitted)."

72.     On 6/26/17, I talked with Defendant O'Neill at the New York City Bar Association in the presence of various whistleblower news censors in journalism during a meeting in which he was the primary speaker. Information about that meeting is available from the New York City Bar Association's web site at http://www.nycbar.org/media-listing/media/detail/a-conversation-with-new-york-city-police-commissioner-james-p-oneill. The audio recording of that meeting that the New York City Bar Association arranged to be recorded is available on the Internet at http://dts.podtrac.com/redirect.mp3/www2.nycbar.org/mp3/Podcasts/media/police_commissioner_audio_2017-06-26.mp3.

73.     The next **screenshot** is from a video recording that I recorded on 6/26/17 at 8:35 am at the New York City Bar Association that shows **Defendant** O'Neill in it as he stood at a podium with microphones that had the names of various New York City news outlets on them.



74.     The fact that no one reported anything in the news about what I discussed with Mr.

O'Neill on 6/26/17 **confirms** that journalism and freedom of the press in New York City just

doesn't exist and claims to the contrary **are** utter lies. That video that I recorded during that

meeting confirms that the following so-called news outlets had some of their personnel present at

that 6/26/17 meeting:

        PIX11News, 1010 WINS, NBC, CBS New York, WCBS 880, and ABC News

75.     The video recording that I recorded of Mr. O'Neill during that meeting that I just

discussed is available on the Internet at the following address:

        https://drive.google.com/file/d/1sofOzQmsQy_1_lkIglBTn9iZiGNwGNpL/view?usp=sha
        ring

76.     During **that** meeting on 6/26/17, I had two face-to-face conversations with Mr. O'Neill.

My first conversation with him during that it **extends from the elapsed time of a)** 32 minutes and

38 seconds from the beginning of the audio recording that the New York City Bar Association

recorded of that meeting to **b)** 33 minutes and 36 seconds in that recording. My second

conversation with him during that meeting extends from the elapsed time of **a)** 47 minutes and 4

seconds from the beginning of that recording to **b)** 49 minutes and 14 seconds.

77. The following is entirely true and accurate about what Mr. O'Neill and I discussed during that meeting:

    a. I told him that I was a military veteran and reminded him that he used the comment of "a free and open society" in a speech that he gave during that meeting. I then pointedly asked him why members of the NYPD who were inside of the Bronx Supreme Court on 5/23/17 illegally directed court officers assigned to that courthouse to prevent me from attending the public resource fair meeting that the Mayor conducted in that courthouse on that date inside of the Veteran's Memorial Hall chamber within it and while members of the NYPD have no jurisdiction in courthouses because jurisdiction for law-enforcement in New York State courthouses belongs to New York State court officers instead of the NYPD. When he responded to that by claiming that he wasn't aware of that situation, I told him that I had a video recording that confirmed what I had just apprised him about had occurred and that I was willing to share that video recording with him if he so desired.

    b. I asked him when members of the NYPD would stop violating civil rights by shoving military veterans as such veterans stood legally on empty public sidewalks while Mr. Redmond illegally discriminated against them by preventing them from attending public town hall meetings that the Mayor held. While asking him that question, I was referring to myself as such a military veteran who was illegally shoved and discriminated against as I referred to the public town hall meeting that the Mayor held on 4/27/17 in Long Island City in Queens. In response, Mr. O'Neill was blatantly evasive and deceitful by claiming that different issues applied to that question. When

he asked what I was talking about in particular in regards to my question, I told him that I was talking about public meetings, New York State's Open Meetings Law, the U.S. Supreme Court decision that was issued in _Wood v. Moss_, 134 S. Ct. 2056, 572 U.S., 188 L. Ed. 2d 1039 (2014) that concerns viewpoint discrimination, and what was then Mr. Redmond's ongoing status as the primary defendant in _Sherrard v. City of New York_, No. 15-cv-7318 (MB)(S.D.N.Y. Jun. 13, 2018).

c.   I also asked Mr. O'Neill about why Mr. Redmond was still being allowed to be a member of the NYPD since he was violating my civil rights after he had violated Mr. Sherrard's civil rights. _Sherrard v. City of New York_ concerns an incident that occurred on 9/17/12 in which Mr. Redmond flagrantly violated Mr. Sherrard's constitutional rights on video before Mr. Redmond blatantly lied about that during a deposition on 5/19/17 and as he testified in that case in June of 2018. When Mr. O'Neill told me during that meeting that he would need to talk with Mr. Redmond about what I discussed with him (Mr. O'Neill) during it and that he wasn't aware of _Sherrard v. City of New York_, as he left that meeting, I offered to give him a printout that I had with me and that contained information shown on its docket sheet that listed the case number for _Sherrard v. City of New York_ and other information about that case. I believe that I handed that information instead to NYPD Detective James Byrne as he escorted Mr. O'Neill out of that meeting and gave me his business card then that appears as follows:



NEW YORK CITY
POLICE DEPARTMENT
D.C.P.I.

James T. Byrne
Detective

Office of the Deputy Commissioner,
Public Information
One Police Plaza, Room 1320
New York, N.Y. 10038

Office: 646.610.6700
Cell: 646.574.1217
jamest.byrne@nypd.org
@NYPDByrne

78.     A critically significant point about my conversation with Mr. O'Neill on 6/26/17 is that I clearly put him on notice then that members of the Mayor's NYPD security detail were violating my civil rights at public forums that the Mayor had been conducting and that Mr. O'Neill told me in response that he would need to talk with Mr. Redmond about what I then discussed with him about Mr. Redmond. As the NYPD's Commissioner, he certainly had the authority to issue a standing order to Mr. Redmond to make certain that he and the rest of the Mayor's NYPD security detail immediately stop violating the civil rights of New Yorkers at public forums. Hindsight clearly confirms that Mr. O'Neill either didn't issue such an order or that such an order was violated at my expense repeatedly and flagrantly thereafter by Mr. Redmond and other members of the Mayor's NYPD security detail and others. On 4/27/17, Mr. Redmond told me at the site of the Mayor's town hall then that he reported to Mr. O'Neill. The preceding discussion is sufficient to establish that this Court's determinations about claims that I am asserting against Mr. O'Neill in this pleading for supervisory liability must be in my favor because additional illegal acts and omissions were committed against me in violation of my civil rights by Mr. Redmond and other members of the Mayor's NYPD security detail after 6/26/17 at public

forums that Mr. O'Neill certainly had a realistic opportunity to prevent from occurring.

79.    The following relevant facts apply to what I discussed with Mr. O'Neill during that meeting:

a.    I later discovered from a written transcript and video recording that the New York City Law Department provided to me that concerned *Sherrard v. City of New York,* No. 15-cv-7318 (MB)(S.D.N.Y. Jun. 13, 2018) that Mr. Redmond committed perjury on 5/19/17 during a sworn deposition that he gave as he lied about a critically significant fact. The next screenshot shows the questions that were asked and the responses to them that were given that appear between lines 11 and 17 that appear on page 20 within the written transcript that was prepared from the deposition that Mr. Redmond gave on 5/19/17 in connection with *Sherrard v. City of New York*, No. 15-cv-7318 (MB)(S.D.N.Y. Jun. 13, 2018). That transcript was provided to me by the New York City Law Department in response to a FOIL demand that I submitted to it and is available on the Internet at https://drive.google.com/open?id=12ATFhN0RVkrvlTjpINTPet57K1D4poiz. The answers shown on lines 13, 14, and 17 in that screenshot were answers that Mr. Redmond gave to the questions that are shown in it.

```
11        Q      The question is, why did you stop at
12    that location?
13        A      Because I was blocked by
14    bicyclists.
15        Q      And was Mr. Sherrard any of those
16    bicyclists that were blocking you?
17        A      Yes.
```

b.  The New York City Law Department also provided me a critically significant video

recording that is available on the Internet at

https://drive.google.com/open?id=13dteIym5B27WAHrR2b_vrb68X8IDT_Ye in

response to a FOIL demand that I submitted to it that was recorded on 9/17/12 in

Manhattan on Lafayette Street by Leonard Street as Mr. Redmond recklessly drove a

black car with just one hand on its steering wheel in the middle of the roadway in the

direction of New York City Hall by the New York City Civil Court and New York

City Family Court. That video recording was presumably recorded by a member of

the NYPD who with Mr. Redmond and other members of the NYPD were stalking

Kalan Sherrard and other bicyclists. Kalan Sherrard was the plaintiff in *Sherrard v.*

*City of New York*, No. 15-cv-7318 (MB)(S.D.N.Y. Jun. 13, 2018). The next

screenshot corresponds to what appears in the video that I just discussed at the

elapsed time of 10 seconds and confirms that **a)** Mr. Redmond was reckless driving a

black car with left hand off of its steering wheel in **the middle** of a roadway and **b)**

Mr. Sherrard was lawfully riding a bicycle on the **far-left** side of that roadway ahead

of 4 other bicyclists shown on the left as he appears in the top-left corner in that

screenshot. At that point, the distance between Mr. Redmond's car and the back of

Mr. Sherrard's bicycle clearly exceeded the lengths of 2 cars that appear on the right

side of that road as Mr. Sherrard rode his bike directly next to the right of an area in

which construction or renovation work was being done and may have endangered his

safety as a bicyclists because of debris that may have possibly been in a bicycle lane

that he was not required by law to use then. The fact that the sidewalk next to that

bicycle lane was closed then because of construction or renovation work suggests that

Mr. Sherrard was being courteous to pedestrians by letting them use that bicycle lane to offset the closure of that sidewalk.



c. The next screenshot is from that same video and corresponds to the elapsed time of 18 seconds. The following is shown in it:

i. Mr. Redmond is shown in the lower-right area as he exited his car with a radio in his left hand.

ii. Mr. Sherrard is shown sitting on his bicycle while illegally stopped by 2 members of the NYPD on scooters or motorcycles in violation of his constitutional rights. The tires on those scooters or motorcycles were clearly wider than the tires on Mr. Sherrard's bicycle. This is relevant because thin tires on bicycles don't withstand coming in contact with debris on roadways as well as wider and thicker tires. One of the members of the NYPD who illegally stopped Mr. Sherrard drove through the bicycle lane on wide and

thick tires to reach him. Also, this screenshot more clearly confirms by the

existence of orange netting and barriers next to that bicycle lane that

construction or renovation work was then taking place near it.



80.     On 6/21/17, Defendant Nieves was recorded on video as he stood in front of the building

that hosted the town hall meeting that the Mayor conducted in Chinatown in Manhattan and

illegally harassed an Asian woman as she was trying to lawfully attend that town hall with

literature that she had. That video recording clearly shows Defendant Nieves illegally

confiscating literature from her in violation of her First Amendment and Fifth Amendment

rights. That video is available on the Internet at https://www.youtube.com/watch?v=KRur-

_QvbC0. What follows are a few screenshots from it. The next screenshot shows Mr. Nieves

giving that woman a hand signal to have her step toward him at the elapsed time of 32 seconds.



81.    The next screenshot shows that Asian woman standing near Mr. Nieves at the elapsed

time of 35 seconds as what clearly appears to be a press credential hung from her neck.



82.     The next screenshot shows that Asian woman standing near Mr. Nieves at the elapsed time of 1 minute and 6 seconds as she held papers that she had been carrying prior to meeting Mr. Nieves as he also then had his hands on those papers after she met him. She is shown standing next to Jane Meyer of the Mayor's office who was then looking at those papers.



83.     The next screenshot shows Mr. Nieves at the elapsed time of 1 minute and 9 seconds as he carried that Asian woman's papers after she left his wretched company



84.     On 6/23/17, a news organization named DNAInfo published a news article on the Internet at https://www.dnainfo.com/new-york/20170623/lower-east-side/mayor-de-blasio-town-hallmargaret- chin-aaron-foldenauer that is entitled "Security Swiped Political Pamphlets at Mayor's Town Hall, Attendees Say" and was written by a journalist named Allegra Hobbs. That article addressed the fact that multiple people who tried to attend the town hall meeting that the Mayor conducted on 6/21/17 in Chinatown in Manhattan had literature illegally confiscated by members of the NYPD as they underwent a security screening process to enter the building that hosted that town hall.

85.     On 7/18/17, I was recorded on video during the public resource fair meeting that the Mayor conducted in Kew Gardens in Queens with other government officials as I talked with the Mayor face-to-face. That conversation occurred as I stood near Mr. Banks, Jessica Ramos, and in front of a whistleblower news censor in journalism named Gloria Pazmino as well as Mr. Gartland. Although the Mayor's office arranged to have a video recording to be recorded of that public resource fair and that video recording certainly is a public record, the Mayor's office has illegally concealed that video recording. It was only because I submitted a FOIL demand to the Mayor's office that it provided me a link to that video recording on the Internet prior to illegally removing that video recording from the Internet or otherwise disabling access to it. Prior to doing so, I downloaded a short clip from that video. The following is a link to that video clip on the Internet:

        https://drive.google.com/open?id=1-ZUN22r8q4qARLEbMk8FVg4KuLqfTtcc

86.     Everything that I talked with the Mayor and Mr. Banks during that meeting were matters of public concern about which I intended to engage in protected whistleblowing against them and others about during the town hall and resource fair meetings that the Mayor conducted on

9/26/17, 9/27/17, and 9/28/17 while attending them from within the rooms in which they were conducted as they were conducted. The next screenshot is from the elapsed time of 1 minute and 31 seconds in that video and pertains to a discussion that I had with the Mayor that was about having him cancel the City of New York's business that taxpayers pay for that is with a company named NTT Data, Inc. that still subjects me to illegal wage-theft, fraud, and retaliatory employment blacklisting that dates back to 2012. Instead of cancelling that business, the Mayor's administration has unconscionably opted to extend it that keeps too much money in the wrong hands as people are now mightily struggling to make ends meet in New York City due to the Coronavirus pandemic and shouldn't have to support businesses that commit wage-theft. HRA has contracts with NTT.



87.     The next screenshot from that video corresponds to the elapsed time of 1 minute and 4 seconds in it as I asked the Mayor a question in a poorly phrased way as I meant to ask him if her could direct Mr. Banks to resolve my litigation against HRA in some way that was fair. The Mayor instead stonewalled me as he told me that his administration has a lot of litigation and "that is how we do things". That answer confirmed to me that he and his administration needed to be fired immediately.



88.    The next screenshot from that video corresponds to the elapsed time of 1 minute and 57 seconds in it as I apprised the Mayor that Mr. Redmond illegally prevented me from attending his 4/27/17 **town** hall meeting and that he was also then defending a federal civil rights lawsuit. In response, he claimed that he didn't' know anything about that and that he wouldn't talk with me further about lawsuits. That response further confirmed to me that he and his administration needed to be fired immediately. I was then referring to *Sherrard v. City of New York*.



89.     The next screenshot from that video corresponds to the elapsed time of 2 minute and 10

seconds and clearly shows both the Mayor and an unknown Black male member of his NYPD

security detail harassing me and subjecting me to what is known as "simple assault" under

applicable law. It shows this as a result of it showing that the Mayor tried to illegally reach over

toward me and touch me near my right shoulder as the Black male member of his NYPD security

detail put his right hand on my backpack before illegally pushing me away. That push was

assault. Neither of them gave me a reasonable opportunity to first leave their wretched company

without being illegally coerced by them to do so. The Mayor's illegal acts against me then

confirmed that he supports and condones illegal acts by the NYPD. During that meeting, I also

handed him a report again that I previously handed to him on 7/16/17 in Clement Clarke Moore

Park in the Chelsea district in Manhattan in front of Mr. Gartland and other whistleblower news

censors in journalism. That report contained screenshots from video recordings that summarized

illegal acts and omissions that were committed against me partly by members of his NYPD

security detail since 4/27/17 at public forums that he conducted. The Mayor lied to my face on

7/16/17 in that park by fraudulently telling me that he supports civil rights and military veterans

in response to questions that I then asked him about that to put him on the spot in front of

whistleblower news censors in journalism.



90.       The following is a link to the video recording on the Internet that the Mayor's office

arranged to be recorded of the Mayor's 7/25/17 publicity stunt publicity stunt that the Mayor

illegally conducted next to a staircase on 7/25/17 inside of the MTA subway station located in

Manhattan below Broadway near City Hall by Warren Street:

 https://www.youtube.com/watch?v=Hq2Q4tPrN2A

91.     On 7/25/17, Mr. Redmond flagrantly and illegally violated my rights pursuant to the First Amendment, Fourth Amendment, Fifth Amendment, and Fourteenth Amendment in retaliation for my having lawfully engaged in protected whistleblowing activity in the immediate vicinity of a large group of whistleblower news censors in journalists, the Mayor, members of the Mayor's staff, and members of the public inside of the subway station that I have discussed above.

92.     The next screenshot was created from what is shown at the elapsed time of 10 minutes and 18 seconds in the video that I just discussed.



93.     The preceding screenshot shows Mr. Redmond flagrantly assaulting me behind a metal partition near the Mayor and Eric Phillips while Mr. Phillips worked a mouthpiece for the Mayor. Mr. Redmond assaulted me then by illegally grabbing my left arm and dragging me by it along the subway platform where I had been standing as I was lawfully conducting myself while engaging in whistleblowing near and against the Mayor, his administration, and its business

partners. I did so then within earshot of many whistleblower news censors in journalism that quite fittingly were assembled together like rats and snakes. Mr. Redmond's assault against me then occurred behind the vertical metal partition shown in that screenshot. By deliberately making physical contact with me and dragging me in that subway station on 7/25/17, Mr. Redmond violated 18 U.S.C. 245(b)(5), NYPL §240.26, NYPL §240.20, and NYPL §195.00 in the process of causing irreparable harm to my rights pursuant to the First Amendment, Fourth Amendment, Fifth Amendment, Fourteenth Amendment, and the MTA's Rules of Conduct to continue to lawfully engage in protected whistleblowing near the Mayor from where I had been standing on that subway platform. The MTA's Rules clearly prohibited the Mayor from conducting his publicity stunt in that subway station because it was conducted next to a staircase, involved the use of a microphone, and impeded the movements of those in that subway station. Those same MTA Rules authorize public speaking in subway stations however and that is exactly what I was doing when Mr. Redmond illegally seized my left arm and criminally assaulted me by doing so. By doing so then and so publicly, he caused me enormous embarrassment and justifiable rage. Upon leaving that subway station, I received an unexpected telephone call from a civil rights attorney named Norman Siegel. He immediately told me during that call that I had a legal right to scream and shout in that subway station. In response, I told him that I hadn't done so and had instead merely projected my voice with my lungs in that subway station. I did so then to compete against the Mayor's use of a microphone during his illegal publicity stunt and noise from subway trains.

94.     The excerpts that appear next are from *People v. Alba*, 81 A.D.2d 345, 440 N.Y.S.2d 230 (App. Div. 1981) and *Dotson v. Farrugia*, No. Civ. 1126 (PAE) (S.D.N.Y. Mar. 26, 2012). Both of them confirm that an unofficial arrest occurs in violation of the Fourth Amendment when

individuals have their ability to freely move about curtailed by a show of authority without a

legal justification. This is applicable to the efforts that I undertook on 9/26/17, 9/27/17, and

9/28/17 to lawfully attend the town hall and resource fair meetings that the Mayor conducted on

those dates within the rooms in which they were conducted as they were conducted.

    a.  **Excerpt from *People v. Alba*:**

        "The majority finds that, although defendant was told that he was "under arrest",
no arrest, in fact, took place. We disagree. "Whenever an individual is physically
or constructively detained by virtue of a significant interruption of his liberty of
movement as a result of police action, that individual has been seized within the
meaning of the Fourth Amendment". (*People v Cantor*, 36 NY2d, at p 111; see
*Terry v Ohio*, 392 US, at p 16.)"

    b.  **Excerpt from *Dotson v. Farrugia*:**

        ""A person is seized by the police and thus entitled to challenge the government's
action under the Fourth Amendment when the officer, by means of physical force
or show of authority terminates or restrains his freedom of movement through
means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (internal
quotations marks and citations omitted) (emphasis in original); see also *Terry*, 392
U.S. at 19 n.16"

95.    In *DK BY LK v. Teams*, No. 16-CV-3246 (PAE)(S.D.N.Y. Jul. 5, 2017), U.S. District

Judge Paul A. Engelmayer articulated the legal standard that applies to confirming personal

involvement of a defendant for 42 U.S.C. §1983 claims in the following way:

        "The personal involvement of a defendant sued in his or her individual capacity is a
requirement for liability under § 1983; a defendant's supervisory authority is insufficient
in itself to create liability under § 1983. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir.
2003). "To proximately cause a ... due process violation ... a defendant must be
personally involved in the violation. A plaintiff may establish such personal involvement
by making any one of five showings (the `Colon factors')." *Warren v. Pataki*, 823 F.3d
125, 136 (2d Cir. 2016) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).
These showings are as follows: "(1) the defendant participated directly in the alleged
constitutional violation, (2) the defendant, after being informed of the violation *354
through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy
or custom under which unconstitutional practices occurred, or allowed the continuance of
such a policy or custom, (4) the defendant was grossly negligent in supervising
subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate
indifference to the rights of [the plaintiffs] by failing to act on information that

unconstitutional acts were occurring." Id. (quoting *Colon*, 58 F.3d at 873); *see also Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 229 (2d Cir. 2004) (" [A] plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his [or her] individual capacity under § 1983. Personal involvement ... includes not only direct participation in the alleged violation but also gross negligence in the supervision of subordinates who committed the wrongful acts and failure to take action upon receiving information that constitutional violations were occurring.") (citations omitted))."

96.    In *An v. City of New York*, 230 F. Supp. 3d 224 (S.D.N.Y. 2017), U.S. District Judge

Lorna Schofield discussed the legal standard for claims pertaining to failure to train and

supervise as well as deliberate indifference in the following way:

> As to the failure to train or supervise theory, the Complaint does not adequately allege the equivalent of an official policy because it does not plead deliberate indifference. "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61, 131 S.Ct. 1350 (internal quotation marks omitted). Deliberate indifference under a failure to train or supervise theory has three requirements:

>> First, the plaintiff must show that a policymaker knows to a moral certainty that her employees will confront a given situation. Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation. Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.

> *Jenkins v. City of New York,* 478 F.3d 76, 94 (2d Cir. 2007) (internal quotation marks and citations omitted); *see also Walker v. City of New York,* 974 F.2d 293, 297-98 (2d Cir. 1992).

> "The operative inquiry is whether th[e] facts demonstrate that the policymaker's inaction was the result of conscious choice and not mere negligence." *Cash v. Cty. of Erie,* 654 F.3d 324, 334 (2d Cir. 2011) (internal quotation marks omitted). Thus a failure to act "satisfies the policy or custom requirement only where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need." *Reynolds v. Giuliani,* 506 F.3d 183, 192 (2d Cir. 2007). "An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Vann v. City of New York,* 72 F.3d 1040, 1049 (2d Cir. 1995).

97.    The following excerpts from *Nigro v. City of New York*, No. 19-CV-2369 (JMF)

(S.D.N.Y. Sept. 11, 2020) also address legal standards that apply to claims for municipal liability

deliberate indifference:

    a.  "when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Connick,* 563 U.S. at 61."

    b.  "although Nigro's citations to unrelated police encounters, letters, and post-hoc reports are not enough to establish a widespread custom or practice of retaliating against the press and public, "they do permit a plausible inference of deliberate indifference." *Case v. City of New York,* 233 F. Supp. 3d 372, 406 (S.D.N.Y. 2017). In particular, the alleged incidents plausibly establish a history of NYPD officers mishandling situations where the press is involved, resulting in the repeated deprivation of constitutional rights."

98.    The following is a pertinent excerpt from *Marom v. City of New York*, No. 15-cv-2017 (PKC) (S.D.N.Y. Mar. 7, 2016) that addresses the legal duty that all law-enforcement personnel that includes lawmakers have to intervene to protect constitutional rights against infringement:

"All law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." Anderson, 17 F.3d at 557. "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used, [] (2) that a citizen has been unjustifiably arrested [] or (3) that any constitutional violation has been committed by a law enforcement official []." Id. However, "[i]n order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring.""

99.    The following is a pertinent excerpt from *Marom v. NYPD Sergeant Fior Blanco,* No. 15-cv-2017 (PKC) (S.D.N.Y. July 25, 2019) that acknowledged that the scope of personal involvement in violating constitutional rights exceeded how it was described in *Marom v. City of New York*, No. 15-cv-2017 (PKC) (S.D.N.Y. Mar. 7, 2016):

"A defendant is also considered "personally involved" if he or she fails to intervene despite having a realistic opportunity to prevent the constitutional violation from occurring. Harris v. City of New York, No. 15-cv-8456 (CM), 2017 WL 6501912, at *3 (S.D.N.Y. Dec. 15, 2017); see Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994)."

100.    The following is a pertinent excerpt from *Bleiwas v. City of New York*, No. 15 Civ. 10046

(ER) (S.D.N.Y. Aug. 14, 2017) that lists the elements for a claim based upon negligence:

> "To demonstrate that a defendant acted with negligence under New York law, a plaintiff must show `1) the existence of a duty flowing from defendant to plaintiff; 2) a breach of this duty; 3) a reasonably close causal connection between the contact and the resulting injury; and 4) actual loss, harm or damage."

101.   What follows is a pertinent excerpt from *US v. Basey*, 816 F.2d 980 (5th Cir. 1987) about the guilt of those who participate in conspiracies and clearly confirms that defendants that I have listed in this pleading's caption have been involved in a conspiracy to violate my constitutional right to lawfully visit HRA's offices located at 150 Greenwich Street in Manhattan to serve legal papers upon HRA and inspect proposed contracts.

**Excerpt from *US v. Basey*:**

> "Well settled is the principle that a party to a continuing conspiracy may be responsible for a substantive offense committed by a co-conspirator, even though that party does not participate in the substantive offense or have any knowledge of it. *Pinkerton v. United States,* 328 U.S. 640, 647, 66 S.Ct. 1180 [1184] 90 L.Ed. 1489 (1946). Once the conspiracy and a particular defendant's knowing participation in it has been established beyond a reasonable doubt, the defendant is deemed guilty of substantive acts committed in furtherance of the conspiracy by any of his criminal partners. *United States v. Sullivan,* 578 F.2d 121, 122-23 (5th Cir.1978)."

102.   The following is a pertinent excerpt from *US v. Blackmon*, 839 F.2d 900 (2d Cir. 1988) that presents a useful discussion about co-conspirators in conspiracies:

> "This court has several times observed that statements "that apprise a coconspirator of the progress of a conspiracy," *United States v. Rahme,* 813 F.2d 31, 36 (2d Cir.1987), or that "brief [a coconspirator] on the scheme," *United States v. Mangan,* 575 F.2d 32, 44 (2d Cir.), *cert. denied,* 439 U.S. 931, 99 S.Ct. 320, 58 L.Ed.2d 324 (1978), are statements made in furtherance of a conspiracy. *See United States v. Paone,* 782 F.2d 386, 391 (2d Cir.1986), *cert. denied,* ___ U.S. ___, 107 S.Ct. 3261, 97 L.Ed.2d 761 (1987). *See also United States v. Persico,* 832 F.2d 705, 716 (2d Cir.1987). The Third Circuit has likewise observed that statements by coconspirators that "inform each other of the current status of the conspiracy further the ends of the conspiracy and are admissible so long as the other requirements of Rule 801(d)(2)(E) are met." *United States v. Ammar,* 714 F.2d 238, 252 (3d Cir.) (citations omitted), *cert. denied,* 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983)."

103.   In *Pangburn v. Culbertson*, 200 F.3d 65 (2d Cir. 1999), the Court addressed conspiracies

to violate civil rights and a legal standard that governs whether litigants should be allowed to file an amended pleading. In short, the excerpts from that case shown below confirm that Court ruled that **a)** "conspiracies are by their very nature secretive operations" that "may have to be proven by circumstantial, rather than direct, evidence" and **b)** though futility "is a valid reason for denying a motion to amend", that is "true only where it is "beyond doubt that the plaintiff can prove no set of facts in support" of his amended claims."

    a. "To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."

    b. "While "conclusory allegations" of a § 1983 conspiracy are insufficient, _Dwares v. City of New York_, 985 F.2d 94, 99-100 (2nd Cir.1993) (citing cases), we have recognized that such "conspiracies are by their very nature secretive operations," and may have to be proven by circumstantial, rather than direct, evidence. _Rounseville v. Zahl_, 13 F.3d 625, 632 (2d Cir.1994)."

    c. "while "futility" is a valid reason for denying a motion to amend, _John Hancock Mutual Life Ins. Co. v. Amerford Int'l Corp._, 22 F.3d 458, 462 (2d Cir.1994), this is true only where it is "beyond doubt that the plaintiff can prove no set of facts in support" of his amended claims. _Ricciuti v. N.Y.C. Transit Auth._, 941 F.2d 119, 123 (2d Cir.1991)"

104.    The following are excerpts from _Vann v. City of New York_, 72 F.3d 1040 (2d Cir. 1995) that addresses municipal liability:

    a. A § 1983 plaintiff injured by a police officer may establish the pertinent custom or policy by showing that the municipality, alerted to the possible use of excessive force by its police officers, exhibited deliberate indifference. _See, e.g., Fiacco v. City of Rensselaer_, 783 F.2d 319 (2d Cir.1986), _cert. denied,_ 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987); _see id._ at 326-27 (municipality "should not take a laissez-faire attitude toward the violation by its peace officers of the very rights they are supposed to prevent others from violating").

    b. To prove such deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious. _See Canton v. Harris,_ 489 U.S. at 390, 109 S.Ct. at 1205. An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed

by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents. *See, e.g., Ricciuti v. N.Y.C. Transit Authority,* 941 F.2d at 123; *Fiacco v. City of Rensselaer,* 783 F.2d at 328

105.   *Turpin v. Mailet,* 619 F.2d 196 (2d Cir. 1980) similarly addressed municipal liability as

follows:

> "The allegations here clearly meet that standard.[4] We see no reason why an official policy cannot be inferred from the omissions of a municipality's supervisory officials, as well as from its acts. The issue of authorization, approval or encouragement is generally one of fact, not law. For example, where senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts. See *Smith v. Ambrogio,* 456 F.Supp. 1130, 1136 (D.Conn.1978); *Popow v. City of Margate,* 476 F.Supp. 1237 (D.N.J.1979). Although that standard is undoubtedly difficult to meet, see *Lewis v. Hyland, supra; Smith v. Ambrogio, supra* at 1136, we cannot say as a matter of law that failure to act may never give rise to an official policy within the meaning of *Monell.*"

## STATEMENT OF FACTS

1.  I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set

forth herein.

### Facts about the Mayor's 9/26/17 Town Hall

1.     The New York City public school that hosted the Mayor's 9/26/17 town hall is the High

School of Art & Design that is controlled by the New York City Department of Education. New

York City Councilman Dan Garodnick served as the moderator for the Mayor's 9/26/17 town

hall.

2.     Everything that I have discussed thus far in this complaint about whistleblowing and

litigation that I engaged in were matters about which I intended to engage in protected

whistleblowing about while attending the town hall and resource fair meetings that the Mayor

conducted on 9/26/17, 9/27/17, and 9/28/17 within the rooms in which they were conducted as

they were conducted largely to try to engage in word-of-mouth advertising against the Mayor's administration and its business partners that I hoped would spread quickly, widely, and sufficiently enough as I hoped its sum and substance would persuade enough people to fire the Mayor in the 2017 New York City government elections that would give New Yorkers leadership instead all that the Mayor and his administration represent. By having New Yorkers throw out Bill de Blasio and his administration like a disease by the power of their votes, I hoped that new management at the Mayor's office would clean house across New York City's government and with its business partners to usher in proper governance. Among other things, that would require Urban's contract with HRA to be cancelled.

3.      On 9/26/17, as I lawfully stood on a public sidewalk next to the school that hosted the Mayor's 9/26/17 town hall as I lawfully waited in a line with other members of the public to be issued an admission ticket for the Mayor's 9/26/17 town hall that would enable me to attend it from within the room in which it was conducted, I had a brief conversation with Defendant Atcheson as she held a tablet computer. During that conversation, she fraudulently told me that I wasn't on the list of people who registered to attend that town hall and refused to issue me an admission ticket for it in violation of my Fifth Amendment rights to property and Fourteenth Amendment due process and equal protection rights as well as the prohibitions against discrimination and selective-enforcement. Such an admission ticket that would have enabled me to attend that town hall from within the room in which it was conducted was functionally equivalent to a press credential. By refusing to issue me an admission ticket for that public forum, Defendant Atcheson also violated New York State's Open Meetings Law and subjected me to an abuse of process. In response to her behavior, I remained in that line while I remained intent on lawfully attending that town hall in accordance with my constitutional rights

irrespective of whether I would be issued an admission ticket for it. While that was occurring, I recorded video recordings with my cell phone at 6:23 pm and thereafter on that date at that location and that were otherwise recorded by 9/26 cam1 video that confirm that Defendants Gerola, Nieves, Mason, Lance, Santana, Ringel, Miller, Jane Doe3 9/26/17, Ridener, John Doe1 Tablet 9/26/17, Brewer, Carrion, Clynes, NYPD Officer John Doe1 9/26/17, NYPD Officer John Doe2 9/26/17, NYPD Officer Jane Doe1 9/26/17, NYPD Officer Jane Doe2 9/26/17, and NYPD Officer Jane Doe3 9/26/17 were present in that immediate area. As that was occurring, they **a)** were aware of the fact that I was being prevented from attending the Mayor's 9/26/17 town hall from within the room in which it was conducted as it would be conducted and unreasonably hindered by Defendant Gerola in doing so, **b)** illegally condoned that, and **c)** otherwise had a legal duty to have detected and stopped that in accordance with 42 U.S.C. §1986 and their capacities as members of the NYPD, and other personnel of the City of New York who all took oaths to uphold the U.S. Constitution and perform their duties as personnel of the City of New York to the best of their abilities. The members of the NYPD who were then in my presence were aware that I was not being issued an admission ticket for that town hall and/or were otherwise aware that I was being prevented from attending that town hall from within the room in which it was conducted as they illegally failed and otherwise refused to perform their Fourteenth Amendment affirmative legal duty to intervene on my behalf to uphold my constitutional rights to receive an admission ticket for that town hall, to be treated like every other member of the public who was in that line, and to be permitted to attend that town hall without any unreasonable delay in the room in which it would be conducted. The following are the members of the NYPD who were personally involved in having illegally prevented me from attending the Mayor's town hall from within the room in which it was conducted partly by

having done nothing to try to intervene on my behalf against Defendant Gerola who deliberately and illegally refused to allow me to attend the Mayor's 9/26/17 town hall from within the room in which it was conducted:

> Defendants Mason, Nieves, Santana, Lance, NYPD Officer John Doe1 9/26/17, NYPD Officer John Doe2 9/26/17, NYPD Officer Jane Doe1 9/26/17, NYPD Officer Jane Doe2 9/26/17, NYPD Officer Jane Doe3 9/26/17

4.       That occurred as I was conducting myself in an entirely lawful manner in contrast to him while we stood near the entrance to that school on 9/26/17 as he was then behaving as a criminal toward me in relation to my efforts to lawfully attend that town hall from within the room in which it would be conducted as he was flagrantly violating 18 USC §245(b)(5), 18 USC §241, 18 USC §1513(e), NYPL §240.20, NYPL §240.26, and other applicable laws in doing so.

5.       As I lawfully waited in line on 9/26/17 to be granted access to the school that hosted the Mayor's 9/26/17 town hall, I conducted myself in an entirely lawful manner and engaged in protected activity partly by distributing literature about various matters to other members of the public as they waited to be granted access to the school that hosted the Mayor's 9/26/17 town hall that I prepared and contained protected whistleblowing information of public concern against the Mayor's administration, NYPD, HRA, HRA's business partners, and others largely to try to greatly offset and counteract the fact that I was again being illegally discriminated against by members of the Mayor's NYPD security detail, members of the Mayor's staff, and other members of the NYPD in violation of my constitutional rights to attend the Mayor's 9/26/17 town hall from within the room in which it was conducted based upon the fact that I registered in advance with the Mayor's office to do so and arrived sufficiently early to the site of that town hall on 9/26/17 to be granted access to the room in which that town hall would be conducted as it would be conducted. I was hoping that members of the public wouldn't hesitate to express

outrage to the Mayor, other government officials, other members of the public, and members of

the press about the fact that I was being flagrantly and illegally discriminated against by being

barred from attending the Mayor's 9/26/17 town hall from within the room in which it was

conducted to have sufficient pressure that would be brought to bear on the Mayor and other

government officials during that town hall that would immediately cause me to be granted access

to that town hall from within the room in which it was conducted before I would then be able to

lawfully engage in an extensive conversation during that public forum with the Mayor, other

government officials, members of the public, and members of the press that would largely be

about why New Yorkers shouldn't immediately fire the Mayor, his administration, and have then

criminally prosecuted with members of the Mayor's NYPD security detail for engaging in voter

suppression, voter fraud, and whistleblower retaliation in flagrant violation of the Hatch Act in

response and relation to matters that my HRA lawsuit and previous whistleblowing against the

Mayor's administration, the Mayor's NYPD security detail, other members of the NYPD, and

HRA's business partner concerned. In short, I correctly anticipated that I would again be

subjected to illegal acts on 9/26/17 in relation to my efforts to attend the Mayor's 9/26/17 town

hall within the room in which it was conducted. As a result, I prepared whistleblowing literature

in advance to bring with me to that site on 9/26/17 to lawfully distribute to those who attended

that town hall before it began and while I would be in the overflow room that was setup for that

town hall.

6.      Prior to trying to attend the Mayor's 9/26/17 town hall, the Mayor, members of the

Mayor's staff, and whistleblower news censors in journalism were at two of the same locations

where I was on 9/26/17 while I was at those locations. Those two locations on 9/26/17 were **a)** in

the High Line Park and then **b)** in close proximity to the building where the Mayor resided while

he attended New York University as a student. While we were at those locations on 9/26/17, I

recorded video recordings of the Mayor, members of his staff, members of his NYPD security

detail, and whistleblower news censors in journalism as I lawfully exercised my First

Amendment rights at both of those locations on that date largely by criticizing the Mayor and

Defendant Redmond and otherwise engaging in protected whistleblowing against them in a very

outspoken and otherwise communicative manner through literature that I prepared and

distributed to people nearby as I deliberately sought then to try to have members of the public

and any actual journalists who were nearby to pay attention to my criticism and whistleblowing

before amplifying it and extending its reach through word-of-mouth advertising about it.

7.      The next screenshot is from a video that I recorded of the Mayor, Defendant Phillips, and

New York City Councilman on 9/26/17 at 11:39 am in the High Line Park in Manhattan. A copy

of that video is available on the Internet at

https://drive.google.com/file/d/1P9bgRlPSXd3sVVEQNF9r08gF4pS8Ywjm/view?usp=sharing.

I loudly and lawfully asked the Mayor as I recorded that video about whether I could attend the

public town hall meeting that he would conduct on that date in accordance with the decision that

was issued in *Wood v. Moss*, 134 S. Ct. 2056, 572 U.S., 188 L. Ed. 2d 1039 (2014) that

addressed viewpoint discrimination as well as New York State's Open Meetings Law. Neither he

nor anyone else then responded to my question. At a different point while we were in that park

then, I directed that same question directly to Mr. Phillips that caused him to then say "no" to me

to express the fact that he would not allow me to attend the Mayor's 9/26/17 town hall.



8.      The following screenshot is from a properly rotated version of a video recording that I recorded of the Mayor at 12:33 pm on 9/26/17 in an upside-down manner inadvertently as he stood in front of the entrance to the building in which he resided while he attended New York University as a student:



9.      The video recording that the preceding screenshot is from is available on the Internet at

https://drive.google.com/file/d/1hdNYP3AOw4Oi9RPpzItXsvOINQQvm1R8/view?usp=sharing.

I'm clearly heard stating in that video that I was a U.S. Navy veteran and was asking the Mayor

in that video about whether I could attend the public town hall meeting that he would conduct on

that date as he never answered that question nor otherwise talked to me on that date. I'm also

heard in that video as I sarcastically asked the Mayor about what he thought about the lawsuit of

*Sherrard v. City of New York*, No. 15-cv-7318 (MB) (S.D.N.Y. Jun. 13, 2018) that was filed

against Defendant Redmond for having violated Mr. Sherrard's civil rights. Although I didn't

mention that lawsuit by its name, I then certainly referred to it as I accurately stated then that it

was partly about the fact that Defendant Redmond illegally caused Mr. Sherrard to have been

kept in jail for roughly19 hours without a legal basis. As the Mayor entered that building and left

my company, I sarcastically said goodbye to him by saying, "Goodbye to Bull Shit."

10.     At 1:06 pm, I recorded another video of the Mayor with my cellphone as he exited the

building that I just discussed where he resided when he attended New York University. That video is available on the Internet at https://drive.google.com/file/d/1bwWcFV6-K0xouHJ2LFxqog8YItUKVlp-/view?usp=sharing. At the elapsed time of 15 seconds in that video, I'm clearly heard loudly asking whether people could vote out the Mayor in a sarcastic manner that made it clear that I was urging them to do so. As I asked that question, an unknown female member of the Mayor's NYPD security detail stood a few feet away from me as she looked at me as she very clearly seemed to have then engaged in a radio communication as she brought her left hand to her mouth in a way that clearly suggested that she then engaged in such a communication. The following screenshot from that video confirms this:



11.     Defendant Ramos, the Mayor, and Michael Gartland and Gloria Pazmino appear in the next screenshot that is from the elapsed time of 4 seconds in that video.



12.     The next screenshot is from a video that I recorded at 1:15 pm on 9/26/17 of the Mayor as I stood across the street from the building that I just discussed. A copy of that video is available on the Internet at https://drive.google.com/file/d/1bwWcFV6-K0xouHJ2LFxqog8YItUKVlp-/view?usp=sharing. That video confirms that I recorded that video of both the Mayor and whistleblowing literature that I prepared that was against Defendant Redmond and the Mayor. The next screenshot is from the elapsed time of 6 seconds in that video and confirms this. That screenshot shows Twitter postings that that were posted by journalists named a) Nathan Tempey, Josh Dawsey, and c) Matthew Chayes between 7/17/16 and 7/19/16 by using the Twitter accounts that have the usernames of "@nathantempey", "@jdawsey", and "chayesmatthew" that were part of a larger discussion that Mr. Tempey engaged in on Twitter about the fact that

Defendant Redmond tried to illegally violate his First Amendment, Fourth Amendment, and Fourteenth Amendment rights in Newark Airport as he lied to Mr. Tempey by fraudulently claiming that he worked for the Port Authority police department.



13.     The opposite side of a page can be partially seen through a paper I then held. That

opposite side of that page concerned the fact that the Mayor appointed Bronx Criminal Court

Judge David Kirschner as a judge before Judge Kirschner freed a gang-member named José

Gonzalez, who shortly thereafter killed a FDNY paramedic named Yadira Arroyo as he tried to

steal an ambulance that was then assigned to her. The New York Post published a news article on

3/20/17 about how Mr. Gonzalez killed Ms. Arroyo and how Judge Kirschner enabled that to

occur. That news article is entitled "Judge Was Soft on Accused EMT Killer Weeks Before

Rampage", was written by Larry Celona, and is available on the Internet at

https://nypost.com/2017/03/20/judge-was-soft-on-accused-emt-killer-weeks-before-rampage/.

That news article was published less than one month after another Bronx Criminal Court Judge

that the Mayor appointed and is named Cori Weston fraudulently claimed that someone named

Ronald Sullivan was not guilty of having viciously assaulted me on 7/2/16 in the living room of

where I reside in spite of the fact that Mr. Sullivan immediately confided in someone who then

resided in the building in which I reside that he had just assaulted me as he fled from the building

in which he had just assaulted me. The Bronx District Attorney's office engaged in prosecutorial

misconduct in that case by not using that witness in court and not properly appealing a baseless

decision that Judge Weston issued in that case in which she arbitrarily and capriciously

suppressed material and admissible security log evidence. Those matters about both Judge

Weston and Judge Kirschner were among many other matters of public concern that I intended to

engage in protected whistleblowing about while attending the Mayor's 9/26/17, 9/27/17, and

9/28/17 town hall and resource fair meetings. If not for the Mayor, it stands to reason that that it

is far more likely that Ms. Arroyo would be alive today and Mr. Sullivan would have been

properly convicted of having viciously assaulted me on 7/2/16 partly because Judge Kirschner

and Judge Weston may not have otherwise been judges.

14.     The next screenshot is from a video that I recorded at 1:20 pm on 9/26/17 of the Mayor, Mr. Gartland, Defendant Ramos, Jesse Sendroff of the Mayor's office, and members of the Mayor's NYPD security detail are shown in it as we stood in an area that was around the corner from the building in which the Mayor resided while he attended New York University as a student. A copy of that video is available on the Internet at

https://drive.google.com/file/d/15h47dqh6hRaLhTnidqFGWqR5EIUspEkI/view?usp=sharing.

That video confirms that I yet again asked the Mayor if I could attend the public town hall meeting that he would conduct on that date, I resumed engaging in protected whistleblowing against Defendant Redmond in regards to the case of *Sherrard v. City of New York* as I loudly asked if anyone within earshot was interested in reading about how it can to be that Mr. Sherrard was illegally put in jail by the NYPD for roughly 19 hours in relation to that case, and I loudly pointed out that the Mayor didn't support military veterans nor civil rights. The next screenshot is from the elapsed time of 16 seconds in that video and shows someone as he copped a feel with his right hand of the Mayor's buttocks near Defendant Ramos' face as members of the Mayor's NYPD security detail were present and did nothing about that.



15.    The next screenshot is from the elapsed time of 39 seconds in that video and shows Mr. Gartland as I made remarks in which I properly called him out for being a whistleblower news censor in journalism for actual journalists who were then present to better expose and members of the public to be aware of.



16.     The next screenshot shows Defendant Gerola in it as is from the video that I recorded of

him on 9/26/17 at 6:23 pm that I discussed earlier in this complaint as he and I stood near the

entrance to the school that hosted the Mayor's 9/26/17 town hall as he told me that he was

definitely not letting me attend that town hall while I was conducting myself in an entirely lawful

manner in contrast to him and pointing out that he was violating New York State's Open

Meetings Law:



17.     The next screenshot is from that same video and shows a printed copy of my RSVP for

that town hall that I brought with me largely to prove that Defendant Gerola and others were then

violating my Fourteenth Amendment due process and equal protection rights as well as my First

Amendment and Fourth Amendment rights by not letting me to attend the Mayor's 9/26/17 town

hall from within the room in which it was conducted.



From: **Towaki Komatsu** towaki_komatsu@yahoo.com
Subject: RSVP for 9/26/17 public Town Hall meeting with New York City's Mayo
Date: September 20, 2017 at 2:37:20 PM
To: manhattantownhall@cityhall.nyc.gov

My name is Towaki Komatsu

This e-mail serves as my RSVP for the 9/26/17 public Town Hall meeting New Yor

Pursuant to New York State's Open Meetings Law, I have a legal right to attend th

Any attempt to hinder my ability to attend it will constitute a violation of both that la
of justice, specifically 18 U.S.C. 1512.

Any such attempt to hinder my ability to attend that public meeting will be severely

18.     At 14 seconds in that video, Mr. Gerola committed defamation against me as he lied to
members of the public who were waiting behind me in line to attend that town hall as he stated
the following as he fraudulently claimed that I was holding them up instead of him by his illegal
behavior toward me from being able to do so:

"Hi. Hi everybody. I'm sorry this man has been holding you up all night."

19.     By making the preceding statement to members of the public about me that he knew was
totally false, Defendant Gerola committed defamation against me through his utterance of a
statement sufficiently derogatory to me injure my reputation while that could be proven false as
he imposed a material burden on my constitutional right to attend that town hall from within the
room in which it would be conducted by violating it with other defendants without according me
any due process in order to cause irreparable harm to my First Amendment, Fifth Amendment,
and Fourteenth Amendment rights in regards to attending that town hall and exercising the entire
array of my First Amendment rights while doing so. as they engaged in discrimination and

mendacity toward me for that purpose. Also, since it wasn't even 6:30 pm as he made the preceding remark about me to members of the public, it was patently impossible that I could have held up those he made that remark to. This is also true about the fact that there were multiple doors at the entrance to that school that members of the public could have used to then enter it if Mr. Gerola allowed them to. That confirms that people could have walked around me to enter that school without being delayed by me.

20.     While I was being prevented from attending that town hall by Defendants Gerola, Mason, Nieves, Ringel, Miller, and others, I clearly made remarks to them in which I apprised then that they were flagrantly violating my rights pursuant to the First Amendment, Fourteenth Amendment, and New York State's Open Meetings Law to attend that town hall from within the room in which it was conducted. As I did so, Defendants NYPD Officer John Doe2 9/26/17, NYPD Officer Jane Doe2 9/26/17, NYPD Jane Doe1 9/26/17, NYPD Officer Jane Doe3 9/26/17, John Doe1 Tablet 9/26/17, Jane Doe3 9/26/17, Carrion, Santana, Lance, Ridener, and Brewer were within earshot and were otherwise present in my immediate vicinity in front of the school that hosted that town hall on 9/26/17 after 6:23 pm as they were aware that I was then being prevented from attending that town hall as they made no effort to try to enable me to do so while they had a realistic opportunity and legal duty to do so. I specifically told Gale Brewer that I was being illegally prevented from attending that town hall as she arrived to that site on 9/26/17 that caused her to then tell me that she would look into that before hindsight strongly suggests that she then lied to my face. Throughout the entire time that I was being illegally prevented from attending the Mayor's 9/26/17 town hall by the defendants, none of them gave me any credible explanation for why that was occurring in spite of the fact that my due process rights confirm that I certainly was then legally entitled to such an explanation.

21.     What follows shows an e-mail message that I received at 9:49 am on 9/27/17 from an

investigator for the CCRB named Judith Lê in response to entirely valid complaints that I

reported to her against Defendants Gerola, Mason, and Nieves about illegal acts and omissions

that they committed against me that were among those that were committed against me that

caused me to have been prevented from attending the Mayor's 9/26/17 town hall. An e-mail

message that I sent to Ms. Lê is at 9:27 am on 9/27/17 is also shown in that e-mail thread. Ms. Lê

clearly stated in her e-mail to me then that the Mayor's staff and/or the Mayor's CAU were then

in charge of admittance to town hall meetings that the Mayor conducted. The remark by her is

very significant largely because it directly implicates others who then worked for the Mayor's

office and included those who worked for the Mayor's CAU for the illegal acts and omissions

that were committed against me that caused me to be illegally prevented from attending public

town hall meetings that the Mayor conducted within the rooms in which they were conducted.

> **From:** "Le, Judith (CCRB)" <JLe@ccrb.nyc.gov>
> **Subject:** RE: New viewpoint discrimination by NYPD's Howard Redmond & Lt. Nieves at Mayor's 8/30 town hall in Brooklyn
> **Date:** September 27, 2017 at 9:49:27 AM EDT
> **To:** Towaki Komatsu <towaki_komatsu@yahoo.com>
>
> Hi Mr. Komatsu,
>
> As we previously discussed, unfortunately, admittance in and out of the Town Hall events falls outside the jurisdiction. Again, if you'd like, I can forward the complaint to Internal Affairs, or recommend that you speak to the Mayor's staff/Community Affairs office, as they are in charge of admittance to the Town Halls.
>
> Best,
>
> Judith Lê
>
> Investigator, Squad 8
> Civilian Complaint Review Board
> 100 Church Street, 10th Floor
> New York, NY 10007

(212) 912-2081

**From:** Towaki Komatsu [towaki_komatsu@yahoo.com]
**Sent:** Wednesday, September 27, 2017 9:27 AM
**To:** Le, Judith (CCRB)
**Subject:** Re: New viewpoint discrimination by NYPD's Howard Redmond & Lt. Nieves at Mayor's 8/30 town hall in Brooklyn
Dear Ms. Le,

Good morning.

Unfortunately, the Mayor's NYPD security detail yet again subjected me to viewpoint discrimination, abuse of authority, and outright deceit last night at the site of the Mayor's public town hall meeting in Manhattan.

Officer Gerola and Detective Mason were primarily responsible for keeping me out of that event.

Although I RSVP-ed in advance for it, Rachel Atcheson of the Mayor's staff refused to issue me an admission ticket that would let me be in the same room as everyone else who had done so and received such a ticket.

Mr. Gerola then told me that I would be allowed into the overflow room there, but he lied after I insisted that I be allowed to be in the main room since I had RSVP-ed.

There are 3 security cameras on the outside of the school I noticed that may have recorded my interactions with the NYPD.

Things between the NYPD and I only became heated and confrontational thereafter strictly because the NYPD and Mayor's office proved yet again that they were violating my civil rights to attend that meeting in its main room.

Also, Lt. Nieves lied by claiming that attendance at that meeting was by invitation.

Regards,

Towaki

22.     The next screenshot is from the video recording that I recorded with my cellphone on

9/26/17 at 9:27 pm as I stood in front of the school that hosted the Mayor's 9/26/17 town hall as

that town hall was still being conducted while Defendant Gerola and others were illegally

preventing me from entering that building. This screenshot shows whistleblowing literature that I

discussed earlier that shows an image of Yadira Arroyo on the left and an excerpt from a press

release that the Mayor's office on the right that confirms that the Mayor appointed David

Kirschner to become a judge before his negligence enabled her death. While attending the

Mayor's 9/26/17 town hall, I really wanted to lawfully ask the audience in the room in which it

was conducted about how fast New York City needed to fire the Mayor partly for having

appointed the judge who got Ms. Arroyo killed because I have enormous respect for the FDNY

in contrast to the NYPD that my firsthand experience with it confirms that it is comprised of

criminals who masquerade as law-enforcement personnel while wearing law-enforcement

costumes for that masquerade.



23.     The next screenshot is from long 9/26 cam1 video at the elapsed time of 2 hours, 2

minutes, and 51 seconds as Defendant Ringel is shown taking whistleblowing literature from me

that I handed to him as we stood in front of the entrance to the school that hosted the Mayor's

9/26/17 town hall.



24.     The next screenshot is from that same video at the elapsed time of 2 hours, 2 minutes,

and 55 seconds as Defendant Ringel is shown reading that literature as he and I stood in front of

the entrance to the school that hosted the Mayor's 9/26/17 town hall.



25.     The next screenshot is from that same video at the elapsed time of 5 hours, 36 minutes,

and 1 second as Grace Rauh is shown taking whistleblowing literature from me that I handed to

her as we stood in front of the entrance to the school that hosted the Mayor's 9/26/17 town hall

as she left that event.



26.     The next screenshot is from 9/26 cam1 video at the elapsed time of 50 minutes and 21 seconds that corresponds to the time of 6:49:27.796 pm as Mr. Banks arrived to the area where Mr. Ringel, Mr. Gerola, Mr. Nieves, Mr. Miller, Mr. Santana, and other defendants in this case then were in front of the entrance to the school that hosted the Mayor's 9/26/17 town hall as Mr. Banks greeted Mr. Ringel. I intended to engage in an extensive amount of whistleblowing and criticism against Mr. Banks and HRA while attending that town hall within the room in which it would be conducted. Mr. Nieves appears at the bottom of that screenshot near its center.



27.    The next screenshot is from 9/26 cam1 video at the elapsed time of 8 minutes and 12 seconds that corresponds to the time of 6:08:11.723 pm as I appear on the far-right and walked past the entrance to the school that hosted the Mayor's 9/26/17 town hall to get in line with other members of the public to lawfully wait in that line to be treated like everyone else in it in order to be granted access to the room in which the Mayor's 9/26/17 town hall would be conducted without any unreasonable delay and interference as long as sufficient seating existed in that room and in the order in which I would be in line to be granted that access. Defendants Nieves, Redmond, and Jane Doe3 appear in the upper-left area in this screenshot. Defendants Mason, Gerola, and Santana appear near the bottom in that screenshot.



28.     The next screenshot is from 9/26 cam1 video at the elapsed time of 38 minutes and 31 seconds that corresponds to the time of 6:37:49.296 pm as I talked with Defendant Miller about the fact that I was then being illegally prevented from attending the Mayor's 9/26/17 town hall from within the room in which it was conducted as he illegally condoned that.



29.     The next screenshot is from 9/26 cam1 video at the elapsed time of 28 minutes and 56 seconds that corresponds to the time of 6:28:22.717 pm as I talked with Defendant Carrion about the fact that I was then being illegally prevented from attending the Mayor's 9/26/17 town hall from within the room in which it was conducted as he illegally condoned that. Defendants Ridener, Gerola, Santana, and Mason also appear in that screenshot.



30.     The next screenshot is from that same video at the elapsed time of 30 minutes and 5 seconds that corresponds to the time of 6:29:30.722 pm as I talked with Defendant Mason about the fact that I was then being illegally prevented from attending the Mayor's 9/26/17 town hall from within the room in which it was conducted as he illegally condoned that.



31.     The next screenshot is from long 9/26 cam1 video at the elapsed time of 1 hour, 43 minutes and 23 seconds that corresponds to the time of 7:43:23.185 pm that shows Defendant Lance and I in the upper-right corner as I talked with him about the fact that I was then being illegally prevented from attending the Mayor's 9/26/17 town hall from within the room in which it was conducted as he illegally condoned that by doing nothing to try to intervene on my behalf about that.



32.     The next screenshot is from 9/26 cam1 video at the elapsed time of 32 minutes and 38 seconds that corresponds to the time of 6:32:00.850 pm as I talked with Defendant Jane Doe3 9/26/17 about the fact that I was then being illegally prevented from attending the Mayor's 9/26/17 town hall from within the room in which it was conducted as she illegally condoned that.



33.     Prior to meeting her then, I met her earlier that day in the High Line Park while the Mayor was in it as I was then lawfully exercising my First Amendment right to loudly criticize him. When I met her in that park, she recall that we had a brief conversation during which she urged me to back down from my criticism of the Mayor then and there. I refused to do so however. I also recall that while I was in that park then, members of the Mayor's NYPD security detail and other members of his staff illegally interfered with my ability to walk closer behind the Mayor and otherwise near him than I was able to in spite of the fact that I was conducting myself in an entirely lawful manner. The next screenshot shows a draft e-mail message that I created on 9/26/17 at 11:17 am in which I recorded information about member of the NYPD who was interfering with my First Amendment right to be closer to the Mayor than I was able to in the High Line Park then. The information in that screenshot shows that member of the NYPD has a name of Abe (I'm not sure if this is his first name or last name), his shield number was 472, and he was then a detective.

| Towaki Komatsu <Towaki_Komatsu@yahoo.com> | 🗀 Drafts - Yahoo! | September 26, 2017 at 11:17 AM |
| --- | --- | --- |
| (No Subject) | | |

472

Abe

Det

34.     That illegal custom and practice by the Mayor's NYPD security detail and members of the Mayor's staff that amounted to an unofficial custom and practice of the City of New York carried over to the Mayor's 9/26/17 town hall as comparable illegal custom and practices by those teams illegally caused me to be prevented from attending the Mayor's 9/26/17 town hall from within the room in which it was conducted as a result of First Amendment and whistleblower retaliation, viewpoint discrimination, and standardless discretion that was applied against me by them to murder my First Amendment rights in a public forum while subjecting me to abuse of process, discrimination, segregation, an unlawful arrest of my movements, and flagrant violations of due process and equal protection.

35.     The next screenshot is from a Twitter posting that was posted on the Internet on 9/26/17 at 7:44 pm by someone who used the Twitter account that has the username of "@galeabrewer" that is registered to Defendant Brewer. The message about a "Full house" that appears in that posting is grossly misleading because that posting reflected the fact that the Mayor's 9/26/17 town hall was full of people in it in the room in which it was conducted that excluded me in spite of the fact that I was entitled to be in that room instead of others who were then it on account of the fact that I had been in front of them in line to do so on that date next to the school that hosted that public forum. That Twitter posting is available on the Internet at https://twitter.com/galeabrewer/status/912825160104890368. That Twitter posting certainly

wasn't posted by Defendant Brewer because she wasn't inside of the school that hosted that town hall when that Twitter posting was posted on the Internet.



36.    The next screenshot is from long 9/26 cam1 video at the elapsed time of 1 hours, 47 minutes, and 50 seconds that corresponds to the time of 7:47:49.954 pm as I talked with Defendant Brewer who appears on the far-left as she stood in the doorway of an entrance top the school that hosted the Mayor's 9/26/17 town hall. I appear in the lower-right area in that screenshot and apprised her then about the fact that I was then being illegally prevented from attending the Mayor's 9/26/17 town hall from within the room in which it was conducted. She told me then in response that she would look into that matter.



37.     The next screenshot is from that same video at the elapsed time of 2 hours, 34 minutes, and 54 seconds that corresponds to the time of 8:34:54.012 pm as I talked with Defendant Brewer who appears on the far-right to follow-up with her about the fact that I was then being illegally prevented from attending the Mayor's 9/26/17 town hall from within the room in which it was conducted after I apprised her of that fact as she approached that building on that date to attend that town hall and told me then that she would look into that. When I talked with her as she left that event, she had no update to provide to me about why I was being illegally barred from that public forum and condoned that by having done nothing to intervene on my behalf to enable me to attend that public forum.



38.     The next screenshot is from that 9/26 cam1 video at the elapsed time of 46 minutes and

44 seconds that corresponds to the time of 6:45:54.914 pm. Defendant Clynes is shown in it in

the upper-right corner as walked directly next to me to my left toward the entrance to the school

that hosted the Mayor's 9/26/17 town hall as I was being illegally prevented from attending it as

he illegally condoned that by virtue of the fact he and New York State Supreme Court Judge

Alexander Tisch refused to properly address claims that I asserted in my HRA lawsuit that were

presented to Judge Tisch for adjudication between August and September of 2017 prior to

9/26/17 while Judge Tisch had jurisdiction over claims in that case that concerned me being

illegally barred from attending public town hall and public resource fair meetings that the Mayor

conducted with Mr. Banks and others while I was conducting myself in a lawful manner while

Defendant Clynes was Judge Tisch's court attorney.



39.    The next screenshot is from the video recording that the Mayor's office arranged to be recorded of the Mayor's 9/26/17 town hall. Defendant Clynes is clearly shown in the lower-right corner in it as well as the Mayor at the elapsed time of 12 seconds as Mr. Clynes applauded the Mayor after having illegally refused to intervene on my behalf to uphold my Fourteenth Amendment and First Amendment right to have then been in that same room and have been granted access to both it and the very seat he sat in before he entered that room on 9/26/17 by virtue of the fact that I registered in advance to attend that town hall and arrived to the site of it for that purpose on 9/26/17 before him as I lawfully waited in line with other members of the

public to be granted access to it.



40.     The next screenshot is from that same video and a magnified playback of it at the elapsed time of 58 minutes and 36 seconds that corresponds to the time of 6:57:34.207 pm. A member of the public who was wearing a hat is shown on the right side in it immediately after he or she accepted whistleblowing literature with his or her right hand that I prepared that was against the Mayor, Defendant Redmond, and others as that member of the public was waiting in line to be granted access to the school that hosted the Mayor's 9/26/17 town hall. That member of the public was among many who accepted such literature from me on 9/26/17 in front of the entrance to the school that hosted the Mayor's 9/26/17 town hall before it began, as it was conducted, and shortly after it ended. Some of them took time to talk with me then about the information in that literature as they expressed interest in it. That fact confirms that the whistleblowing literature that I prepared and then distributed was of public concern. Also, in

contrast to me, other members of the public who also distributed literature to those who entered that school on 9/26/17 to attend that town hall as they approached it for that purpose were permitted to enter that school on 9/26/17 in violation of my Fourteenth Amendment due process and equal protection rights as I was then clearly subjected to unequal treatment in regards to them.



41.      The next screenshot is from the video recording that the Mayor's office arranged to be recorded of the Mayor's 9/26/17 town hall while I played it back while I had the closed-captioning feature enabled. That screenshot reflects what appears in that video at the elapsed time of 12 minutes and 31 seconds as the Mayor was then making remarks as a con artist as he fraudulently insinuated that the whole citizenry of New York City had been granted the ability to attend that town hall from within the room in which he was then conducting it as he spoke about democracy and traditional New England town hall meetings in which people gathered and discussed various issues.



New England town hall meeting when the whole citizenry would come together to

42.    The next screenshot is from that same video and reflects what appears in it at the elapsed time of 12 minutes and 21 seconds as the Mayor was grandstanding by acknowledging that there had been an "intensification of people's feelings about the need to participate and be involved in democratic" processes as he fraudulently the material fact that he refused to answer my questions earlier that same day about whether I would be able to attend that town hall before I was illegally prevented from doing so.



there has been an intensification of
people's feelings about

43.     The next screenshot is from the video recording that the Mayor's office arranged to be recorded of the Mayor's 9/26/17 town hall while I played it back while I had the closed-captioning feature enabled. That screenshot reflects what appears in that video at the elapsed time of 15 minutes and 22 seconds as the Mayor was then making remarks that confirmed that town hall was subject to New York State's Open Meetings Law as he implicitly confirmed that a quorum that was comprised of senior members of his administration were then present in that room and that they would be available at the end of that meeting for the members of that audience to walk up to and talk with about whatever was on those members' minds.



Mayor de Blasio Participates in Town Hall Discussion

,999 views • Streamed live on Sep 26, 2017

44.     To close out this discussion about my claims in this action that concern the Mayor's

9/26/17 town hall, additional reasons why I sought to attend it from within the room in which it

was conducted partly were to follow-up with the Mayor and Mr. Banks about the discussions that

I had with **a)** the Mayor on 3/15/17 during his town hall on that date, **b)** the Mayor and Mr.

Banks on 7/18/17, and **c)** Mr. Banks on additional dates since 3/1/16. Matters that I discussed

with them during those earlier face-to-face conversations concerned the following subjects about

which I intended to engage in whistleblowing on 9/26/17, 9/27/17, and 9/28/17 while attending

the public town hall and resource fair meetings that the Mayor conducted on those dates within

the rooms in which they were conducted as they were conducted:

    a.     Requests that I made to the Mayor and Mr. Banks for pro-bono legal representation to

        address wage-theft and housing matters as well as fraud by one of HRA's partners

        that provides housing services. I was referring to Urban as that partner as I talked

        with the Mayor about that on 3/15/17. My request for pro-bono legal representation

for wage-theft matters concerned wage-theft that NTT still illegally subjects me to.

b.  A request that I made to the Mayor on 7/18/17 for assistance with being granted a job

interview with the agencies that comprise his administration as a U.S. Navy veteran

who was supposed to receive preferential consideration for such jobs while I instead

was consistently being denied job interviews by his administration in violation of

legal duties that HRA had in regards to me with respect to **a)** the binding and fully

enforceable agreement that HRA's Deputy General Counsel Ann Marie Scalia issued

to me on 8/1/17 in which she explicitly stated at the end of it that she and HRA would

assist me "in any way possible and **b)** 18 NYCRR §352.23(a).

c.  A bait-and-switch fraud and forgery that Urban was involved in committing against

me that HRA condoned that concerned the binding and fully-enforceable apartment

lease agreement that I signed on 2/16/16 in HRA's offices located at 33 Beaver Street

in Manhattan with Urban's Lisa Lombardi. I talked with Mr. Banks about that on

7/19/17 during the Mayor's town hall meeting on that date.

d.  Payment of storage expenses on my behalf by HRA in accordance with its legal

duties while I resided where I reside in the wake of HRA having committed fraud in

my HRA lawsuit by claiming that I wasn't entitled to have it do so while I resided

where I reside before it nonetheless did so anyway.

e.  Reimbursement for the theft of an iPhone belonging to me that occurred between

2/21/16 and 2/22/16 within one of HRA's facilities mainly due to inadequate security

within that facility that I discussed with Mr. Banks on 3/1/16 and 7/18/17 as he told

me on 7/18/17 that HRA may need to reimburse me for that iPhone.  I also sought

reimbursement for higher costs for cell phone service that I had to pay as a

consequence of that theft.

    f.   Cancelling the contracts that the City of New York has with Urban and NTT.

    g.   Illegal acts and omissions against me that were committed by members of the
Mayor's NYPD security detail, member of the Mayor's staff, and others at public
forums that the Mayor conducted.

45.     In addition to the reasons that I have previously identified in this complaint for having
sought to attend the Mayor's 9/26/17 town hall from within the room in which it was conducted,
I also sought to do so to engage in whistleblowing:

    a.   Against an attorney for HRA named Jeffrey Mosczyc and New York State Supreme
Court Judge Nancy Bannon as well as Defendant Clynes and New York State
Supreme Court Judge Alexander Tisch in response to acts and omissions that they
committed in my HRA lawsuit against me that were illegal, unethical, deceptive, self-
serving, irrational, prejudicial, and an abuse of discretion in a way that would have
been similar to how I expressed criticism against judges during the town hall meeting
that the Mayor conducted on 3/15/17 as a member of that audience was recorded on
video as she shook her head to express agreement with my remarks then.  Following
that meeting, Mr. Moszyc and Judge Bannon engaged in both gamesmanship and
witness tampering by having illegally stolen my First Amendment right to testify as
scheduled on 4/12/17 in my HRA lawsuit just one day after I engaged in parallel
litigation against HRA. Due to that theft, Judge Bannon adjourned that hearing to
6/7/17 as neither she nor Mr. Mosczyc performed their legal duty to have apprised me
of the ex-parte adjournment request that Mr. Mosczyc illegally faxed to Judge
Bannon's chambers on 4/5/17. That illegally deprived me of exercising my legal right

to submit opposition in response to that adjournment application and to have that

opposition fully and properly considered before a determination could legally be

made about whether to grant Mr. Mosczyc's adjournment application. Judge Bannon

also illegally ignored material and admissible evidence that I submitted in my HRA

lawsuit on 5/19/17 that was stored on a USB thumb drive that was in conjunction

with an order to show cause application that I submitted on that date in that case.

b. About the fact that fraud and negligence by HRA and Urban as well as another

business partner for HRA named Services for the Underserved, Inc. ("SUS") enabled

the vicious assault that I suffered on 7/2/16 in the living room of where I reside that

occurred after Mr. Sullivan tried to assault me in that same living room on 5/12/16 in

the immediate presence of one of Urban's personnel as Mr. Sullivan was the

physically restrained by him I response to Mr. Sullivan having suddenly rushed

toward me to assault me.

c. About the fact that the NYPD unconscionably released Mr. Sullivan on 7/11/16 after

it arrested him on that date for having assaulted me on 7/2/16 instead of having kept

him in its custody until I was issued a restraining order against him for that assault.

d. About the fact that Mr. Sullivan's assault against me on 7/2/16 caused me to suffer a

concussion and that in turn sabotaged my ability to perform adequately during a job

interview that I had on 8/18/16 for a job that would have paid me $450 per day.

**Facts about the Mayor's 9/27/17 Resource Fair**

1. As I discussed earlier in this complaint, Defendants Keck, Baez, Gerola, and NYPD Officer

John Doe1 9/27/17 were all personally involved in having illegally prevented me from

attending the Mayor's 9/27/17 resource fair by preventing me from entering the building in

which it was conducted as it was conducted after I registered in advance to lawfully attend

that public forum in accordance with my constitutional rights and New York State's Open

Meetings Law. I intended to attend that event for the same reasons that I sought to attend the

Mayor's 9/26/17 town hall and to further engage in whistleblowing about the illegal acts and

omissions that Defendants Keck, Baez, Gerola, and NYPD Officer John Doe1 9/27/17,

NYPD Officer John Doe2 9/27/17, NYPD Officer John Doe3 9/27/17, and NYPD Officer

John Doe4 9/27/17 were committing against me on 9/27/17 at the site of that public resource

fair meeting that were causing me to be illegally prevented from attending that public forum.

I wasn't provide any credible explanation on 9/27/17 about why I was illegally prevented

from attending that public forum and I didn't engage in any illegal, disorderly, nor

threatening behavior while I was at the site of that public resource fair meeting on 9/27/17.

2.      As Defendant Baez was illegally preventing me from entering the building that hosted

that public resource fair, I stood on a public sidewalk as he illegally directed me to move away

from where I lawfully stood near an entrance to the building in which that public resource fair

was being conducted. While I was being illegally prevented from attending that public resource

fair, other members of the public were illegally being permitted to enter the building that hosted

that event to attend it by Defendants Baez, Keck, Gerola, and other members of the NYPD in

violation of my Fourteenth Amendment due process and equal protection rights as well as my

constitutional rights that prohibit discrimination, abuse of process, selective-enforcement that

corresponds to the class-of-one legal theory, deprivation of property, deprivation of liberty, and

unofficial arrests that impede the freedom of movement. As I was illegally prevented from

attending that resource fair meeting, Defendants NYPD Officer John Doe2 9/27/17, NYPD

Officer John Doe3 9/27/17, and NYPD Officer John Doe4 9/27/17 were in sufficiently close

proximity to me to have been aware that I was being prevented from attending that public forum in violation of my constitutional rights as they illegally made no effort to intervene on my behalf to enable me to attend that public forum.

3.      Throughout the Mayor's 9/27/17 resource fair, public records were made available to the members of the public who attended that event and senior representatives from New York City government agencies that comprise the Mayor's administration attended it and actively made themselves available to the public who attended that event to talk with. Those facts sufficiently establish that a quorum comprised of New York City government officials existed during that event as that quorum's members conducted public business. Those circumstances establish that the Mayor's 9/27/17 resource fair was subject to New York State's Open Meetings Law. Also, that public forum was conducted as a traditional public forum.

4.      As I discussed earlier in this complaint, I asked a journalist named Alexandra Semenova on 9/27/17 as I happened to meet her for the first time as I was being illegally prevented from attending the Mayor's 9/27/17 resource fair to ask Defendant NYPD Officer John Doe1 9/27/17 about why that was occurring. She told me that he didn't give her any explanation.

5.      The next screenshot shows Defendant Keck as he was illegally preventing me from entering the building that hosted the Mayor's 9/27/17 resource fair as that event was being conducted as he stood in front of a doorway to block me from entering that building. That screenshot is from the video that I recorded of him with my cellphone on 9/27/17 at 12:10 that corresponds to the file named "9-27-17 at 12_10 pm with NYPD Keck at Mayor's resource fair.mp4". By preventing me from attending that public forum, Defendants Keck, Baez, Gerola, and NYPD John Doe1 9/27/17 violated a large number of applicable laws that include NYPL §240.20, NYPL §240.26, NYPL §175.25, NYPL §240.65, 42 USC §1985, 42 USC §1986, 18

USC §241, 18 USC §1513(e), and 18 USC §1512.



6.     The next screenshot shows Defendant Baez as he was illegally preventing me from

entering the building that hosted the Mayor's 9/27/17 resource fair as that event was being

conducted as he stood in front of a doorway to block me from entering that building. That

screenshot is from the video that I recorded of him with my cellphone on 9/27/17 at 12:10 that

corresponds to the file named IMG_2208.mov".



7.     The next screenshot shows Defendants Gerola and Baez as they were jointly and illegally preventing me from entering the building that hosted the Mayor's 9/27/17 resource fair as that event was being conducted. That screenshot is from the video that I recorded of them with my cellphone on 9/27/17 at 12:15 that corresponds to the file named IMG_2210.mov". The fact that a Black male is shown putting his cell phone into a white plastic basket prior to entering the

building that hosted the Mayor's 9/27/17 resource fair strongly suggests that a metal detector was in use inside of the entrance to that building to have visitors subjected to a security screening inside of it. That further indicates that no valid justification existed to prevent me from attending the Mayor's 9/27/17 resource fair.



8.     The next screenshot shows a Twitter posting that was posted by the Twitter account that has the username of "@NYCMayor" that is used by someone on behalf of the Mayor. That Twitter posting was posted on the Internet on 9/27/17 at 5:49 pm and included a remark that was

a lie that stated that the Mayor's 9/27/17 resource fair was an "open house for anyone to come in

with their ideas." That Twitter posting is available on the Internet at

https://twitter.com/NYCMayor/status/913158767184932865.



9.        The next screenshot shows a Twitter posting that was posted by the Twitter account that

has the username of "@NYCDCA" that is used by someone on behalf of the New York City

Consumer And Worker Protection agency that is also known as "DCA" and the "New York City

Department of Consumer Affairs". That Twitter posting was posted on the Internet on 9/27/17 at

12:02 pm and included photographs of public records that agency made available to the public to

collect and otherwise inspect during the Mayor's 9/27/17 resource fair. That Twitter posting is

available on the Internet at https://twitter.com/NYCDCA/status/913071275408584704. If I had

been permitted to attend that resource fair, I would have sought to talk directly with that agency's commissioner as she attended that event to further follow-up on the conversation that I had with the Mayor on 3/15/17 during his tow hall meeting during which he told me that I should meet with that agency to have the City of New York make arrangements for me to be provided pro-bono legal representation for wage-theft matters.



10. Coincidentally, I was actively involved in litigation against NTT on 9/27/17 about wage-theft and other matters.

11. The next screenshot shows a Twitter posting that was posted by the Twitter account that has the username of "@CCRB_NYC" that is registered to the CCRB. That Twitter posting was posted on the Internet on 9/27/17 at 11:04 pm at the Internet address of https://twitter.com/CCRB_NYC/status/913056747618750464 and confirmed that one or more representatives of the CCRB would be in attendance at the Mayor's 9/27/17 resource fair for the

public to talk with. If I had been permitted to attend that resource fair, I would have certainly

talked with members of the CCRB to report valid complaints against all of the defendants that

this action concerns who were members of the NYPD between 9/26/17 and 9/28/17 in response

to illegal acts and omissions that they committed against me during that period that this

complaint addresses. In short, I would have sought to lawfully embarrass them in a very public

way during that public forum as I would have certainly expressed my complaints then and there

in a very outspoken way to allow many others to easily overhear me and perhaps ask me for

more information about them.



12.     The next screenshot shows a Twitter posting that was posted by the Twitter account that

has the username of "@MarissaEsque" that is registered to someone named Marissa Jackson

Sow. That Twitter posting was posted on the Internet on 9/27/17 at 11:40 am at the Internet

address of https://twitter.com/MarissaEsque/status/913065945110851584 and included a video

recording that was recorded by someone who attended the Mayor's 9/27/17 resource fair while

attending it that showed how it was being conducted as a traditional public forum.



**Facts about the Mayor's 9/28/17 Town Hall**

1.      Prior to trying to attend the Mayor's 9/28/17 town hall, I engaged in protected activity on

that date against HRA and Urban as I lawfully testified in an entirely truthful and frank manner

in the main chamber of City Hall on that date during the public hearing that the City Council's

Committee on General Welfare conducted. That hearing began at roughly 10:30 am and was recorded on video as a result of arrangements that the City Council made. That video recording is available on the Internet at https://councilnyc.viebit.com/player.php?hash=RD5c60yt7qfh. The City Council also arranged to have a somewhat accurate written transcript prepared from the testimony that was given during that hearing. That transcript is available as a PDF file on the Internet at https://legistar.council.nyc.gov/View.ashx?M=F&ID=5511243&GUID=1A1C0E67-02DF-4DD5-A542-3A479D4FE49C. The testimony that I gave during that hearing was broadcast over the Internet live as I testified in that hearing. My testimony in that hearing lasted less than 2 minutes and begins in that video at the elapsed time of 4 hours, 6 minutes, and 45 seconds. I mainly testified then about the fact that I was viciously assaulted on 7/2/16 in the living room of where I reside by being punched on my head 15 times primarily because of fraud and negligence by HRA, Urban, and SUS. I didn't then name Urban and SUS then as being the business partners of HRA to which I was then referring. The full transcript of my remarks during that testimony appears between pages 208 and 209 in the written transcript of that hearing. I also pointed out as I testified that the assault that I suffered on 7/2/16 was entirely foreseeable because my assailant then had previously tried to assault me in that same living room on 5/12/16. I further pointed that no one to whom I timely reported that earlier attempted assault took appropriate corrective action in response and that enabled the 7/2/16 actual assault.  I then wrapped up my testimony by sharply criticizing HRA, Mr. Banks, and HRA's business partners by stating that **a)** there were systemic problems in how HRA and its business partners operate that included bait-and-switch frauds they committed against me and **b)** Mr. Banks lies when he testifies. The next two screenshots are from the written transcript of that hearing that reflect my testimony in it somewhat inaccurately:

6          TOWAK KOMATSU:  Hi.  I'm Towak Komatsu.

7   I've testified previously at City Council meetings

8   before Mr. Levin and others.  One of the reasons why

9   I'm here today is really my conscience more than

10   anything else.  I live in supportive housing and

11   that's subsidized by HRA.  I was assaulted in my own

12   apartment on July 2nd of last year.  As a result of

13   that assault I sustained a concussion. It was

14   internally foreseeable.  I had a mentally unstable

15   roommate that tried assaulting me on May 12th.  I put

16   HRA partners on notice of that fact; however, they

17   refused to do anything.  So, because of that I took

18   15 punches to my left temple on July 2nd, and then I

19   preformed extraordinarily badly during a job

20   interview on August 18th, about three weeks after I

21   was diagnosed with a concussion.  So, if the roles

22   were reversed, if you took 15 punches to your head,

23   how well do you think you would perform when you're

24   being considered for a seat on the City Council?  And

25   if the legislation that is being discussed today is

```
 2   essentially to put teenager in the hands of HRA at
 3   the same time that they have all these systemic
 4   problems with existing shelters with their existing
 5   partners that are committing "bait and fraud"--
 6   sorry, "bait and switch frauds" with tenants in their
 7   supportive housing, then shouldn't those existing
 8   problems be addressed before a new group of people
 9   are thrusted into the hands of HRA that is already
10   negligent and whose commissioner repeatedly makes
11   fraudulent statements while testifying under oath?
12   That's pretty much all I have to say.
```

2.      I sought to attend the Mayor's 9/28/17 town hall for the same reasons that I sought to attend the Mayor's 9/26/17 town hall and the Mayor's 9/27/17 resource fair. I also sought to attend it to engage in protected whistleblowing against HRA, Mr. Banks, and HRA's business partners in relation to the testimony that I gave on 9/28/17 to the City Council. I further sought to attend it to engage in protected whistleblowing against the Defendants who prevented me from attending it through their acts and omissions against me that caused me to be unable to.

3.      The video recording that the Mayor's office arranged to be recorded of the Mayor's 9/28/17 town hall confirms that the Mayor began making remarks in it at the elapsed time of 12 minutes and 45 seconds during which he told the audience that its members could meet with the representatives of the agencies that comprised his administration at the end of that meeting in the room in which it was conducted to discuss whatever was on their mind. Those remarks by him confirmed that town hall was conducted as a traditional public forum in which a quorum that was

comprised of the Mayor and the heads of agencies that comprised his administration existed and

was conducting public business. That also established that that town hall meeting was subject to

New York State's Open Meetings Law. The next screenshot is from the elapsed time of 13

minutes and 31 seconds in that video as he correctly stated that someone would test him on his

claim that members of the public could meet with the heads of the agencies that comprise his

administration within the rooms in which he conducted town hall meetings at the end of those

meetings and his related claim in which he contended that those agency heads would stay there

all night for that purpose, if necessary. This entirely valid lawsuit against him and others counts

as such a clear test of that deceitful claim by him.



4.       The next screenshot shows a Twitter posting that was posted by the Twitter account that

has the username of "@CCRB_NYC" that is used by the CCRB and was posted on the Internet

on 9/27/17 at 3:20 pm . That Twitter posting is available on the Internet at

https://twitter.com/CCRB_NYC/status/913121305024659456 and indicated that one or more

representatives of the CCRB would attend the Mayor's 9/28/17 town hall.



**NYC CCRB**
@CCRB_NYC

Join us and @MMViverito @galeabrewer @EspaillatNY at the Q&A with @NYCmayor
at the Town Hall Meeting 9/28, 6–10pm 1833 Lexington Ave #Harlem

3:20 PM · Sep 27, 2017 · Twitter Web Client

5.      The next screenshot shows Defendants Mason, Gerola, and Ioveno as Mr. Mason and Mr.
Gerola turned their hands to have them face away from my cellphone's camera lens to try to
prevent me from being able to record them on video as they and others were illegally preventing
me from attending the Mayor's 9/28/17 town hall. This screenshot is from the video that I
recorded at 5:58 pm with my cellphone of them and others as I lawfully conducted myself while
waiting in line to be granted access to the building that hosted the Mayor's 9/28/17 town hall.
That video corresponds to the file named "IMG_22367(1).mov" that I discussed earlier in this
complaint. This screenshot reflects the elapsed time of 6 seconds in that video. Mr. Ioveno is
bald and appears on the far-right side of this screenshot.



6.      The next screenshot is from the elapsed time of 8 seconds in the video that I just
discussed and shows Defendants Miller, Mason, and Gerola as they were personally involved in

causing me to be prevented from attending the Mayor's 9/28/17 town hall partly by having refused to intervene on my behalf to uphold my constitutional rights as members of the Mayor's staff that included Defendant Gulotta refused to issue me an admission ticket that I needed to be able to enter the building that hosted the Mayor's 9/28/17 town hall as members of the Mayor's staff instead gave other members of the public around me such admission tickets instead while illegally discriminating against me.



7.      Although other members of the NYPD were then in that immediate area and were aware that I wasn't being issued an admission ticket for that town hall, they illegally didn't intervene on my behalf as well. As that night progressed and I continued to be prevented from attending that town hall, the following additional members of the NYPD were near me and among those who illegally didn't intervene on my behalf to attend that town hall while they were aware that I was being prevented from doing so at the same time that I was conducting myself in a lawful manner:

NYPD Officer Keith Dietrich (shield #: 5779, NYPD Officer John Doe1 9/28/17, NYPD

Officer John Doe2 9/28/17, NYPD Officer John Doe3 9/28/17, NYPD Officer Jane Doe1 9/28/17, NYPD Officer Jane Doe2 9/28/17, NYPD Officer Jane Doe3 9/28/17, NYPD Officer Jane Doe4 9/28/17

8.      As I stated earlier in this complaint, I recorded a video of Defendant Ringel at 7:34 pm on 9/28/17 as he stood in front of a sign for the Mayor's 9/28/17 town hall and was illegally refusing to intervene on my behalf to enable me to attend that town hall. The following is a screenshot from that video that shows him in it as he stood in front of that sign and the entrance to that building:



9.      The next screenshot is from the elapsed time of 17 seconds within the video named "IMG_2238.MOV" that I discussed earlier in this complaint. Defendants Dietrich, NYPD Officer John Doe2 9/28/17, and NYPD Officer Jane Doe1 9/28/17 appear in this screenshot at the entrance to the building that hosted the Mayor's 9/28/17 town hall. Mr. Dietrich is shown then as he appeared to be looking in the direction of sign about that town hall that was affixed to

a door as he had his right hand near his chin.



10.     Both as I waited in line with other members of the public on 9/28/17 in front of the

entrance to the building that hosted the Mayor's 9/28/17 town hall prior to and after 6 pm before

and as I was being illegally prevented from attending that town hall, I engaged in protected

whistleblowing against the Mayor's administration and the Mayor's NYPD security detail as I

told people near me that I had repeatedly been illegally prevented from attending earlier town

hall and resource fair meetings that the Mayor conducted and that I expected that I would be

treated in that same way by being illegally prevented from attending the Mayor's 9/28/17 as I

would again be conducting myself in an entirely lawful manner. I also told those near me that the

Mayor's administration was doing business with a company that was subjecting me to wage-theft that the public was forced to pay for because it was a government contract. I was referring to NTT in this regard. I also told them then that I had ongoing litigation against HRA then as I was then referring to my HRA lawsuit.

11.    After the Mayor's 9/28/17 town hall ended, the New York Post published a news article on the Internet at https://nypost.com/2017/09/28/residents-tossed-out-of-de-blasio-town-hall-over-zoning-spat/ that is entitled "Residents Tossed from De Blasio Town Hall over 'Racist' Zoning Feud" and was written by Rich Calder. In short, that news article reported that people who lawfully voided criticism against the Mayor while they attended that town hall from within the room in which it was conducted were coerced by security personnel to leave that town hall in retaliation for their criticism against the Mayor that was protected speech. I had a Fourteenth Amendment and First Amendment right to attend that town hall in the room in which it was conducted as that occurred and to assertively order the Mayor and those security personnel in no uncertain and sugarcoated terms to fuck off and immediately cease and desist from those illegal acts against those critics in accordance with my U.S. Navy enlistment oath to protect and defend the U.S. Constitution against all enemies.

12.    The next screenshot shows an e-mail message that I sent on 9/29/17 at 6:40 pm to an e-mail address that the NYPD's IAB uses. In that e-mail message, I truthfully and accurately reported that Defendant Gerola was personally involved in having illegally prevented me from attending the Mayor's 9/26/17 town hall, the Mayor's 9/27/17 resource fair, and the Mayor's 9/28/17 town hall. While sending that e-mail message, I included Rich Calder as a blind courtesy copy e-mail recipient while he then worked for the New York Post that didn't report anything about what I reported in that e-mail message.

From: Towaki Komatsu <towaki_komatsu@yahoo.com>
Subject: Re: NYPD INTERNAL AFFAIRS
Date: September 29, 2017 at 6:40:36 PM EDT
To: IABCMDCNTR <IABCMDCNTR@nypd.org>

Hi,

Attached is a video I recorded of NYPD Officer Gerola of the Mayor's security detail on 9/26 outside of the public town hall meeting on East 56th Street in Manhattan.

After recording it, he refused to let me into the Mayor's public town hall meeting on that date, a "Resource Fair" public meeting the Mayor's office held on the following day, and another public town hall meeting that the Mayor held yesterday in East Harlem.



Gerola at 9-26-17
town hall.m4v
6.8 MB

Regards,

Towaki Komatsu

On Sep 29, 2017, at 11:31:51 AM, IABCMDCNTR <IABCMDCNTR@nypd.org> wrote:

To: Mr. Komatsu,

As you requested, I'm sending you an E-mail so that you can forward the "YOUTUBE" link.

Respectfully,

Internal Affairs Bureau

13.     To close out this section, it is worth pointing out that the New York City 2017 general elections were held in November of 2017 and likely heavily factored into the decisions that were made to commit the illegal acts and omissions against me on 9/26/17, 9/27/17, and 9/28/17 in relation to my efforts to have lawfully attended the town hall and resource fair meetings that the Mayor conducted on those dates to minimize, marginalize, and murder my First Amendment and Fourteenth Amendment right to lawfully assassinate the character of the Mayor, members of his NYPD security detail, Mr. Banks, other personnel of HRA, Mr. Clynes, New York State Supreme Court Judge Nancy Bannon as she was then running for re-election, HRA's business partners, and others that I have discussed in this complaint in order to protect the Mayor's re-election interests and the interests of others in violation of the Hatch Act and other applicable laws. The timing of those illegal acts truly matters.

## CAUSES OF ACTION

**CLAIM #1:**   **Violations of the First Amendment right of access to a public forum, to protest in a public forum, to record audio and video recordings in a public forum, to take photographs in a public forum, to receive information in a public forum, to have the opportunity to talk with journalists in a public forum, to distribute whistleblowing literature in a public forum, to engage in lawful assembly in a public forum, to engage in freedom of expression in a public forum, to otherwise engage in whistleblowing and criticism of government officials in a public forum, to engage in expressive association, and to petition government officials in a public forum for redress of grievances**

**(Against Defendants City of New York, Gerola, Nieves, Mason, Ringel, Carrion, Miller, Atcheson, Gulottta, Redmond, Ramos, Phillips, Redmond, Keck, Baez)**

1.   I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.   I also incorporate by reference as though fully set forth herein the decision that was issued on 5/19/20 in *Dunn v. City of Fort Valley,* No. 19-cv-287(TES) (M.D. Ga. May 19, 2020) due to relevant findings it contains about First Amendment rights in public forums, supervisory liability, and other pertinent things.

3.   My right to lawfully protest in a public forum in a manner that doesn't disrupt how that public forum is conducted while valid time, place, and manner restrictions do not exist to prohibit such protest in a public forum was acknowledged the following remark that Judge Schofield expressed in the decision that she issued in *Gonzalez v. City of New York*, No. 14 Civ. 7721 (LGS) (S.D.N.Y. Sept. 29, 2016):

> "Two branches of First Amendment claims are relevant to the present case: (a) interference with the right to protest in a public forum and (b) retaliation for exercising First Amendment rights."

4.   More importantly, my right to lawfully protest in a public forum in a manner that doesn't

disrupt how that public forum is conducted while valid time, place, and manner restrictions do not exist to prohibit such protest in a public forum was confirmed by the following excerpt from *Occupy Nashville v. Haslam*, 949 F. Supp. 2d 777 (M.D. Tenn. 2013):

> "a state may not restrict First Amendment rights, absent valid time, place, or manner restriction. *See Dean*, 354 F.3d at 551; *Galvin v. Hay*, 374 F.3d 739, 751 (9th Cir.2004) (**"As speakers may generally control the presentation of their message by choosing a location for its importance to the meaning of their speech, speakers may ordinarily— absent a valid time, place and manner restriction—do so in a public forum."**); *Childs v. Dekalb Cnty., Ga.*, 286 Fed.Appx. 687, 693-94 (11th Cir.2008) (denying qualified immunity and stating that, based on Supreme Court precedent, "police officers have known for decades that protestors present on public property have a First Amendment right to peacefully express their view, in the absence of narrowly tailored ordinances restricting the time, place, or manner of the speech")."

(boldface formatting added for emphasis)

5. Due to the facts and circumstances that I have discussed at length and with sufficient specificity in this pleading, I have decisively established that the Defendants identified above that this claim concerns were personally involved in having willfully, callously, and wantonly illegally violated my First Amendment rights in relation to my efforts to have attended the town hall and resource fair meetings that the Mayor conducted on 9/26/17, 9/27/17, and 9/28/17 from within the rooms in which they were conducted as they were conducted, shortly before they began, and shortly after they ended.

6. I have further established that the defendants that this claim concerns violated my First Amendment right of access to public records that were made available in the buildings that hosted the Mayor's 9/26/17, 9/27/17, and 9/28/17 town hall and resource fair meeting that were made available strictly to the members of the public who were permitted to attend those public forums from within the rooms in which they were conducted.

7. Ms. Ramos is also liable for this cause of action due to her role as co-conspirator in that conspiracy as she illegally deceived Ms. Durkin on 6/28/17 and 6/29/17 in e-mail messages

that she sent to Ms. Durkin about me and the illegal acts that continued to be illegally committed against me on 9/26/17, 9/27/17, 9/28/17 and prevented me from being able to lawfully attend the town hall and resource fair meetings that the Mayor conducted on 9/26/17, 9/27/17, and 9/28/17 from within the rooms in which they were conducted as they were conducted, shortly before they began, and shortly after they ended. Ms. Ramos sent those e-mail messages to Ms. Durkin about me in furtherance of a fraudulent scheme to try to illegally cover-up such illegal acts and omissions that were committed against me. Relevant findings that support this assertion about Ms. Ramos' liability exist in the decisions that were issued in _US v. Blackmon_, 839 F.2d 900 (2d Cir. 1988), _Escalera v. Samaritan Village Men's Shelter_, No. 17-cv-4691 (CM) (S.D.N.Y. Sept. 27, 2019), _US v. Basey_, 816 F.2d 980 (5th Cir. 1987), _Vann v. City of New York_, 72 F.3d 1040 (2d Cir. 1995), _Pangburn v. Culbertson_, 200 F.3d 65 (2d Cir. 1999), and _Dunn v. City of Fort Valley_, No. 19-cv-287(TES) (M.D. Ga. May 19, 2020).

**CLAIM #2:      First Amendment Retaliation and Viewpoint Discrimination**

**(Against Defendants City of New York, Gerola, Nieves, Mason, Atcheson, Ringel, Miller, Ramos, Phillips, de Blasio, O'Neill, Redmond, Carrion, Baez)**

1. I incorporate by reference the information presented in the preceding paragraphs as though fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #3:                Violations of the Fourth Amendment**

**(Against Defendants City of New York, Gerola, Nieves, Mason, Atcheson, Ringel, Miller, Gulotta, Ramos, Phillips, Jane Doe3 9/26/1 , Redmond, Carrion, Keck, Baez, Dietrich, NYPD Officer John Doe2 9/28/17)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #4:**          <u>**Violations of the Fifth Amendment**</u>

**(Against Defendants City of New York, Gerola, Nieves, Mason, Atcheson, Ringel, Miller, Gulotta, Ramos, Phillips, Redmond, Carrion, Keck, Baez, Dietrich, NYPD Officer John Doe2 9/28/17)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #5:**          <u>**Violations of the Fourteenth Amendment**</u>
<u>**Substantive Due Process Rights**</u>

**(Against Defendants City of New York, Gerola, Nieves, Mason, Lance, Santana, Atcheson, Ringel, Miller, Gulotta, Ramos, Phillips, Jane Doe3 9/26/17, Ridener, John Doe1 Tablet 9/26/17, de Blasio, O'Neill, Redmond, Carrion, Keck, Baez, Ioveno, Dietrich, NYPD Officer John Doe1 9/26/17, NYPD Officer John Doe2 9/26/17, NYPD Officer Jane Doe1 9/26/17, NYPD Officer Jane Doe2 9/26/17, NYPD Officer Jane Doe3 9/26/17, NYPD Officer John Doe1 9/27/17, NYPD Officer John Doe2 9/27/17, NYPD Officer John Doe3 9/27/17, NYPD Officer John Doe4 9/27/17, NYPD Officer John Doe1 9/28/17, NYPD Officer John Doe2 9/28/17, NYPD Officer John Doe3 9/28/17, NYPD Officer Jane Doe1 9/28/17, NYPD Officer Jane Doe2 9/28/17, NYPD Officer Jane Doe3 9/28/17, NYPD Officer Jane Doe4 9/28/17)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #6:**         <u>Violations of Procedural Due Process</u>

**(Against Defendants City of New York, Gerola, Nieves, Mason, Lance, Santana, Atcheson, Ringel, Miller, Gulotta, Ramos, Phillips, Jane Doe3 9/26/17, Ridener, John Doe1 Tablet 9/26/17, de Blasio, O'Neill, Redmond, Carrion, Keck, Baez, Ioveno, Dietrich, NYPD Officer John Doe1 9/26/17, NYPD Officer John Doe2 9/26/17, NYPD Officer Jane Doe1 9/26/17, NYPD Officer Jane Doe2 9/26/17, NYPD Officer Jane Doe3 9/26/17, NYPD Officer John Doe1 9/27/17, NYPD Officer John Doe2 9/27/17, NYPD Officer John Doe3 9/27/17, NYPD Officer John Doe4 9/27/17, NYPD Officer John Doe1 9/28/17, NYPD Officer John Doe2 9/28/17, NYPD Officer John Doe3 9/28/17, NYPD Officer Jane Doe1 9/28/17, NYPD Officer Jane Doe2 9/28/17, NYPD Officer Jane Doe3 9/28/17, NYPD Officer Jane Doe4 9/28/17)**

1.  I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.  The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #7:**         <u>Violations of the Fourteenth Amendment<br>Equal Protection Rights</u>

**(Against Defendants City of New York, Gerola, Nieves, Mason, Lance, Santana, Atcheson, Ringel, Miller, Gulotta, Ramos, Phillips, Jane Doe3 9/26/17, Ridener, John Doe1 Tablet 9/26/17, de Blasio, O'Neill, Redmond, Carrion, Keck, Baez, Ioveno, Dietrich, NYPD Officer John Doe1 9/26/17, NYPD Officer John Doe2 9/26/17, NYPD Officer Jane Doe1 9/26/17, NYPD Officer Jane Doe2 9/26/17, NYPD Officer Jane Doe3 9/26/17, NYPD Officer John Doe1 9/27/17, NYPD Officer John Doe2 9/27/17, NYPD Officer John Doe3 9/27/17, NYPD Officer John Doe4 9/27/17, NYPD Officer John Doe1 9/28/17, NYPD Officer John Doe2 9/28/17, NYPD Officer John Doe3 9/28/17, NYPD Officer Jane Doe1 9/28/17, NYPD Officer Jane Doe2 9/28/17, NYPD Officer Jane Doe3 9/28/17, NYPD Officer Jane Doe4 9/28/17)**

1.  I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2.  The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #8:**         <u>Violations of the Fourteenth Amendment<br>Prohibitions Against Selective-Enforcement</u>

**(Against Defendants City of New York, Gerola, Nieves, Mason, Lance, Santana, Atcheson, Ringel, Miller, Gulotta, Ramos, Phillips, Jane Doe3 9/26/17, Ridener, John Doe1 Tablet 9/26/17, de Blasio, O'Neill, Redmond, Carrion, Keck, Baez, Ioveno, Dietrich, NYPD Officer John Doe1 9/26/17, NYPD Officer John Doe2 9/26/17, NYPD Officer Jane Doe1 9/26/17, NYPD Officer Jane Doe2 9/26/17, NYPD Officer Jane Doe3 9/26/17, NYPD Officer John Doe1 9/27/17, NYPD Officer John Doe2 9/27/17, NYPD Officer John Doe3 9/27/17, NYPD Officer John Doe4 9/27/17, NYPD Officer John Doe1 9/28/17, NYPD Officer John Doe2 9/28/17, NYPD Officer John Doe3 9/28/17, NYPD Officer Jane Doe1 9/28/17, NYPD Officer Jane Doe2 9/28/17, NYPD Officer Jane Doe3 9/28/17, NYPD Officer Jane Doe4 9/28/17)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #9:**        <u>Failure to Intervene in Violation of the Fourteenth Amendment</u>

**(Against Defendants City of New York, Gerola, Nieves, Mason, Lance, Santana, Atcheson, Ringel, Miller, Gulotta, Ramos, Phillips, Jane Doe3 9/26/17, Ridener, John Doe1 Tablet 9/26/17, de Blasio, O'Neill, Brewer, Redmond, Carrion, Clynes, Keck, Baez, Ioveno, Dietrich, NYPD Officer John Doe1 9/26/17, NYPD Officer John Doe2 9/26/17, NYPD Officer Jane Doe1 9/26/17, NYPD Officer Jane Doe2 9/26/17, NYPD Officer Jane Doe3 9/26/17, NYPD Officer John Doe1 9/27/17, NYPD Officer John Doe2 9/27/17, NYPD Officer John Doe3 9/27/17, NYPD Officer John Doe4 9/27/17, NYPD Officer John Doe1 9/28/17, NYPD Officer John Doe2 9/28/17, NYPD Officer John Doe3 9/28/17, NYPD Officer Jane Doe1 9/28/17, NYPD Officer Jane Doe2 9/28/17, NYPD Officer Jane Doe3 9/28/17, NYPD Officer Jane Doe4 9/28/17)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #10:**        <u>Failure to Train and Supervise</u>

**(Against Defendants City of New York, Gerola, Nieves, Mason, Lance, Santana, Ringel,**

**Miller, Ramos, Phillips, Ridener, de Blasio, O'Neill, Brewer, Redmond, Carrion, Ioveno, Dietrich)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #11:**        **Violation of the New York State's Open Meetings Law**

**(Against Defendants City of New York, Gerola, Nieves, Mason, Lance, Santana, Atcheson, Ringel, Miller, Gulotta, Ramos, Phillips, Jane Doe3 9/26/17, Ridener, John Doe1 Tablet 9/26/17, de Blasio, O'Neill, Brewer, Redmond, Carrion, Keck, Baez, Ioveno, Dietrich, NYPD Officer John Doe1 9/26/17, NYPD Officer John Doe2 9/26/17, NYPD Officer Jane Doe1 9/26/17, NYPD Officer Jane Doe2 9/26/17, NYPD Officer Jane Doe3 9/26/17, NYPD Officer John Doe1 9/27/17, NYPD Officer John Doe2 9/27/17, NYPD Officer John Doe3 9/27/17, NYPD Officer John Doe4 9/27/17, NYPD Officer John Doe1 9/28/17, NYPD Officer John Doe2 9/28/17, NYPD Officer John Doe3 9/28/17, NYPD Officer Jane Doe1 9/28/17, NYPD Officer Jane Doe2 9/28/17, NYPD Officer Jane Doe3 9/28/17, NYPD Officer Jane Doe4 9/28/17)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #12:**                          **Abuse of Process**

**(Against Defendants City of New York, Gerola, Nieves, Mason, Lance, Santana, Atcheson, Ringel, Miller, Gulotta, Ramos, Phillips, Jane Doe3 9/26/17, Ridener, John Doe1 Tablet 9/26/17, de Blasio, O'Neill, Brewer, Redmond, Carrion, Clynes, Keck, Baez, Ioveno, Dietrich, NYPD Officer John Doe1 9/26/17, NYPD Officer John Doe2 9/26/17, NYPD Officer Jane Doe1 9/26/17, NYPD Officer Jane Doe2 9/26/17, NYPD Officer Jane Doe3 9/26/17, NYPD Officer John Doe1 9/27/17, NYPD Officer John Doe2 9/27/17, NYPD Officer John Doe3 9/27/17, NYPD Officer John Doe4 9/27/17, NYPD Officer John Doe1 9/28/17, NYPD Officer John Doe2 9/28/17, NYPD Officer John Doe3 9/28/17, NYPD Officer Jane Doe1 9/28/17, NYPD Officer Jane Doe2 9/28/17, NYPD Officer Jane Doe3 9/28/17, NYPD Officer Jane Doe4 9/28/17)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #13:**                    <u>**Deliberate Indifference**</u>

**(Against Defendants City of New York, Gerola, Nieves, Mason, Lance, Santana, Atcheson, Ringel, Miller, Gulotta, Ramos, Phillips, Jane Doe3 9/26/17, Ridener, John Doe1 Tablet 9/26/17, de Blasio, O'Neill, Brewer, Redmond, Carrion, Clynes, Keck, Baez, Ioveno, Dietrich, NYPD Officer John Doe1 9/26/17, NYPD Officer John Doe2 9/26/17, NYPD Officer Jane Doe1 9/26/17, NYPD Officer Jane Doe2 9/26/17, NYPD Officer Jane Doe3 9/26/17, NYPD Officer John Doe1 9/27/17, NYPD Officer John Doe2 9/27/17, NYPD Officer John Doe3 9/27/17, NYPD Officer John Doe4 9/27/17, NYPD Officer John Doe1 9/28/17, NYPD Officer John Doe2 9/28/17, NYPD Officer John Doe3 9/28/17, NYPD Officer Jane Doe1 9/28/17, NYPD Officer Jane Doe2 9/28/17, NYPD Officer Jane Doe3 9/28/17, NYPD Officer Jane Doe4 9/28/17)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #14:**     <u>**Fraudulent Misrepresentation and Fraudulent Inducement**</u>

**(Against Defendants City of New York, Gerola, Nieves, Mason, Lance, Santana, Atcheson, Ringel, Miller, Gulotta, Ramos, Phillips, Jane Doe3 9/26/17, Ridener, John Doe1 Tablet 9/26/17, de Blasio, O'Neill, Brewer, Redmond, Carrion, Clynes, Keck, Baez, Ioveno, Dietrich, NYPD Officer John Doe1 9/26/17, NYPD Officer John Doe2 9/26/17, NYPD Officer Jane Doe1 9/26/17, NYPD Officer Jane Doe2 9/26/17, NYPD Officer Jane Doe3 9/26/17, NYPD Officer John Doe1 9/27/17, NYPD Officer John Doe2 9/27/17, NYPD Officer John Doe3 9/27/17, NYPD Officer John Doe4 9/27/17, NYPD Officer John Doe1 9/28/17, NYPD Officer John Doe2 9/28/17, NYPD Officer John Doe3 9/28/17, NYPD Officer Jane Doe1 9/28/17, NYPD Officer Jane Doe2 9/28/17, NYPD Officer Jane Doe3 9/28/17, NYPD Officer Jane Doe4 9/28/17)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set

forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I

   presented in this complaint.

## CLAIM #15:        <u>Violation of New York State General Business Law 349</u>

**(Against Defendants City of New York, Gerola, Nieves, Mason, Lance, Santana, Atcheson, Ringel, Miller, Gulotta, Ramos, Phillips, Jane Doe3 9/26/17, Ridener, John Doe1 Tablet 9/26/17, de Blasio, O'Neill, Brewer, Redmond, Carrion, Clynes, Keck, Baez, Ioveno, Dietrich, NYPD Officer John Doe1 9/26/17, NYPD Officer John Doe2 9/26/17, NYPD Officer Jane Doe1 9/26/17, NYPD Officer Jane Doe2 9/26/17, NYPD Officer Jane Doe3 9/26/17, NYPD Officer John Doe1 9/27/17, NYPD Officer John Doe2 9/27/17, NYPD Officer John Doe3 9/27/17, NYPD Officer John Doe4 9/27/17, NYPD Officer John Doe1 9/28/17, NYPD Officer John Doe2 9/28/17, NYPD Officer John Doe3 9/28/17, NYPD Officer Jane Doe1 9/28/17, NYPD Officer Jane Doe2 9/28/17, NYPD Officer Jane Doe3 9/28/17, NYPD Officer Jane Doe4 9/28/17)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set

   forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I

   presented in this complaint.

## CLAIM #16:                    <u>Negligence</u>

**(Against Defendants City of New York, Gerola, Nieves, Mason, Lance, Santana, Atcheson, Ringel, Miller, Gulotta, Ramos, Phillips, Jane Doe3 9/26/17, Ridener, John Doe1 Tablet 9/26/17, de Blasio, O'Neill, Brewer, Redmond, Carrion, Clynes, Keck, Baez, Ioveno, Dietrich, NYPD Officer John Doe1 9/26/17, NYPD Officer John Doe2 9/26/17, NYPD Officer Jane Doe1 9/26/17, NYPD Officer Jane Doe2 9/26/17, NYPD Officer Jane Doe3 9/26/17, NYPD Officer John Doe1 9/27/17, NYPD Officer John Doe2 9/27/17, NYPD Officer John Doe3 9/27/17, NYPD Officer John Doe4 9/27/17, NYPD Officer John Doe1 9/28/17, NYPD Officer John Doe2 9/28/17, NYPD Officer John Doe3 9/28/17, NYPD Officer Jane Doe1 9/28/17, NYPD Officer Jane Doe2 9/28/17, NYPD Officer Jane Doe3 9/28/17, NYPD Officer Jane Doe4 9/28/17)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set

   forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #17:**                 <u>**Municipal Liability**</u>

**(Against Defendant City of New York)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. Defendant City of New York is liable for this claim due to the information that I presented in this complaint.

**CLAIM #18:**     <u>**Intentional and Negligent Infliction of Emotional Distress**</u>

**(Against Defendants City of New York, Gerola, Nieves, Mason, Lance, Santana, Atcheson, Ringel, Miller, Gulotta, Ramos, Phillips, Jane Doe3 9/26/17, Ridener, John Doe1 Tablet 9/26/17, de Blasio, O'Neill, Brewer, Redmond, Carrion, Clynes, Keck, Baez, Ioveno, Dietrich, NYPD Officer John Doe1 9/26/17, NYPD Officer John Doe2 9/26/17, NYPD Officer Jane Doe1 9/26/17, NYPD Officer Jane Doe2 9/26/17, NYPD Officer Jane Doe3 9/26/17, NYPD Officer John Doe1 9/27/17, NYPD Officer John Doe2 9/27/17, NYPD Officer John Doe3 9/27/17, NYPD Officer John Doe4 9/27/17, NYPD Officer John Doe1 9/28/17, NYPD Officer John Doe2 9/28/17, NYPD Officer John Doe3 9/28/17, NYPD Officer Jane Doe1 9/28/17, NYPD Officer Jane Doe2 9/28/17, NYPD Officer Jane Doe3 9/28/17, NYPD Officer Jane Doe4 9/28/17)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #19:**          <u>**Conspiracy to Violate Civil Rights and**</u>
<u>**Cover-Up Such Abuse**</u>

**(Against Defendants City of New York, Gerola, Nieves, Mason, Lance, Santana, Atcheson, Ringel, Miller, Gulotta, Ramos, Phillips, Jane Doe3 9/26/17, Ridener, John Doe1 Tablet 9/26/17, de Blasio, O'Neill, Brewer, Redmond, Carrion, Clynes, Keck, Baez, Ioveno,**

**Dietrich, NYPD Officer John Doe1 9/26/17, NYPD Officer John Doe2 9/26/17, NYPD Officer Jane Doe1 9/26/17, NYPD Officer Jane Doe2 9/26/17, NYPD Officer Jane Doe3 9/26/17, NYPD Officer John Doe1 9/27/17, NYPD Officer John Doe2 9/27/17, NYPD Officer John Doe3 9/27/17, NYPD Officer John Doe4 9/27/17, NYPD Officer John Doe1 9/28/17, NYPD Officer John Doe2 9/28/17, NYPD Officer John Doe3 9/28/17, NYPD Officer Jane Doe1 9/28/17, NYPD Officer Jane Doe2 9/28/17, NYPD Officer Jane Doe3 9/28/17, NYPD Officer Jane Doe4 9/28/17)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #20:**                     <u>**Unjust Enrichment**</u>

**(Against Defendants City of New York, Gerola, Nieves, Mason, Lance, Santana, Atcheson, Ringel, Miller, Gulotta, Ramos, Phillips, Jane Doe3 9/26/17, Ridener, John Doe1 Tablet 9/26/17, de Blasio, O'Neill, Brewer, Redmond, Carrion, Clynes, Keck, Baez, Ioveno, Dietrich, NYPD Officer John Doe1 9/26/17, NYPD Officer John Doe2 9/26/17, NYPD Officer Jane Doe1 9/26/17, NYPD Officer Jane Doe2 9/26/17, NYPD Officer Jane Doe3 9/26/17, NYPD Officer John Doe1 9/27/17, NYPD Officer John Doe2 9/27/17, NYPD Officer John Doe3 9/27/17, NYPD Officer John Doe4 9/27/17, NYPD Officer John Doe1 9/28/17, NYPD Officer John Doe2 9/28/17, NYPD Officer John Doe3 9/28/17, NYPD Officer Jane Doe1 9/28/17, NYPD Officer Jane Doe2 9/28/17, NYPD Officer Jane Doe3 9/28/17, NYPD Officer Jane Doe4 9/28/17)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #21:**                     <u>**Public and Private Nuisance**</u>

**(Against Defendants City of New York, Gerola, Nieves, Mason, Lance, Santana, Atcheson, Ringel, Miller, Gulotta, Ramos, Phillips, Jane Doe3 9/26/17, Ridener, John Doe1 Tablet 9/26/17, de Blasio, O'Neill, Brewer, Redmond, Carrion, Clynes, Keck, Baez, Ioveno, Dietrich, NYPD Officer John Doe1 9/26/17, NYPD Officer John Doe2 9/26/17, NYPD Officer Jane Doe1 9/26/17, NYPD Officer Jane Doe2 9/26/17, NYPD Officer Jane Doe3**

**9/26/17, NYPD Officer John Doe1 9/27/17, NYPD Officer John Doe2 9/27/17, NYPD Officer John Doe3 9/27/17, NYPD Officer John Doe4 9/27/17, NYPD Officer John Doe1 9/28/17, NYPD Officer John Doe2 9/28/17, NYPD Officer John Doe3 9/28/17, NYPD Officer Jane Doe1 9/28/17, NYPD Officer Jane Doe2 9/28/17, NYPD Officer Jane Doe3 9/28/17, NYPD Officer Jane Doe4 9/28/17)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

**CLAIM #22:**                    **Defamation and stigma-plus**

**(Against Defendant Gerola)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. Defendant Gerola is liable for this claim due to the remarks that he made about me to members of the public on 9/26/17 during the video recording that I recorded of him at 6:23 pm that I discussed in this complaint.

**CLAIM #23:**       **Violations of the Hatch Act (see 5 U.S.C. §1502(a)(1))**

**(Against Defendants City of New York, Gerola, Nieves, Mason, Atcheson, Ringel, Miller, Gulotta, Ramos, Phillips, Jane Doe3 9/26/17, Ridener, John Doe1 Tablet 9/26/17, de Blasio, O'Neill, Brewer, Redmond, Carrion, Clynes, Keck, Baez, Ioveno, Dietrich, NYPD Officer John Doe2 9/28/17)**

1. I incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

2. The defendants that this claim concerns are liable for it due to the information that I presented in this complaint.

## DEMAND FOR A JURY TRIAL

1. I demand a trial by jury in this action on each and every one of my damage claims.

## PRAYER FOR RELIEF

WHEREFORE, this Court should accept jurisdiction over this entire matter and grant me additional relief by:

1. Causing this Court to exercise supplemental jurisdiction over my X1 lawsuit, my X2 lawsuit, my X3 lawsuit, and my X4 lawsuit, then consolidate them with this action that will lead this action to control how all of that litigation is conducted. This request stems from a common nucleus of operative fact and is pursuant to FRCP Rule 42.

2. Empaneling a jury to hear and decide this case strictly on its merits.

3. Granting me the following additional relief against the defendants individually and jointly:

   a. Compensation for violations of my constitutional rights, defamation, abuse of process, nuisance, unjust enrichment, wire fraud, and fraudulent misrepresentations as well as pain, suffering, mental anguish, and humiliation that I experienced due to the illegal acts and omissions by the defendants.

   b. Declaratory, injunctive, and equitable relief through the issuance of an order that voids the results of the 2017 New York City government elections for the jobs of New York City Mayor, New York City Councilmember, Bronx District Attorney, Queens Borough President, New York City Comptroller, and New York City Public Advocate primarily because it is reasonable to believe that results of those elections were materially tainted by voter fraud, voter suppression, and whistleblower retaliation in violation of 5 U.S.C. §1502(a)(1) that occurred partly by illegally:

      i. Preventing whistleblowers from attending public forums that the Mayor conducted

with them and were partly used as campaign events to attract various types of
support from voters and prospective voters.

    ii.  Segregating and discriminating against whistleblowers at such public forums.

c.  Declaratory, injunctive, and equitable relief in accordance with findings expressed in
_Capitol Records, Inc. v. Thomas-Rasset_, 692 F.3d 899 (8th Cir. 2012) through the
issuance of an order that enjoins Defendant City's personnel and agencies from
continuing to commit illegal acts and omissions against me that violate my rights.

d.  Further declaratory, injunctive, and equitable relief through the immediate issuance of an
order that:

    i.  Prohibits all members of the NYPD from deliberately making any physical
contact with me while I am conducting myself in a lawful manner.

    ii.  Requires all members of the Mayor's NYPD security detail to not come within
10 feet from me while they are on-duty as members of the Mayor's NYPD
security detail and I am conducting myself in a lawful manner, unless I
explicitly grant consent for that to occur.

    iii.  Requires all members of the Mayor's CAU to not come within 10 feet from me
while I am conducting myself in a lawful manner and they are on-duty as
members of the Mayor's CAU, unless I explicitly grant consent for that to
occur.

    iv.  Prohibits Defendant City's personnel from illegally interfering with my ability
to attend public forums that the Mayor may conduct from within the room in
which he does so as he does so.

    v.  Prohibits Defendant City's personnel from illegally interfering with the rights

that other people have to lawfully attend public forums that the Mayor conducts
that may allow others and I to exercise our First Amendment right to observe,
hear, and enjoy lawful speech and other expression that such people may
engage in to criticize the Mayor and others during them.

vi.   Prohibits Defendant City's personnel from illegally interfering with the First
Amendment and Fifth Amendment rights that people have to **a)** bring literature
and signs with them into rooms in which the Mayor conducts public forums, **b)**
lawfully distribute such literature during those meetings without disrupting
those meetings, **c)** distribute such literature and otherwise show it and signs in
the rooms in which the Mayor conducts such meetings before they begin and
after they end, and **d)** Keep such literature and signs with them as the Mayor
conducts such public forums.

vii.  Requires Defendant City to grant access to public forums that the Mayor
conducts inside of buildings based on the order in which members of the public
line up directly outside of those buildings shortly before those meetings begin to
be granted access to the room in which the Mayor conducts such public forums
on those dates.

viii. Prohibits Defendant City from allowing its personnel to prevent members of the
public from attending public forums that the Mayor conducts inside of buildings
from within the rooms in which he does so while sufficient seating is available
in those rooms.

ix.   Orders Defendant City to immediately cause all members of the NYPD who are
present in areas where the Mayor conducts public town hall meetings, public

resource meetings, public hearings, and press conferences that the public may
observe to wear body-cameras that are always on and always recording both
audio and video recordings.

x.   Orders Defendant City of New York to provide all audio and video recordings
from such body-cameras in unedited and non-redacted form along with their
audit trail records to allow for an independent forensic analysis within 24 hours
of any adverse encounter that occurs between **a)** members of the public and **b)**
the members of the NYPD wearing those body-cameras.

xi.   Orders Defendant City to immediately **a)** cause clear audio recordings to be
recorded of all verbal communications that members of the NYPD have while
they are on-duty as members of the NYPD and present in areas where the
Mayor conducts public town hall meetings, public resource meetings, public
hearings, and press conferences that the public may observe.

xii.   Orders Defendant City of New York to provide all such audio recordings in
unedited and non-redacted form that includes information that identifies the date
and time when those recordings began to be recorded as well as the speakers
heard in those communications that are personnel of Defendant City within 24
hours of any adverse encounter that occurs between **a)** members of the public
and **b)** the members of the NYPD heard in those audio recordings while they are
being recorded.

xiii.   Orders Defendant City to immediately cause all other electronic
communications (such as e-mail messages, cell phone text messages, and
encrypted communications) that are engaged in by those who are part of the

Mayor's NYPD security detail to be recorded and preserved for possible use in litigation by people that they commit illegal acts and omissions against.

xiv. Orders Defendant City to provide all such electronic communications within 24 hours in unedited and non-redacted form that includes information that identifies the date and time when those communications occurred and the identities of those who engaged in them to members of the public who have adverse encounters with members of the Mayor's NYPD security detail to the extent that those communications concern those adverse encounters.

xv. Orders Defendant City to provide me copies of all communications that its personnel have had about me since 2/1/16 in unedited and non-redacted form. This includes, but is not limited to all of the following:

1) All communications that have taken place by using personally-owned devices, personal e-mail accounts, personal encrypted messaging accounts, and personal cell phone plans as well as by using computers and other devices that are owned or leased by Defendant City and e-mail, cell phone, and encrypted messaging accounts that are administered and/or controlled by Defendant City.

e. Further declaratory, injunctive, and equitable relief through the immediate issuance of an order that:

i. Orders Defendant City to immediately cause the CCRB and DOI to be provided all video recordings within 24 hours after a complaint is reported to them about illegal acts and omissions that are committed by members of the NYPD and other personnel of Defendant City that are recorded by video security cameras

that Defendant City controls. This includes, but is not limited to illegal acts that are related to public forums that the Mayor conducts and occur on the dates and at the locations where the Mayor conducts them.

ii.   Further orders Defendant City to make those video recordings available within 24 hours in unedited and non-redacted form to those who report such illegal acts and omissions to the CCRB and DOI.

iii.   Orders that the following Defendants are also required to be fired at the earliest possible instead of practical or convenient time from the jobs that they hold with Defendant City of New York largely pursuant to Section 1116 of the New York City Charter in response to the illegal acts and omissions that they committed against me in relation to my efforts to have lawfully attended the town hall and resource fair meetings that the Mayor conducted on 9/26/17, 9/27/17, and 9/28/17 from within the rooms in which they were conducted as they were conducted and that they are prohibited from being employed by Defendant City again:

> Defendants Gerola, Nieves, Mason, Lance, Santana, Atcheson, Ringel, Miller, Gulotta, Ramos, Phillips, Jane Doe3 9/26/17, Ridener, John Doe1 Tablet 9/26/17, de Blasio, O'Neill, Brewer, Redmond, Carrion, Clynes, Keck, Baez, Ioveno, Dietrich, NYPD Officer John Doe1 9/26/17, NYPD Officer John Doe2 9/26/17, NYPD Officer Jane Doe1 9/26/17, NYPD Officer Jane Doe2 9/26/17, NYPD Officer Jane Doe3 9/26/17, NYPD Officer John Doe1 9/27/17, NYPD Officer John Doe2 9/27/17, NYPD Officer John Doe3 9/27/17, NYPD Officer John Doe4 9/27/17, NYPD Officer John Doe1 9/28/17, NYPD Officer John Doe2 9/28/17, NYPD Officer John Doe3 9/28/17, NYPD Officer Jane Doe1 9/28/17, NYPD Officer Jane Doe2 9/28/17, NYPD Officer Jane Doe3 9/28/17, and NYPD Officer Jane Doe4 9/28/17

iv.   Defendants Gerola, Nieves, Mason, Lance, Santana, Atcheson, Ringel, Miller, Gulotta, Ramos, Phillips, Jane Doe3 9/26/17, Ridener, John Doe1 Tablet

9/26/17, de Blasio, O'Neill, Brewer, Redmond, Carrion, Clynes, Keck, Baez, Ioveno, Dietrich, NYPD Officer John Doe1 9/26/17, NYPD Officer John Doe2 9/26/17, NYPD Officer Jane Doe1 9/26/17, NYPD Officer Jane Doe2 9/26/17, NYPD Officer Jane Doe3 9/26/17, NYPD Officer John Doe1 9/27/17, NYPD Officer John Doe2 9/27/17, NYPD Officer John Doe3 9/27/17, NYPD Officer John Doe4 9/27/17, NYPD Officer John Doe1 9/28/17, NYPD Officer John Doe2 9/28/17, NYPD Officer John Doe3 9/28/17, NYPD Officer Jane Doe1 9/28/17, NYPD Officer Jane Doe2 9/28/17, NYPD Officer Jane Doe3 9/28/17, and NYPD Officer Jane Doe4 9/28/17 to immediately and fully reimburse the City of New York with pre-judgment and post-judgment interest for the total value of pay and benefits that they received that directly correspond to the length of time during which they were involved in the illegal acts and omissions that were committed against me in relation to my efforts to have lawfully attended the town hall and resource fair meetings that the Mayor conducted on 9/26/17, 9/27/17, and 9/28/17 from within the rooms in which they were conducted as they were conducted.

v.   Restrains Defendant City's personnel and agencies from continuing to commit illegal acts and omissions against me that violate my rights, especially in all areas that are public forums.

vi.  Declares that the ban that the Mayor announced that prohibits large gatherings of people in New York City and protests from being conducted is overly broad, pretextual, void, and unenforceable largely because it impermissibly violates core First Amendment rights as well as Fifth Amendment and Fourteenth

Amendment rights that pertain to due process, selective-enforcement, equal protection, and liberty.

vii.   Further declares that though it may possibly be advisable to wear a face mask in New York City, no one is required to do so partly because doing so impedes the flow of oxygen to healthy people and impermissibly infringes upon the First Amendment rights that people have to engage in freedom of expression, such as by having people see them smiling, expressing affection by kissing, being able to yawn without having to wear a face mask, and having other facial expressions that they make seen by others. Although it is potentially dangerous to one's health to engage in a wide variety of other activities that include driving a car because of the possibility that a drunk driver may pass by and having a drink in a bar because there is a possibility to breathe in second-hand smoke, bans on driving and visiting bars have not been imposed due to such risk factors.

viii.   Similarly declares that the social-distancing restrictions in New York State are overly broad, void, and unenforceable for the same reasons just discussed and declares that those restrictions have been selectively-enforced by the NYPD in violation of the Fourteenth Amendment.

f.   Declaratory relief by declaring that the town hall and resource fair meetings that the Mayor conducted on 9/26/17, 9/27/17, and 9/28/17 were public forums that were subject to New York State's Open Meetings Law and that all actions that were taken as a result of those public forums having been conducted are void pursuant to Section 107 of New York State's Public Officer Law because those public forums were conducted in violation

of New York State's Open Meetings Law.

g.  Injunctive and equitable relief by ordering Defendant City to immediately provide me the following in unedited and non-redacted form:

    i.  Copies of all video recordings and photographs that were recorded and otherwise taken by Defendant City's personnel inside of the buildings that hosted the town hall and resource fair meetings that the Mayor conducted on 9/26/17, 9/27/17, and 9/28/17 between the time when **a)** the first member of the public entered those buildings on the dates when the Mayor conducted those public forums within them in relation to attending those public forums and **b)** everyone who attended those public forums exited those buildings on the dates when they were conducted in them.

    ii.  Copies of all records that have been in the possession of Defendant City's personnel that pertain to the deliberations, planning, coordination, execution, and cover-up that took place in regards to my having been illegally prevented from attending the town hall and resource fair meetings that the Mayor conducted on 9/26/17, 9/27/17, and 9/28/17.

    iii.  Copies of all records that have been in the possession of Defendant City's personnel that describe staff assignments that were issued to the members of the Mayor's staff, the Mayor's CAU, the members of the Mayor's NYPD security detail, and the other members of the NYPD who were assigned work to do in relation to the town hall and resource fair meetings that the Mayor conducted on 9/26/17, 9/27/17, and 9/28/17.

    iv.  Copies of all records that have been in the possession of Defendant City's

personnel that consist of the names and contact information for the members

of the public who registered to attend the town hall and resource fair meetings

that the Mayor conducted on 9/26/17, 9/27/17, and 9/28/17 as well as the

names and contact information for the journalists who attended the town hall

and resource fair meetings that the Mayor conducted on 9/26/17, 9/27/17, and

9/28/17.

h.  Injunctive and equitable relief by ordering Defendant City of New York to immediately

provide me all video recordings as an ".avi", ".mp4", or ".mov" computer file that were

recorded on 2/19/20 by all video security cameras that were installed in the school and

are controlled by DOE that hosted the town hall meeting that the Mayor conducted on

that date between the times when the first member of the public was allowed into that

school for the purpose of attending that town hall until everyone who attended that town

hall exited that school.

i.  Compensation for all costs and attorney fees that are related to my pursuit of this civil

action.

j.  Equitable and injunctive relief that authorizes me and others that I may ask to help me to

paint, write, or draw any message or image of any size indefinitely throughout New York

City without needing pre-approval from anyone on any public street, sidewalk, public

passageway, concourse, and park indefinitely by using resources that will be provided to

me by the City of New York for that purpose.

k.  Equitable and injunctive relief that orders the City of New York to cause its NYPD to

accord whatever messages and images that I may paint, write, or draw in public areas

throughout New York City to receive equal law-enforcement protection that is accorded

to Black Lives Matter signs on streets in New York City, especially the one located in front of Trump Tower in Manhattan.

l.   An award of damages against Defendants City of New York, Gerola, Nieves, Mason, Lance, Santana, Atcheson, Ringel, Miller, Gulotta, Ramos, Phillips, Jane Doe3 9/26/17, Ridener, John Doe1 Tablet 9/26/17, de Blasio, O'Neill, Brewer, Redmond, Carrion, Clynes, Keck, Baez, Ioveno, Dietrich, NYPD Officer John Doe1 9/26/17, NYPD Officer John Doe2 9/26/17, NYPD Officer Jane Doe1 9/26/17, NYPD Officer Jane Doe2 9/26/17, NYPD Officer Jane Doe3 9/26/17, NYPD Officer John Doe1 9/27/17, NYPD Officer John Doe2 9/27/17, NYPD Officer John Doe3 9/27/17, NYPD Officer John Doe4 9/27/17, NYPD Officer John Doe1 9/28/17, NYPD Officer John Doe2 9/28/17, NYPD Officer John Doe3 9/28/17, NYPD Officer Jane Doe1 9/28/17, NYPD Officer Jane Doe2 9/28/17, NYPD Officer Jane Doe3 9/28/17, and NYPD Officer Jane Doe4 9/28/17 pursuant to 18 U.S.C. §1986 for having not intervened on my behalf in relation to my effort to have attended the town hall and resource fair meetings that the Mayor conducted on 9/26/17, 9/27/17, and 9/28/17 from within the rooms in which they were conducted as they were conducted.

m.   An award of damages against Defendants Gerola, Nieves, Mason, Lance, Santana, Atcheson, Ringel, Miller, Gulotta, Ramos, Phillips, Jane Doe3 9/26/17, Ridener, John Doe1 Tablet 9/26/17, de Blasio, O'Neill, Brewer, Redmond, Carrion, Clynes, Keck, Baez, Ioveno, Dietrich, NYPD Officer John Doe1 9/26/17, NYPD Officer John Doe2 9/26/17, NYPD Officer Jane Doe1 9/26/17, NYPD Officer Jane Doe2 9/26/17, NYPD Officer Jane Doe3 9/26/17, NYPD Officer John Doe1 9/27/17, NYPD Officer John Doe2 9/27/17, NYPD Officer John Doe3 9/27/17, NYPD Officer John Doe4 9/27/17, NYPD

Officer John Doe1 9/28/17, NYPD Officer John Doe2 9/28/17, NYPD Officer John Doe3 9/28/17, NYPD Officer Jane Doe1 9/28/17, NYPD Officer Jane Doe2 9/28/17, NYPD Officer Jane Doe3 9/28/17, NYPD Officer Jane Doe4 9/28/17 pursuant to New York State General Business Law §349 for deception in relation to my efforts to have attended the town hall and resource fair meetings that the Mayor conducted on 9/26/17, 9/27/17, and 9/28/17 from within the rooms in which they were conducted as they were conducted and how those defendants conducted themselves as criminal accomplices instead of the law-enforcement personnel that they technically were on 9/26/17, 9/27/17, and 9/28/17.

n.  An award of punitive damages for all of my claims set forth in this pleading.

o.  An award of pre-judgment and post-judgment interest.

p.  Declares that the Mayor's 9/26/17 town hall was illegally conducted inside of a public school.

q.  Equitable and injunctive relief that orders the City of New York to remove all obstructions from public sidewalks, public streets, public parks, and public concourses that include traditional public forums within 24 hours that the NYPD and Mayor's office has set up and otherwise allowed to exist on them and to not setup such obstructions again in such public areas nor otherwise allow them to exist on and in them without prior approval by this Court. The existence of such obstructions on sidewalks violates New York City Administrative Code §16-122(b). Also, such obstructions impermissibly infringe upon and otherwise burden the First Amendment rights that people have to lawfully walk, bicycle, and otherwise freely move about and congregate in such areas – especially on sidewalks and in parks that are traditional public forums – while some who seek to do so may have various disabilities that include blindness and physical ailments.

Allowing such obstructions to exist on public sidewalks, in public streets, in public parks, and on public concourses in New York City is clearly inequitable and quite literally an insult to injury with respect to my claims in this action that largely concern illegal acts and omissions that were committed against me while no pandemic existed in New York City that prevented me from lawfully attending public forums. It is patently inequitable to my countervailing interest and ability to lawfully exercise my constitutional rights on public sidewalks and in parks to be curtailed by the NYPD and Mayor's administration during the ongoing Coronavirus pandemic to accommodate such things as outdoor dining after the NYPD and Mayor's administration flagrantly, willfully, criminally, and repeatedly violated my constitutional rights to lawfully attend public forums inside of buildings that the Mayor and other government officials conducted. In the same way that I took a risk that I would be illegally prevented from lawfully attending such public forums that the Mayor conducted while no pandemic existed in New York City as I visited the sites where those public forums were conducted on the dates when they were conducted, the owners of restaurants and other businesses that would benefit by being able to expand their operations on public sidewalks and in public parks in New York City at the expense of my First Amendment, Fifth Amendment, and Fourteenth Amendment rights to freely make use of all areas on such public sidewalks and public parks that are traditional public forums took a risk that circumstances beyond their control would possibly arise that would materially and repeatedly disrupt their ability to operate their businesses. A reasonable, equitable, and creative accommodation may be made for owners of businesses that wish to conduct their operations outside by having this Court order the immediate bulldozing of City Hall; the NYPD headquarters, precincts, and

training facilities, and Gracie Mansion to allow such businesses to promptly expand their operations on account of the fact that those locations have been the primary sanctuaries of mobsters dressed as government officials and members of the NYPD that committed illegal acts and omissions that rigged and stole the 2017 New York City government elections through voter suppression, voter fraud, whistleblower retaliation, and terrorism that persists against New Yorkers.

r.   Equitable relief that will have this Court adopt the practice in <u>USA v. Donziger</u>, No. 11-cv-0691(LAK)(RWL)(S.D.N.Y.) to similarly appoint private prosecutors to commence criminal prosecutions against the defendants that this action concerns in response to criminal acts and omissions that they committed and/or condoned against me that are addressed in this complaint to remedy the fact that prosecutors have negligently refused to do so.

s.   Declares that New York City has proven to be and remains an anarchist jurisdiction largely because of illegal acts and omissions that the defendants in this action criminally perpetrated in New York City in relation to the constitutional rights that people have to lawfully attend and participate in public forums in New York City.

t.   Such other, further, and different relief as the interests of justice and equity may require.

Dated:        New York, New York
              September 25, 2020

                                        From,

                                        s_/Towaki Komatsu

*Plaintiff, Pro Se*
802 Fairmount Pl., Apt. 4B
Bronx, NY 10460
(347) 872-1205
Towaki_Komatsu@yahoo.com

# Exhibit A



**Council Member Daniel R. Garodnick**
with Manhattan Borough President Gale A. Brewer
U.S. Representative Carolyn B. Maloney
State Senator Liz Krueger
& Assembly Member Dan Quart
present

WORKING FOR COUNCIL DISTRICT 4



**TOWN**HALL

- with -

# Mayor Bill de Blasio

Tuesday, September 26th at 7pm
DOORS OPEN AT 6:00PM AND CLOSE AT 7:30PM

High School of Art & Design
245 East 56th St. New York, NY 10022

**Space is limited - please RSVP by September 25th at noon**



TOWN HALL CO-SPONSORS
Manhattan Community Boards 5, 6, and 8
Waterside Tenants Association
Stuyvesant Town-Peter Cooper
Village Tenants Association
Lenox Hill Neighborhood House

Mayor's Community
Affairs Unit

**TO RSVP:**
**www.nyc.gov/cd4townhall**
Or Email: ManhattanTownHall@cityhall.nyc.gov
Or Call: (212) 788-2781
ACCESS PROVIDED:

Please contact us if you have any additional accessibility needs.




The Office of the Mayor and
Office of the Manhattan Borough President

*cordially invite you to:*

# CITY HALL IN YOUR BOROUGH:
# CITY RESOURCE FAIR

**Wednesday September 27th, 2017** |
**10:30 A.M. to 2:30 P.M.**

**Malcolm X and Dr. Betty Shabazz
Memorial and Educational Center**
3940 Broadway, New York, NY 10032

Meet with top city commissioners and senior staff during scheduled office hours to address your questions and concerns.

Meet with top representatives from City Hall, Department of Transportation, Mayor's Office of Immigrant Affairs, Department of Finance, NYPD, Economic Development Corporation, Department of Education, Department of Health, Small Business Services, Department of Parks and Recreation, and more.

**Sign Up Here to Attend:** www.nyc.gov/manhattan or by calling 212-748-0281





AS A PART OF

**NYC Council Speaker Melissa Mark-Viverito**
with Borough President Gale A. Brewer
U.S. Representative Adriano Espaillat
State Senators Brian Benjamin & José M. Serrano
& Assembly Member Robert Rodriguez
present

WORKING FOR **COUNCIL DISTRICT 8**



# TOWN HALL

- with -

# Mayor Bill de Blasio

**THURSDAY,** September 28TH at 7pm
DOORS OPEN AT 6:00PM AND CLOSE AT 7:30PM

Johnson Community Center
1833 Lexington Avenue, New York, NY 10029
(between 112th & 115th Streets)

**Space is limited - please RSVP by September 26th at 5PM**



Mayor's Community
Affairs Unit

TOWN HALL CO-SPONSORS

**MANHATTAN COMMUNITY BOARD 11**
**EAST HARLEM** Community Alliance
**23RD, 25TH & PSA5** Precinct Councils
**MANHATTAN NORTH** Council of Presidents

**TO RSVP**
**Visit:** www.nyc.gov/cd8townhall
**Email:** townhallrsvp@cityhall.nyc.gov
**or Call:** (212) 788-8526

ACCESS PROVIDED:

Please contact us if you have any additional accessibility needs.

# **Exhibit B**



OverviewNewsMayor's BioOfficials

## Join us for the Manhattan City Hall in Your Borough:
## City Resource Fair!

**Wednesday September 27th, 2017**

**12:00 P.M. to 2:30 P.M.**

**The Malcolm X and Dr. Betty Shabazz Memorial and Educational Center**

3940 Broadway, New York, NY 10032

**We look forward to seeing you there!**



**Meet with top city commissioners and senior staff during scheduled office hours to address your questions and concerns.**